**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**ERIN TONKYRO,**
**DANA STRAUSER,**
**KARA MITCHELL-DAVIS,** **Case No.:8:16-cv-2419-t-36AEP**
**Plaintiffs,**

**v.**

**ROBERT A. MCDONALD, *Secretary,***
**DEPARTMENT OF VETERANS AFFAIRS,**
**Defendant.**
**_______________________________________/**

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**
**INJUNCTIVE RELIEF REQUESTED**

Plaintiffs, Erin Tonkyro, Dana Strauser, and Kara Mitchell-Davis complain of Defendant, Robert A. McDonald, Secretary, Department of Veterans Affairs as follows:

1. This court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, including 42 U.S.C. § 2000e-16.

2. Plaintiff has complied with all jurisdictional prerequisites to action under Title VII of the Civil Rights Act of 1964 as amended including having exhausted their administrative remedies.

3. James A. Haley VA Healthcare System (Haley VAHCS) is a Veterans Administration (VA) hospital and medical center with related services. It is broken down into various services. Kathleen Fogarty (Fogarty) was Director at material times until 2015. Joe D. Battle is the current Director. Edward Cutolo (Cutolo) is Chief of Staff. Stephen Stenzler (Stenzler) is the Chief of the Radiology Service. Joseph Parise (Parise) is Assistant Radiology Chief. John Bennett (Bennett) is currently the Administrative Officer of Radiology and was Plaintiffs second line supervisor as the Chief Radiology Technologist from 2008 to 2012. Jeri

Graham (Graham) was the Plaintiffs' direct supervisor until April 2012 and is currently Plaintiffs' second line supervisor and is the Chief Technologist in the Radiology Department. Carolyn Eubanks was the Plaintiffs' first line supervisor from January 2013 until November 2013. Mario De Leon (De Leon) was Plaintiffs' first line supervisor prior to Scott Petrillo (Petrillo) being hired at the beginning of October 2014. Dr. Jorge DeVillasante was the Chief of Radiology prior to Dr. Stenzler. Each of the employees of the VA as described herein were employed by the Defendant and were acting within the course and scope of his or her employment with the Defendant at the time of the conduct described herein. Each of the employees was there during relevant times of this complaint.

4. Erin Tonkyro (Tonkyro) is a Medical Instrument/Ultrasound Technologist (MIT) at the Haley VA. She has worked at VA in her position for over thirteen (13) years.

5. Kara "Nikki" Mitchell-Davis (Davis) has been a Lead Medical Instrument Technologist (GS-10) since February 2014 at the Haley VA and prior to that was an MIT/ Ultrasound Technologist (GS-9) since November 2008.

6. Dana "Michelle" Strauser (f/k/a Pryor) (hereinafter Strauser) has been in her position as an MIT/Ultrasound Technologist (GS-9) for over seven (7) years at the Haley VA.

7. The Defendant has engaged in sexual harassment of several female employees and a pattern and practice of retaliation for engaging in EEO activity including opposing sexual harassment, the filing of informal and formal Equal Employment Opportunity ("EEO") claims, participation in this EEO activity or participation as a witness on behalf of other parties' EEO claims. This retaliation for EEO activity went on throughout all material times.

8. Tonkyro was a victim of sexual harassment and opposed sexual harassment against herself and several other female employees. She filed informal EEO complaints on

May1, 2012 and March 28, 2014. She filed formal EEO complaints on June 12, 2012 and July 9, 2014. She filed her present EEO complaint on July 9, 2014. She added like or related claims and amendments on November 14, 2012, which were accepted for investigation on November 19, 2012 and on September 24, 2014, which were accepted for investigation on October 1, 2014. She has fully participated throughout the processing of those complaints and the processing of complaints by others, *inter alia,* by providing testimony, documents and deposing witnesses including individuals set forth in Paragraph 3. Tonkyro filed her present formal EEO complaint on July 9, 2014 and more than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c). Tonkryo also filed another informal complaint on September 22, 2015 and filed her formal compliant on November 3, 2015. More than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).

9. Davis was a victim of sexual harassment and opposed sexual harassment against herself and several other female employees. She filed informal EEO complaints on April 30, 2012 and April 1, 2014. She filed formal EEO complaints on June 8, 2012 and July 7, 2014. She added like or related claims and amendments on November 14, 2012, which were accepted for investigation on November 19, 2012, and on November 20, 2014, which were accepted for investigation on November 25, 2014. She has fully participated throughout the processing of those complaints and the processing of complaints by others, *inter alia,* by providing testimony, documents and deposing witnesses including individuals set forth in Paragraph 3. Davis filed her present formal EEO complaint on July 7, 2014 and more than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c). Davis also filed another informal complaint on September 23, 2015 and filed her formal compliant on

October 28, 2015. More than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).

10. Strauser was a victim of sexual harassment and opposed sexual harassment against herself and several other female employees. She filed informal EEO complaints on May 1, 2012 and March 28, 2014. She filed formal EEO complaints on June 8, 2012 and June 15, 2014. She has fully participated throughout the processing of those complaints and the processing of complaints by others, *inter alia*, by providing testimony, documents and deposing witnesses including individuals set forth in Paragraph 3. Strauser filed her formal EEO complaint on July 11, 2014 and more than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c). Strauser also filed another informal complaint on February 10, 2016 and filed her formal compliant on April 4, 2016. More than 180 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).

11. On May 1, 2015 Plaintiffs' Tonkyro and Davis also moved to amend their original formal EEO complaints. More than 360 days have passed since that time.

12. The Plaintiffs' claims arise out of the same transaction or occurrence or series of transactions or occurrences and the claims have common questions of fact and law.

## GENERAL ALLEGATIONS

13. Beginning in 2008 Plaintiffs and others began to suffer from sexual harassment and a hostile work environment caused by supervisory management officials. After numerous complaints to upper management about these issues without meaningful action, EEO complaints were filed in May 2012. An Administrative Investigative Board was commenced by management and an investigation was conducted into the behaviors reported. On July 9, 2012 an

Administrative Investigation Board (AIB) investigation was completed regarding allegations of sexual harassment, creating a hostile work environment, and conduct unbecoming of a federal employee within the Ultrasound Department. The AIB committee was composed of all Haley VA employees other than one individual, despite concerns voiced by the Plaintiffs to Director Fogarty and the Chief of Staff, Cutolo that some members of the AIB possessed a bias. The AIB investigation was not a good faith investigation into the allegations of sexual harassment. It nevertheless concluded that "appropriate administrative action" needed to be taken against Dr. Parise and Bennett. Appropriate administrative action was not taken. On November 14, 2012, Plaintiffs were notified that Bennett and Graham were placed back into their supervisory roles. On January 17, 2013 Plaintiffs were notified of Dr. Parise's reinstatement as Assistant Chief of Radiology and John Bennett's new position was a promotion to Administrative Officer of Radiology. Director Fogarty was responsible for making the final decision based on the AIB findings regarding what appropriate administrative actions would or would not be taken.

14. In May 2012, Plaintiffs, Erin Tonkyro, Dana Strauser and Kara Mitchell-Davis, had filed complaints with the EEO as a result of the sexual harassment and hostile work environment. Given the lack of good faith in the AIB, their cases proceeded through discovery depositions of John Bennett and Kathleen Fogarty as well as the plaintiffs and a former ultrasound technologist, Megan Green who resigned because of sexual harassment. Those cases involved most of the same management officials that are involved in this case. Their cases settled in September 2013. The cases settled for damages, attorneys fees, and other affirmative relief.

15. During the periods of the AIB and the Plaintiffs' EEO cases and subsequently, management officials spread rumors and made denigrating remarks about the Plaintiffs to others inside and outside the VA. These included demeaning their work ethic; falsely describing their

conduct; and disparaging their motives and reputations. The Plaintiffs were portrayed as falsely claiming harassment, only seeking money and people who should be avoided.

16. Certain officials also threatened the Plaintiffs and others. Dr. Parise threatened various doctors that his lawyers would get any statements they made and he would see them. They would know how management felt by the actions that followed. On or about June 12 or 13, 2013, a meeting occurred in Dr. Parise's office. Present at the meeting were Dr. Stenzler, Chief of Radiology, Dr. Parise, Dr. Hersh, Dr. Cay, Dr. Brenner and Dr. Andrews. Dr. Parise told the doctors that he would not go down to the Ultrasound Department because if he saw them (the sexually harassed technologists) he would "put his F****** foot down their throats". No one spoke up in defense of the ultrasound technologists. Dr. Parise and Bennett often postured hostility when encountering the Plaintiffs. Strauser received threatening phone calls from Haley VAHCS by a male claiming to be an attorney and threatening to file a law suit against Strauser on behalf of Dr. Parise's wife, Dominique. Strauser also received harassing telephone calls from Mrs. Parise on two occasions. Bennett told an outside vendor to only send female representatives to demonstrate equipment because the ultrasound technologists had issues with men. Strauser and Davis received baseless written counselings.

17. Since the September 2013 settlement, investigations which were supposed to take place into certain matters referenced above have either not been conducted in good faith or at all. Witnesses that have come forward have had their workload complicated and subjected to baseless fact findings and management lead Administrative Investigative Boards (AIBs). Assertions that Parise and Bennett would be taken out of the Plaintiffs' chains of command have not actually occurred. The Plaintiffs have continued to suffer from a hostile work environment based on reprisal and conduct of the type alleged has continued. The Plaintiffs have: been

denied career advancement and promotions; subjected to privacy breaches; threatened and intimidated; and denied compressed work schedules, among other things.

18. Following the September 2013 settlement, information which is confidential and Privacy Act protected was placed on the VA's intranet available to all other employees and supervisors. This included information disclosing the fact of the Plaintiffs' EEOs, documents that were supposed to have been removed or expunged from their files as part of the settlement and other documents which placed the Plaintiffs in a bad light. Similar conduct has been found to evidence retaliation. *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010). Discovery has shown that the Privacy Office found that this was protected information and ordered an investigation.

19. The Defendant put Bennett in charge of its investigation into Privacy Act breaches. Discovery has also shown that Bennett and Stenzler provided false information to the Privacy Office. The report back to the Privacy Office was under the signature of Service Chief, Stenzler. However, depositions reflect that the report was prepared by Bennett. The report reflects that ADPAC coordinator Kevin Miller was designated to investigate the radiology S:/Drive for improper material or unsecured sensitive information. The report states: "Upon investigation, it was revealed that: the sensitive information referred to did in fact reside on the radiology S:/Drive." Miller testified that while assigned the investigation, he found no information on the S:/Drive. On information and belief, evidence will show it had already been moved elsewhere. The report to the Privacy Office next maintains that ". . . it must be deduced that the outgoing Supervisor of [MRI and ultrasound, Carolyn Eubanks] placed the information on the S:/Drive for the service to retain." Mr. Miller denied discovering that as a result of his investigation. The report further states that "no person currently working in the service had

knowledge of these files being transferred to the S:/Drive as no notification to any employee was established." Mr. Miller did not make that finding as a result of his investigation.

20. The report also contains a remediation plan which could not be verified through discovery. The redress, preservation and protection of the Plaintiffs' Privacy Rights has not occurred.

21. The Plaintiffs' hostile work environment has continued with new like and related hostile events. Members of management have used various means to undermine the Plaintiffs' ability to perform their jobs. Management has hired supervisors over ultrasound who have no knowledge or experience with ultrasound procedures or techniques. They have also hired incompetent technologists to work in Ultrasound and placed the health and safety of veterans in danger while ignoring prior decisions by ultrasound technologists and hiring panels rejecting the hiring of these technologists. Tumors, pregnancies, thyroid nodules, and general or miscellaneous pathologies have been missed, but management failed to address these issues. This places the veterans, lead technologist Davis and other ultrasound technologists in jeopardy. Open positions have also not been filled. Davis's ability to perform through her employees is being impaired. Other technologists have experienced increased stress from having to carry an extra load. This provides management with a pretextual basis to take actions against her and other technologists or deny them advancement.

22. Management has not only hired technologists for the Ultrasound Department who do not know how to perform ultrasound or who have difficulty following the orders given by radiologists or other physicians to check various organs, but one of those technologists has engaged in continuous sexual harassment which is offensive to other ultrasound technologists. Efforts to get Petrillo, Stenzler or others to address each of these issues have failed. These

actions by management have aggravated the hostile work environment that the Plaintiffs are experiencing.

23. Both Davis and Tonkyro have been denied positions for which they were the most qualified. In addition to statements by Dr. Stenzler to Tonkyro made two months after the September, 2013 settlement agreement that management would not allow her to be a supervisor after her EEO activity, management has made statements to other employees that none of the technologists who filed EEOs would be allowed to advance.

24. Tonkyro, Davis and Strauser have been subjected to the same or substantially similar hostile work environments based upon reprisal (EEO activity) as set forth below.

25. Tonkyro has been subjected to a hostile work environment based upon reprisal (EEO activity) including in the following ways:

a. On August 23, 2013 Bennett glared in a threatening manner at Tonkyro when he walked past her.

b. On September 13, 2013, Dr. Stephen Stenzler (Stenzler) approached Tonkyro and asked to speak to her in private. He stated to Tonkyro that an MRI/Ultrasound supervisor position was about to become available and that she should apply and that she would make a great leader. On December 4, 2013, Stenzler stated that after providing his recommendations to the Director and Dr. Cutolo, they both stated that would not occur and that the Director wanted an external party to be hired for the position.

c. On January 9, 2014, management (Stenzler, Bennett and Parise) modified the job qualifications for the MRI/Ultrasound supervisor position in such a manner to ensure Plaintiffs would not be qualified. They modified it from previously being open to

Diagnostic Radiology Technologists (DRTs) and Ultrasound Technologists to just DRTs only, thus excluding Plaintiffs.

d. January 20, 2014, Tonkyro was denied the opportunity to apply for the MRI/Ultrasound supervisor position. Only DRTs, not MITs, could apply for this job.

e. On or around February 12, 2014, management knowingly allowed privacy act protected information relating to Tonkyro, Davis and Strauser relating to their prior EEO complaint, records, and written counseling, as well as HIPAA information to be stored on the “S-drive,” which was available to view on the computers of other supervisors and hospital employees. This included information which was supposed to be removed from official files as a result of the September 2013 Settlement Agreement.

f. On or about February 12, 2014, Plaintiffs were notified by another staff employee that confidential information concerning them and their EEOs were on the facility intranet accessible by other employees and supervisors. This placed them in a bad light. Later, several technologists claimed to have knowledge of the Plaintiffs’ settlement agreement and made statements denigrating the Plaintiffs. This did not come from the Plaintiffs and must have come from supervisors trying to create hostility between the Plaintiffs and others because of benefits the Plaintiffs were said to have received.

g. On March 23, 2014, Tonkyro felt threatened and intimidated when Parise entered her work area and glared at her.

h. On March 26, 2014 Plaintiffs had a meeting with Stenzler to discuss that they felt uncomfortable with Parise being in their department and informed Stenzler that

Parise was in the department unaccompanied. Stenzler stated during the meeting "you girls will never get past this," referencing their prior EEO complaints.

i. On or about August 27, 2014, another staff employee made a disparaging comment about female Ultrasound Technologists after allegedly accessing information about the Plaintiffs' prior EEO complaint on a hard drive.

j. In September of 2014, Tonkyro, who was frustrated by the treatment she received at the main hospital, transferred to the Primary Care Annex (PCA). On several other occasions Tonkyro had issues with obtaining supplies for her work location in regards to preparing the facility for patient care. Tonkyro's performance was based in large part upon providing that care. Bennett was responsible for making sure Tonkyro had the items needed for the start-up of the PCA.

k. A PCA lead tech position has been approved by upper management since June 27, 2014. That involves a GS increase from a GS-9 to a GS-10, and increased pay. However, Radiology management has refused to provide the lead technologist position to Tonkyro. Tonkyro has been provided a number of excuses for why the position which has been approved by upper management for two years has not been made available to her.

l. On January 26, 2015 during a meeting, MRI/Ultrasound Supervisor, Petrillo, and Chief of Radiology, Stenzler, informed the Ultrasound staff that there was going to be a new position posted for an Ultrasound Supervisor. Petrillo had no ultrasound experience or training. He stated that he would no longer be the supervisor once the position was filled and that the position would be posted within a week. The position was not posted. Both Davis and Tonkyro inquired about the position with

Petrillo over a two month time period and his response to both of them was he had no knowledge of the new position.

m. On March 31, 2015 in a department meeting, Petrillo informed the Ultrasound technologists that the supervisor position was not going to be posted and/or filled. It was decided by upper management that the greater need was for a technologist that can scan patients. Once Tonkyro and Davis showed interest in this upper-level position, management decided that it was no longer needed or available in an effort to retaliate against the Plaintiffs by prohibiting their advancement within the department. This instance was similar to when the MRI/Ultrasound position was posted in January 2014 for DRT's to apply, thus excluding the ultrasound technologists from the possibility of advancing into an upper-level management position. In addition, this instance is similar to a course previously used by the same management officials named in Plaintiffs' prior EEO complaints where management played favorites by dangling the Lead Ultrasound Technologist position in front of Plaintiffs and used it as a tool in creating a sexually harassing and hostile work environment.

n. After the PCA lead and ultrasound supervisor issues were made a part of the Plaintiffs' latest EEOs, the ultrasound supervisor's position was posted. An ultrasound supervisor position was posted in April 2016. However, management will not allow any of the three ultrasound technologists to obtain this position which still remains unfilled. In March 2016 Petrillo offered the PCA lead to Davis, not Tonkyro. Petrillo knew Davis would not want to take that position. Davis refused. On June 2, 2016, Tonkyro asked Stenzler why she was not being offered the PCA lead position. Stenzler admitted authorizing Petrillo to offer the PCA lead to Davis as a lateral move, but

pretextually told Tonkyro he was now working out organizational chart issues. Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised. Only Davis applied, but she has not received the position. Among the pretextual reasons Davis was given was the need for organization chart changes. During the June 2, 2016 conversation, however, Stenzler, who knows Tonkyro has reported this as part of her EEO claims, told Tonkyro that the Ultrasound supervisor position was "meant for" her and he was surprised that she had not applied for that position. He made this statement despite knowing Tonkyro had already reported his statement that the Director and Dr. Cutolo would not let her have that position as part of her EEO claims. ¶24 b. In or around July 2016 Tonkyro was also told that management had told others that neither Davis, her, or Strauser would ever receive these positions. Rather, someone from outside would be selected as supervisor and make it difficult on them. Management is creating continued disruption by allowing technologists to know positions could be available, but not allowing them to obtain them while offering pretextual excuses instead and conveying conflicting information.

o. From the summer of 2016 until the present several of these issues have continued and new threats have been made. The ultrasound lead and supervisors' positions have not been filled and despite requests, no one will offer an understandable reason.

p. On August 25, 2016, Davis, Tonkryo, and Stauser met with Battle to discuss their apprehensions regarding the apparent decline of patient care and safety, as

well as threatening and retaliatory practices and deteriorating morale within their service. The next day, Dr. Osman Cay, who was acting chief while Stranzler was out of town and Dr. Parise was off, spoke with some Radiology staff members about it. This conversation included the fact that they met with Battle the day before, and how this was perceived as going out their "chain of command" by other Radiology staff members. A few days later Parise began to tell other radiologists that the "problem" ultrasound girls were going to be fired because of the "in-fighting" within the department. On September 14, 2016, the Plaintiffs disclosed this threating information to Battle by email. He responded on September 19, 2016 and stated that he would not tolerate retribution and that he did not know how Dr. Cay got the information about the meeting. No further follow-up has occurred.

q. It was brought to Davis's attention by Dr. Deborah Bailey, a staff radiologist at James A Haley, that Parise made derogatory gestures and comments about Davis during the October 2016 Radiologist meeting in front of the Chief of Radiology, Stenzler, as well as other physicians. Stanzler stood up in front of all the Radiologists at this meeding and told them that Davis was about to have her baby and that she would be out on maternity leave for four months Parise then yelled out "Yes" and at the same time made an arm jerking motion to suggest a celebratory action. As soon as the meeting was over, Bailey told Davis about the incident. This was the second time that Parise had threatened or acted inappropriately about Davis in front of Stenzler and nothing had been done about it. This upset Tonkyro because the techs have been considered as one and criticized as a group.

r. Davis was also informed by Dr. Thornton Eastham a radiologist, that Parise was speaking out to different individuals about threatening to fire the ultrasound girls, Davis, Tonkyro , and Strauser, because he heard that they had a meeting with the hospital director. Dr. Eastham said he was concerned for their well being.

s. The Ultrasound Department continued to be short staffed and patient care is being interrupted and compromised. The lack of a sufficient number of competent ultrasound techs has been brought to management's attention on multiple occasions. The lack of support from Radiology's management team has been part of a desire to harass the Ultrasound Department as a form of retaliation for their prior and current EEOs.

t. Dr. Aaron Andrews, who met with Stanlzer on November 4, 2016, brought to Davis's attention that Stenzler had been making derogaroy comments about Davis's performance as the lead of the Ultrasound Department. During the same meeting Stenzler was discussing Davis, Tonkyro, and Strauser's previous and current private EEO information with Andrews. Stenzler told Andrews that Davis, Stauser, Tonkyro and ultrasound technologist Yenny Hernandez were the reasons for the Ultrasound Department's failures because they were filing frivolous or unfounded EEOs.

26. Davis has been subjected to a hostile work environment based upon reprisal (EEO activity) including in the following ways:

a. From August 23, 2013 to late March, 2014 Bennett constantly intimidated Davis by glaring at Davis in a threatening manner when he was in close proximity to her.

b. On January 9, 2014, management (Stenzler, Bennett and Parise) modified the job qualifications for the MRI/Ultrasound supervisor position in such a manner to ensure Plaintiffs would not be qualified. They modified it from previously being open to

Diagnostic Radiology Technologists (DRTs) and Ultrasound Technologists to just DRTs only, thus excluding Plaintiffs.

c. On February 14, 2014, Davis received a call from an MRI technologist, Gina Feeney, informing Davis that Bennett and Stenzler allowed personal information relating to her previous EEO and other EEO complaints to be stored on a computer hard drive that was accessible to anyone with access to the facility's computers. She and other technologists complained. They felt they were being made to look bad.

d. On or about February 14, 2014, Plaintiffs were notified by another staff employee that confidential information concerning them and their EEOs were on the facility intranet accessible by other employees and supervisors. This placed them in a bad light. Later, several technologists claimed to have knowledge of the Plaintiffs' settlement agreement and made statements denigrating the Plaintiffs. This did not come from the Plaintiffs and must have come from supervisors trying to create hostility between the Plaintiffs and others because of benefits the Plaintiffs were said to have received.

e. On February 28, 2014 Davis was selected (approving authority information pending) to serve as the Lead Technologist, GS-10. Davis was told that she would have to be boarded and processed for the position and that it would be finalized no later than two weeks. Davis did not receive the promotion or pay until May 2014. Bennett and other members of management attempted to rewrite standards in order to delay her promotion and to reduce her ability to be successful. Subsequently, management has undertaken efforts which undermine her ability to work and place her at risk for punishment.

f. On March 21, 2014 Graham convened a hiring panel to conduct interviews that Davis was tasked to participate in. Throughout the process the individuals not initially qualified to apply were added to inventory and Davis and other panel members interviewed them. The hiring official, Stenzler, decided against the panel's recommendations and selected someone of his choosing. Davis had a meeting with Stenzler to express that he, as the hiring official, performed this act as a means to hire unqualified personnel in order to see her (Davis) fail as the lead technologist.

g. On March 25, 2014 Parise entered Davis' workspace unaccompanied. This action was in violation of a previous agreement between Plaintiffs and management per the previous EEO complaints.

h. On March 26, 2014 Parise entered Davis' work space and glared at her in an intimidating manner.

i. On March 26, 2014 Plaintiffs had a meeting with Stenzler to discuss that they felt uncomfortable with Parise being in their department and informed Stenzler that Parise was in the department unaccompanied. Stenzler stated during the meeting "you girls will never get past this," referencing their prior EEO complaints.

j. On March 27, 2014, in attempt to see Davis fail as Lead Technologist, Stenzler decided against the recommendations of a panel and selected unqualified individuals for a position that Davis would have some responsibility for. Davis had a meeting with Dr. Stenzler regarding this to no avail.

k. On or about August 1, 2014 management denied Davis' request for a compressed work schedule when they had approved it for other ultrasound technologists within the department.

l. On or about August 27, 2014, another staff employee made a disparaging comment about female Ultrasound Technologists after allegedly accessing information about the Plaintiffs' prior EEO complaint on a hard drive.

m. As a result of a workplace injury, Davis went on Workman's Compensation. When Davis was released from Workman's Compensation in January 2015 for the work related injury, Petrillo under the direction of Bennett denied her return to work in her service area. Davis received paperwork from Human Resources (HR) via mail notifying her that she was denied return to work in her service area and was given an alternate work assignment out at PCA. A few days after Davis emailed management stating that she felt she was being retaliated against by being prohibited to return to work in her service area when all the employees before in her situation were accommodated, HR informed her that management had a "change of heart" and decided to give Davis an alternate work assignment in her service area at the main hospital.

n. Petrillo acted disparately towards Davis compared to how he treated the other MRI/Ultrasound technologists upon her return to work. His actions included placing a large amount of space between them to the point it was difficult to discuss patients, keeping doors open when Davis met with him and closed when other technologists met with him, and demeaning Davis in front of her peers.

o. On January 26, 2015 during a meeting, Petrillo informed the Ultrasound staff that there was going to be a new position posted for an Ultrasound Supervisor. He stated that he would no longer be the supervisor once the position was filled and that the position would be posted within a week. The position was not posted. Both Davis and

Tonkyro inquired about the position with Petrillo over a two month time period and his response to both of them was he had no knowledge of the new position.

p. On March 31, 2015 in a department meeting, Petrillo informed the Ultrasound technologists that the supervisor position was not going to be posted and/or filled. It was decided by upper management that the greater need was for a technologist that can scan patients. Once Tonkyro and Davis showed interest in this upper-level position, management decided that it was no longer needed or available in an effort to retaliate against the Plaintiffs by prohibiting their advancement within the department. This instance was similar to when the MRI/Ultrasound position was posted in January 2014 for DRT's to apply, thus excluding the ultrasound technologists from the possibility of advancing into an upper-level management position. In addition, this instance is similar to a course previously used by the same management officials named in Plaintiffs' prior EEO complaints where management played favorites by dangling the Lead Ultrasound Technologist position in front of Plaintiffs and used it as a tool in creating a sexually harassing and hostile work environment.

q. While Davis was not allowed to qualify for a supervisor position and Tonkyro was not allowed to apply for the PCA lead for roughly two years, in the Spring of 2016 management created a series of events designed to create deniability of retaliation while denying any of the Plaintiffs the advancement they wanted. While various excuses have been provided, in March 2016 Petrillo offered the PCA lead to Davis, not Tonkyro. Petrillo knew Davis would not want to take that position. Davis refused. An ultrasound supervisor position was posted in April 2016. Tonkyro asked why she was not being offered the PCA lead position. Stenzler admitted authorizing

Petrillo to offer the PCA lead to Davis, but pretextually told Tonkyro he was now working out organizational chart issues. Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised. Only Davis applied, but she has not received the position. Management is offering pretextual excuses instead. Among the pretextual reasons Davis was given were the need for organization chart changes. Tonkyro was told that management had told others that neither Davis, her, or Strauser would ever receive these positions. Rather, someone from outside would be selected as supervisor and make it difficult on them.

r. Shortly before the selection was to be made for the supervisor position, an Administrative Investigative Board (AIB) was impaneled to purportedly investigate a hostile work environment that existed within the ultrasound area. The incompetent ultrasound tech was moved to the New Port Richey office without discussion. Her mother worked in that office and has personal ties with members of management. While the ultrasound techs were asked to testify before the AIB, none were informed beforehand or during what the alleged hostile work environment was. They and other ultrasound techs pointed out that there was a hostile work environment caused by management and cited their past and present EEO activity and the methods being used by management to undermine the section and not provide it with appropriate supervisors or technologists.

s. Throughout this process, the supervisor position has not been filled. Recently, Tonkyro and Davis have learned that management has privately said that they

were hiring someone from the outside to fill this position. While that person would have ultrasound experience, it would not be good for the ultrasound technologists.

t. On April 13, 2016, the ultrasound supervisor position was advertised and posted. On April 21, 2016, Davis was sent a letter by HR that her application had been accepted for the position. However, management has not accepted her. Dr. Stenzler separately told another employee that Davis would never be allowed to be the supervisor.

u. Since February 2015, despite several requests from Plaintiffs (Strauser and Davis) to have it addressed, there has been a black mold infestation within the Ultrasound Department and action or remedy was not timely taken.

v. Despite the fact Davis disqualified an applicant based on lack of qualifications for a MIT position in March 2014, the same applicant was hired for the MIT position on or about August 24, 2015. This applicant did not possess basic abilities necessary to be a competent ultrasound technologist. Since being hired she has missed many abnormalities and potential malignancies. Davis was intentionally excluded from the interview process involving this candidate, which is typically a part of her normal duties. Again, these actions have acted to undermine Davis' success as lead technologist. When Davis attempted to address deficiencies she was accused of creating a hostile work environment.

w. While Davis was not allowed to qualify for a supervisor position and Tonkyro was not allowed to apply for the PCA lead for roughly two years, in the Spring of 2016 management created a series of events designed to create deniability of retaliation while denying any of the Plaintiffs the advancement they wanted. While various excuses have been provided, in March 2016 Petrillo offered the PCA lead to

Davis, not Tonkyro. Petrillo knew Davis would not want to take that position. Davis refused. Tonkyro asked why she was not being offered the PCA lead position. Stenzler admitted authorizing Petrillo to offer the PCA lead to Davis, but pretextually told Tonkyro he was now working out organizational chart issues. Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised. Only Davis applied, but she has not received the position. Management is offering pretextual excuses instead. Among the pretextual reasons Davis was given were the need for organization chart changes. Tonkyro was told that management had told others that neither Davis, her, or Strauser would ever receive these positions. Rather, someone from outside would be selected as supervisor and make it difficult on them.

x. Shortly before the selection was to be made for the supervisor position, an Administrative Investigative Board (AIB) was impaneled to purportedly investigate a hostile work environment that existed within the ultrasound area. The incompetent ultrasound tech was moved to the New Port Richey office without discussion. Her mother worked in that office and has personal ties with members of management. While the ultrasound techs were asked to testify before the AIB, none were informed beforehand or during what the alleged hostile work environment was. They and other ultrasound techs pointed out that there was a hostile work environment caused by management and cited their past and present EEO activity and the methods being used by management to undermine the section and not provide it with appropriate supervisors or technologists.

y. Throughout this process, the supervisor position has not been filled. Recently, Tonkyro and Davis have learned that management has privately said that they were hiring someone from the outside to fill this position. While that person would have ultrasound experience, it would not be good for the ultrasound technologists.

z. On April 13, 2016, the ultrasound supervisor position GS-10 was posted was advertised and posted. On April 21, 2016, Davis was sent a letter by HR that her application had been accepted for the position. However, management has not accepted her. Dr. Stenzler separately told another employee that Davis would never be allowed to be the supervisor.

aa. Many of the above issues have continued. Conflicting reasons are being offered for failure to fill the lead supervisors and lead tach and other positions. Continuing requests for information are being ignored or deflected.

bb. On August 25, 2016, Davis, Tonkryo, and Stauser met with Battle to discuss their apprehensions regarding the apparent decline of patient care and safety, as well as threatening and retaliatory practices and deteriorating morale within their service. The next day, Dr. Osman Cay, who was acting chief while Stranzler was out of town and Dr. Parise was off, spoke with some Radiology staff members about it. This conversation included the fact that they met with Battle the day before, and how this was perceived as going out their "chain of command" by other Radiology staff members. A few days later Parise began to tell other radiologists that the "problem" ultrasound girls were going to be fired because of the "in-fighting" within the department. On September 14, 2016, the Plaintiffs disclosed this threating information to Battle by email. He responded on September 19, 2016 and stated that he would not tolerate retribution and that he did not

know how Dr. Cay got the information about the meeting. No further follow-up has occurred.

cc. It was brought to Davis's attention by Dr. Deborah Bailey, a staff radiologist at James A Haley, that Parise made derogatory gestures and comments about Davis during the October 2016 Radiologist meeting in front of the Chief of Radiology, Stenzler, as well as other physicians. Stanzler stood up in front of all the Radiologists at this meeding and told them that Davis was about to have her baby and that she would be out on maternity leave for four months Parise then yelled out "Yes" and at the same time made an arm jerking motion to suggest a celebratory action. As soon as the meeting was over, Bailey told Davis about the incident. This was the second time that Parise had threatened or acted inappropriately about Davis in front of Stenzler and nothing had been done about it.

dd. Davis was also informed by Dr. ___ Eastham a radiologist, that Parise was speaking out to different individuals about threatening to fire the ultrasound girls, Davis, Tonkyro, and Strauser, because he heard that they had a meeting with the hospital director. Dr. Eastham said he was concerned for their well being.

ee. The Ultrasound Department continued to be short staffed and patient care is being interrupted and compromised. The lack of a sufficient number of competent ultrasound techs has been brought to management's attention on multiple occasions. The lack of support from Radiology's management team has been part of a desire to harass the Ultrasound Department as a form of retaliation for their prior and current EEOs.

ff. Dr. Aaron Andrews, who met with Stanlzer on November 4, 2016, brought to Davis's attention that Stenzler had been making derogaroy comments about

Davis's performance as the lead of the Ultrasound Department. During the same meeting Stenzler was discussing Davis, Tonkyro, and Strauser's previous and current private EEO information with Andrews. Stenzler told Andrews that Davis, Stauser, Tonkyro and ultrasound technologist Yenny Hernandez were the reasons for the Ultrasound Department's failures because they were filing frivolous or unfounded EEOs.

27. Strauser has been subjected to a hostile work environment based upon reprisal (EEO activity) including in the following ways:

a. On January 9, 2014, Stenzler, Bennett, and Parise created a position for MRI/Ultrasound supervisor, Posting ID: X-14-TSC-102-5906, with qualifications of a DRT which purposely disqualified Strauser from applying for the position.

b. On February 12, 2014, MRI Technologist Gina Feeney, notified Strauser that information relating to Strauser's previous EEO complaint, records and written counseling were available on the S:/ drive of the computer system making the information accessible to the entire medical center.

c. February 2014 Ms. Graham interrupted Strauser during the training for a new piece of equipment, and in front of numerous parties, began questioning Strauser about a patient who was allegedly unhappy with the bathroom facility.

d. On March 18, 2014 while returning from a portable exam, Strauser saw Parise down the hall from her. Once Parise saw Strauser, he glared at her and shook his head in an intimidating manner.

e. On March 26, 2014, Strauser, Davis and Tonkyro had a meeting with Stenzler to let him know they felt uncomfortable with Parise being in their department

and that he was there unaccompanied, Stenzler stated, “You girls will never get past this,” referring to a prior EEO complaint in which she had participated.

f. On January 26, 2015 during a meeting, Petrillo informed the Ultrasound staff that there was going to be a new position posted for an Ultrasound Supervisor. He stated that he would no longer be the supervisor once the position was filled and that the position would be posted within a week. The position was not posted. Both Davis and Tonkyro inquired about the position with Petrillo over a two month time period and his response to both of them was he had no knowledge of the new position.

g. Since February 2015, despite several requests from Plaintiffs (Strauser and Davis) to have it addressed, there has been a black mold infestation within the Ultrasound Department and no action or remedy was taken in a timely manner.

h. On March 31, 2015 in a department meeting, Petrillo informed the Ultrasound technologists that the supervisor position was not going to be posted and/or filled. It was decided by upper management that the greater need was for a technologist that can scan patients. Once Tonkyro and Davis showed interest in this upper-level position, management decided that it was no longer needed or available in an effort to retaliate against the Plaintiffs by prohibiting their advancement within the department. This instance was similar to when the MRI/Ultrasound position was posted in January 2014 for DRT’s to apply, thus excluding the ultrasound technologists from the possibility of advancing into an upper-level management position. In addition, this instance is similar to a course previously used by the same management officials named in Plaintiffs’ prior EEO complaints where management played favorites by dangling the

Lead Ultrasound Technologist position in front of Plaintiffs and used it as a tool in creating a sexually harassing and hostile work environment.

i. While various excuses have been provided, in March 2016 Petrillo offered the PCA lead to Davis, not Tonkyro. Petrillo knew Davis would not want to take that position. Davis refused. An ultrasound supervisor position was posted in April 2016. Tonkyro asked why she was not being offered the PCA lead position. Stenzler admitted authorizing Petrillo to offer the PCA lead to Davis, but pretextually told Tonkyro he was now working out organizational chart issues. Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised. Only Davis applied, but she has not received the position. Management is offering pretextual excuses instead. Among the pretextual reasons Davis was given were the need for organization chart changes. Tonkyro was told that management had told others that neither Davis, her, or Strauser would ever receive these positions. Rather, someone from outside would be selected as supervisor and make it difficult on them.

j. Between April 2016 and May 2016 Parise and Stenzler hired a radiologist who had previously had a personal relationship with Strauser before she came to the Haley VAHCS. The relationship ended badly. Strauser had discussed this with Parise and gave him information which should have caused him to know that hiring the radiologist to work around Strauser would be difficult for Strauser. Regardless, the radiologist was hired over concerns she expressed to Stenzler when she heard he was

being considered. The radiologist has come on board. He has blamed Strauser for impairing his ability to do or obtain work.

k. From the summer of 2016 until the present several of these issues have continued and new threats have been made. The ultrasound lead and supervisors' positions have not been filled and despite requests, no one will offer an understandable reason.

l. On August 25, 2016, Davis, Tonkryo, and Stauser met with Battle to discuss their apprehensions regarding the apparent decline of patient care and safety, as well as threatening and retaliatory practices and deteriorating morale within their service. The next day, Dr. Osman Cay, who was acting chief while Stranzler was out of town and Dr. Parise was off, spoke with some Radiology staff members about it. This conversation included the fact that they met with Battle the day before, and how this was perceived as going out their "chain of command" by other Radiology staff members. A few days later Parise began to tell other radiologists that the "problem" ultrasound girls were going to be fired because of the "in-fighting" within the department. On September 14, 2016, the Plaintiffs disclosed this threating information to Battle by email. He responded on September 19, 2016 and stated that he would not tolerate retribution and that he did not know how Dr. Cay got the information about the meeting. No further follow-up has occurred.

m. It was brought to Davis's attention by Dr. Deborah Bailey, a staff radiologist at James A Haley, that Parise made derogatory gestures and comments about Davis during the October 2016 Radiologist meeting in front of the Chief of Radiology, Stenzler, as well as other physicians. Stanzler stood up in front of all the Radiologists at

this meeding and told them that Davis was about to have her baby and that she would be out on maternity leave for four months Parise then yelled out “Yes” and at the same time made an arm jerking motion to suggest a celebratory action. As soon as the meeting was over, Bailey told Davis about the incident. This was the second time that Parise had threatened or acted inappropriately about Davis in front of Stenzler and nothing had been done about it. This upset Strauser because the techs have been considered as one and criticized as a group.

n. Davis was also informed by Dr. Thornton Eastham a radiologist, that Parise was speaking out to different individuals about threatening to fire the ultrasound girls, Davis, Tonkyro , and Strauser, because he heard that they had a meeting with the hospital director. Dr. Eastham said he was concerned for their well being.

o. The Ultrasound Department continued to be short staffed and patient care is being interrupted and compromised. The lack of a sufficient number of competent ultrasound techs has been brought to management’s attention on multiple occasions. The lack of support from Radiology’s management team has been part of a desire to harass the Ultrasound Department as a form of retaliation for their prior and current EEOs.

p. Dr. Aaron Andrews, who met with Stanlzer on November 4, 2016, brought to Davis’s attention that Stenzler had been making derogaroy comments about Davis’s performance as the lead of the Ultrasound Department. During the same meeting Stenzler was discussing Davis, Tonkyro, and Strauser’s previous and current private EEO information with Andrews. Stenzler told Andrews that Davis, Stauser, Tonkyro and ultrasound technologist Yenny Hernandez were the reasons for the Ultrasound Department’s failures because they were filing frivolous or unfounded EEOs.

28. Between September 2013 and present, each Plaintiff either observed or became aware of actions which affected the other plaintiffs.

**COUNT I: Retaliation**

29. Plaintiffs, Tonkyro, Strauser, and Mitchell-Davis sue Robert A. McDonald, as Secretary of the Department of Veterans Affairs, for retaliation under Title VII.

30. Plaintiffs incorporate and re-allege paragraphs 1 through 28.

31. Plaintiffs engaged in EEO activity which is protected under Title VII. Including participation in their individual EEO case as well as participation in each other's cases.

32. As alleged in paragraphs 7 and 13-26 above the Defendant was aware of the Plaintiffs' protected EEO activities.

33. As alleged, the adverse actions followed after Plaintiffs engaged in EEO activity and included loss of pay, reputation, opportunity for advancement and positions.

34. As alleged in paragraphs 7 and 13-28, the aforesaid adverse employment actions, other adverse actions, misconduct, and other conduct, acts and omissions to the Plaintiffs' detriment, were all taken (or failed to be taken) by administrators, managing and supervisory personnel with the Haley VA in retaliation for the protected or EEO activity of the Plaintiffs including those set forth above. They are the direct and proximate result of the EEO activity.

35. The Defendant, through the supervisors of the Plaintiffs, has engaged in, directed, and/or ratified retaliatory conduct, and has frustrated the Plaintiffs' efforts to obtain relief and intentionally maintained these retaliatory and unlawful practices to the detriment of its employees. The Defendant at all relevant times knew or should have known of the retaliatory actions being taken against the Plaintiffs and failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct.

36. As a result of the foregoing, Plaintiffs have been damaged. Such damages include, but are not limited to loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputations; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress. Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

37. Plaintiffs have satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiffs request prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## Count II: Hostile Work Environment

38. Plaintiffs, Tonkyro, Strauser, and Mitchell-Davis sue Robert A. McDonald, as Secretary of the Department of Veterans Affairs, for hostile work environment based upon retaliation. Plaintiffs incorporate and re-allege paragraphs 1 through 28.

39. Included within this hostile work environment are adverse actions or material adverse actions within 45 days of filing the complaint. In the case of retaliatory hostile work environment, the environment includes the material adverse actions alleged in paragraphs 13-28.

40. The aforesaid actions and conduct have created an intolerable hostile work environment.

41. As a result of the foregoing, Plaintiffs have been damaged. Such damages include, but are not limited to payment of attorneys' fees and legal costs, loss of an amicable

work environment, humiliation, anxiety, degradation, embarrassment, physical injury or illness, and severe emotional suffering and distress. Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

42. Plaintiffs have satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiffs request prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count III**
**Injunctive Relief**

43. Plaintiffs, Tonkyro, Strauser, and Mitchell-Davis, sue Defendant, Robert A. McDonald, as Secretary of the Department of Veterans Affairs.

44. Plaintiffs incorporate and re-allege paragraphs 1 through 28.

45. Unless the above practices are enjoined, Plaintiffs will suffer irreparable harm.

46. There is (1) a substantial likelihood of success on the merits; (2) irreparable injury that will be suffered unless an injunction is issued; (3) the threatened injury to the Plaintiffs is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest.

47. Plaintiffs request the Court award their attorneys' fees and costs and enter preliminary and permanent injunctions enjoining the following practices, actions and conduct:

a. Violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as described above including retaliation against Plaintiffs for protected or EEO activity and breach of the Privacy Act.

b. Such other practices, actions or conduct that the court deems appropriate and proper to enjoin.

WHEREFORE, Plaintiffs demand trial by jury of all issues so triable and such other and further relief as the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiffs, Erin Tonkyro, Dana Strauser, and Kara Mitchell-Davis hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

***/s/ Joseph D. Magri***

Joseph D. Magri
Florida Bar No.: 0814490
Merkle Magri & Meythaler, P.A.
5601 Mariner St., Suite 400
Tampa, FL 33609
Fax.: (813) 281-2223
Email: jmagri@merklemagri.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 19, 2016 I filed the First Amended Complaint with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to:

Scott H. Park
Assistant United States Attorney
Identifying No. USA 084
400 W. Washington, Street, Suite 3100
Orlando, FL 32801
Telephone: (407) 648-7543
Facsimile: (407) 648-7588
Email: Scott.Park@usdoj.gov

***/s/ Joseph D. Magri***

Joseph D. Magri