

**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**140 Fountain Parkway, Suite 620**
**St. Petersburg, FL 33716**

**Investigative Report**
**In the Matter of the EEO Complaint of Discrimination of:**

Yenny Hernandez )
Complainant )
 )
   v. )    ORM No. 200I-0673-2016104480
 )
Robert McDonald, Secretary )
Department of Veterans Affairs )
810 Vermont Avenue NW )
Washington, DC 20420 )
Respondent )

Facility: James A. Haley, Tampa VAMC.

Doralisa Wroblewski, EEO Investigator
Office of Resolution Management

## I. Introduction

Having met all procedural requirements for acceptance, with respect to the issues specified hereafter; this complaint was assigned for investigation on September 22, 2016. An investigation using affidavits and sworn testimony was conducted from September 22, 2016, to January 12, 2017. This report is submitted for the consideration of the Regional EEO Officer on this 13th day of January of 2017.

## II. Background

Yenny Hernandez contacted an EEO Counselor on July 28 2016, stating that sex and reprisal were the bases for discrimination resulting in a hostile work environment and sexual harassment. Counseling and or ADR attempts were unsuccessful in resolving her complaint and she filed a formal complaint on September 8, 2016. The complaint was accepted for investigation on September 17, 2016. (Section 1 – Section 3)

## III. Claims and Basis

*Whether complainant, Medical Instrument Technologist, GS-9, was subjected to a hostile work environment/sexual harassment based on Reprisal and Sex as evidenced by the following events:*

*1. During January through March 2015, Scott Petrillo (SP), Diagnostic Radiologic Technologist, denied complainant's request for help in general as she was the only female technologist during this period.*

*2. On February 12, 2015, Angela Geraci-Desimone (AG), Medical Instrument Technician, was assigned an emergency ultrasound, she then "slung" the request at the complainant and "went off" on her stating, "Why the hell I need to do this again?"*

*3. On June 12. 2015, SP denied complainant's request for leave.*

*4. On August 27, 2015, during a conversation with complainant, Angela Geraci-Desimone (AG), Medical Instrument Technician, stated she was a double D and proceeded to pull up her blouse, even though complainant told her she didn't want to see them repeatedly; complainant saw her bra and the size of her breast.*

*5. In late August 2015, during a conversation with complainant about scanning a transvaginal ultrasound, AG stated, "Why don't you just let me borrow your vagina?"*

*6. Between August 2015 and February 2016, AG reminded complainant that her mom was "close friend" with Jeri Graham, Chief Technologist.*

*7. On September 3, 2015, as complainant was walking towards her interview for the sexual harassment fact-finding, AG approached her and asked, "Is the vagina here?" and made a gesture of inserting something into her vagina.*

*8. During the first week of September 2015, complainant reported AG's sexual harassment to SP; however, SP did not notify AG until September 11, 2015 and SP did not interview complainant until September 18, 2015.*

*9. On September 10, 2015, AG commented she enjoyed working there, but couldn't stand the fact that she had to work with "dirty vaginas."*

*10. On September 18, 2015, as AG was walking towards her interview on the sexual harassment fact finding, she gave complainant an angry, hostile look.*

*11. On September 21, 2015, complainant reported bullying to SP, as of September 25, 2015, SP has not done anything about it.*

*12. On September 21, 2015, AG refused to talk to complainant when complainant tried to talk to her about a patient.*

*13. In September 2015, AG did not acknowledge or look at complainant when she asked AG to chaperone her with a patient, AG just left instead.*

*14. Around October 2015, after AG learned about her benefits, she gave complainant a "high five" and purposely put her chest on the complainant while doing a "shoulder bump."*

3

15. *During October and November 2015, complainant saw AG scan her own abdomen with the door open and her undergarments exposed.*

16. *In November 2015, AG instructed complainant in a "condescending and hostile" tone, to use her own assigned room like everybody else, then turned her back on complainant and started talking to Brent Burton (BB), Medical Instrument Technologist, about how she got drunk the night before.*

17. *In December 2015, AG referred to one of the Radiology Residents as "Dark Chocolate" and described "all the things she would do" to sway him her way.*

18. *In December 2015 and January 2016, AG gave complainant "dirty looks" and made disparaging remarks about her eating disorder and stated, "Oh my God, you are obsessed over the stupidest sh\*t ever."*

19. *On multiple occasions3, AG looked at complainant "disgustingly" while complainant was eating and stated, "I can't believe you're going to eat all that."*

20. *In January 2016, AG embraced complainant and kissed her on the cheek after complainant told AG her patient had cancelled an appointment.*

21. *In January 2016, AG "hollered" at complainant when complainant asked AG to call for an In-House patient.*

22. *In January 2016, AG caused complainant to be late for her patient by taking 50 minutes to perform an ultrasound that takes 30 minutes.*

23. *Around January/February 2016, complainant saw AG embrace BB inappropriately in the hallway.*

24. *Around January/February 2016, complainant saw AG enter the Tech room and sat on BB's lap and wrapped her arms around his neck and asked how he was doing.*

25. *During January and February 2016, when AG entered the room where complainant was performing an ultrasound on a patient, AG demanded that complainant leave the room.*

26. *Between January, February, and March 2016, AG pulled up her shirt multiple times to show complainant her abs.*

27. *During January, February, and March 2016, Victor Martinez (VM), Medical Instrument Technician, taunted complainant by stating that AG was her best friend, asking her where her best friend was, knowing AG had sexually harassed and bulled her.*

4

28. On February 16, 2016 and several occasions, AG, as a chaperone to complainant for a transvaginal ultrasound, interrupted complainant several times and rudely hollered, "You need to hurry up, how much longer, I have a patient," in front of the patient.

29. On February 19, 2016, AG approached complainant, and in an angry, hostile tone, stated, "It is your responsibility to close one of the rooms."

30. On February 19, 2016, while complainant was on break, AG approached her, stared at the computer, and asked complainant in a condescending and angry tone, "Did those outpatient requests get done?"

31. On February 25, 2016, when complainant went to SP and told him about AG's actions, he told complainant there were more pressing issues so he couldn't get to it, and for her to do what she has to do.

32. From March 3, 2016 to present, AG continues to ignore complainant when complainant asks for assistance, and continues to interrupt complainant's procedures by knocking on the door and telling complainant to hurry up.

33. Around June 27, 2016, VM taunted complainant continually by telling her he was going to take her job, he was going to allege she was harassing him, and he would conduct a fact finding, in order to get his way.

34. On June 28, 2016, SP instructed Michelle Strauser, Medical Instrument Technologist, to inform the department, which includes the complainant, to perform the Doppler ultrasounds for AG.

35. On June 30, 2016, VM became hostile towards complainant because she refused to perform a scan after he had scanned the wrong organ.

36. On July 12, 2016, complainant sent an email to SP regarding VM's taunting and approaching her saying, "Oh you think you're perfect", and VM stopped talking to complainant after she told him to stop.

37. As of July 27, 2016, SP has not taken action about the February 19, 2015 incident (event 2) and the incident above that complainant had reported to him.

38. On July 29, 2016, SP sent an email stating technologists were not to cc: the Lead Technologist on emails, in response to complainant's July 27, 2016 request for status on her harassment complaints.

**Investigator's Note:** All events were accepted for investigation as part of the overall pattern of harassment. No events were accepted as discrete events.

5

## IV. Review of Documents

7-12  Contains documents associated with the fact-finding conducted by RMO Petrillo including the Written Counseling issued to Witness Geraci-Desimone and summaries of the information gathered from each person interviewed.

7-15  Includes emails from the Complainant to RMO Petrillo reporting the issues covered by the complaint.

## V. Summary

The witnesses testified to the following:

**Yenny Hernandez** (Sex: Female; EEO Activity: Participation as a witness and the instant complaint; hereinafter **Complainant**) is a GS-9 Sonographer/Medical Instrument Technician for the Tampa VAMC.   She has held the position for five years. Complainant's direct supervisor is Scott Petrillo. She attested that she was a witness in two EEO complaints, one in December 2012 and the other in December 2014. Complainant is unaware of how Scott Petrillo became aware of the prior EEO complainants.    She is familiar with the facility's policies on harassment/sexual harassment, and reprisal. (7-1, pp. 5-20)

**Jeri Graham** (Sex: Female; Prior EEO Activity: Yes; hereinafter **RMO Graham**) is the Chief Technologist of the Radiology Service for the Tampa VAMC. She has held the position since April 2014.  RMO Graham became aware of the instant complaint when it was filed.  RMO Graham is familiar with the facility's policies on harassment/sexual harassment and reprisal.  She is Complainant's second line supervisor. (7-2, pp. 4-8)

**Scott Petrillo** (Sex: Male; Prior EEO Activity: Yes; hereinafter **RMO Petrillo**) is the Ultrasound and MRI Supervisor and has held the position for two years.  RMO Petrillo is Complainant's supervisor.  He became aware of the instant complaint when it was in the informal stage.  RMO Petrillo is familiar with the facility's policies on harassment/sexual harassment and reprisal. (7-3, pp. 4-9)

**Angela Geraci-Desimone** (Sex: Female; Prior EEO Activity: No; hereinafter **Witness Geraci-Desimone**) is a Medical Instrument Technologist/Ultrasonographer.  She has held the position for one and a half years.  During the events in question she was at the Tampa VA, but is now at the New Port Richey facility.  She does not recall when she became aware of Complainant's EEO complaint.  Witness Geraci-Desimone is familiar with the facility's policies on sexual harassment/hostile work environment and reprisal. During the period in question, RMO Petrillo was her supervisor. (7-4, pg. 4-12)

**Victor Martinez** (Sex: Male; Prior EEO Activity: No; hereinafter **Witness Martinez**) is a Medical Instrument Technician/Ultrasound Sonographer.  He has held the position for seven years.  He became aware of Complainant's participation in a prior EEO complaint through Witness Mitchell-Davis.  Witness Martinez's supervisor is RMO Petrillo.  He is

familiar with the facility's policies on sexual harassment/hostile work environment and reprisal. (7-5, pp. 4-9)

**Brent Burton** (Sex: Male; Prior EEO Activity: No; hereinafter **Witness Burton**) is a Diagnostic Medical Sonographer. He has been employed at the VA since September 2011 and during the time in question was employed at the Tampa VA, but is currently at the Phoenix VA. Witness Burton became aware of Complainant's EEO complaint when he was contacted to complete the written affidavit. He is familiar with the facility's policies on sexual harassment/hostile work environment and reprisal. (7-6, pp. 2-4)

**Dana Michelle Strauser** (Sex: Female; Prior EEO Activity: Yes; hereinafter **Witness Strauser**) is an Ultrasound Technologist at the Tampa VA. She has held the position for eight years. Witness Strauser became aware of the instant complaint when she was contacted to complete the affidavit. She is familiar with the facility's policies on sexual harassment/hostile work environment and reprisal. (7-7, pp. 2-3)

**Dyanith Axsom** (hereinafter **Witness Axsom**) was an Ultrasound Technologist at the Tampa VA, but left employment at the VA shortly after the events listed in complaint. She no longer lives in the United States and provided information via email. This witness was provided by Complainant. (7-8, Email Response)

**Nikki Mitchell-Davis** (Sex: Female; Prior EEO Activity: Yes; hereinafter **Witness Mitchell-Davis**) is a Lead Technologist at the Tampa VA. She began in her current position in March 2014. She became aware of Complainant's EEO complaint when she was contacted by their mutual attorney to provide testimony Complainant's complaint. Witness Mitchell-Davis is familiar with the facility's sexual harassment and reprisal policies. (7-9)

***Investigator's Note:*** *Witness Mitchell-Davis was sent a written affidavit for her completion but because of her own time constraints, she preferred to discuss the issues to the phone. A ROC was prepared summarizing the phone call and it is contained in Tab 7-9.*



***Whether complainant, Medical Instrument Technologist, GS-9, was subjected to a hostile work environment/sexual harassment based on Reprisal and Sex as evidenced by the following events:***

***Event 1:*** *During January through March 2015, Scott Petrillo (SP), Diagnostic Radiologic Technologist, denied complainant's request for help in general as she was the only female technologist during this period.*

**Complainant** attested that even prior to the period in question her and Witness Strauser were doing everything. Witness Strauser went on maternity leave and Complainant was left alone to do all the female pelvic and breast exams. Among many other tasks, she also had to "coordinate" the department, arrange the in-house patients

to be seen, fit in the emergent cases, and the breast ultrasounds with the mammograms. It got to the point that she told RMO Petrillo that she needed the other staff to help with the schedule and with performing the transvaginal and breast examinations. RMO Petrillo would say that he would provide assistance, but he never did. The male Technologists were not performing the pelvic and breast exams, and RMO Petrillo was aware of it, but he did not direct them to perform them. Around February 17, 2015, she returned from leave to find that the pelvic and breast exams were not done and that the examination rooms had to be closed because of mold. Because of the mold, the exams were sent out on a fee basis. Complainant contends that RMO Petrillo did not send out the exams in an effort to assist her; he sent them out because he had no choice. (7-1, pp.20-40)

**RMO Petrillo** stated that due to a staffing shortage during the period in question, Complainant was the only female technologist on premise. Up to that time, the standard was to try to have a female technologist do the pelvic and breast exams for female Veterans. Male technologist would perform the exams in emergent situations. Once the issue listed in this event was brought to his attention, a plan was put into action and they started fee basing a large quantity of the pelvic exams out to the outside diagnostic centers so they could lighten the load inside the facility for Complainant. The fee basing started around March 2015 and it went on for about three or four months. (7-3, pp. 12-22)

**Witness Mitchell-Davis** maintained that she was out for the period of May 2014 to around mid-February 2015. During that period, she would receive phone calls from Complainant that she was "drowning" and getting no help. Complainant would tell Witness Mitchell-Davis that she had to scan all females and that the staff was not listening to her. Witness Mitchell-Davis contacted RMO Petrillo to alert him of the difficulties Complainant was having and he responded that he would speak with the staff; however, no action was taken. When Witness Mitchell-Davis was able to return, she found a backlog of cases and found that there was mold in the rooms. The mold has allegedly been removed from some of the rooms, but she realized that other rooms also had mold so she contacted upper management. After she went to upper management about the mold, the rooms were shut down and the pelvic exams were sent out on a fee basis. (7-9)

**_Event 2: On February 12, 2015, Angela Geraci-Desimone (AG), Medical Instrument Technician, was assigned an emergency ultrasound, she then "slung" the request at the complainant and "went off" on her stating, "Why the hell I need to do this again?"_**

**Complainant** explained that this event should have read February 12, 2016, not 2015. She attested that when this incident occurred Witness Geraci-Desimone had been working in her department for about six months, so they already had "history." Complainant indicated that Witness Geraci-Desimone thought that the ultrasound was a repeat exam. Complainant stated that Witness Axsom, who walked into the room, explained the circumstances surrounding the need for the ultrasound but Witness Geraci-Desimone would not accept the explanation. She advised RMO Petrillo, in an

email, about that incident and about other incidents that had occurred after her complaint of sexual harassment, but no action was taken. (7-1, pp. 40-51)

**Witness Geraci-Desimone** denied this event occurred and stated that because of differences in their schedules she did not have a lot of contact with Complainant. (7-4, pg. 13)

**Witness Axsom** stated that Witness Geraci-Desimone did question the order as to why she needed to repeat it and slung it on the table, but not really directed towards anyone. (7-8)

*Event 3: On June 12. 2015, SP denied complainant's request for leave.*

**Complainant** averred that she had requested July 2, 2015, during the open period in November 2014. By the date in question, she had not received a response about her request, so she asked RMO Petrillo about it. RMO Petrillo told her that because of coverage issues, he could not approve the leave; however, Complainant saw that male Technologist, Scottie Simpson, had been approved leave for the same day. Complainant had seniority over Mr. Simpson, so she questioned RMO Petrillo about it and told him she did not want to involve the Union in matter. RMO Petrillo approved five hours of leave for July 2, 2015. (7-1, pp. 51-61)

**RMO Petrillo** confirmed that Complainant had been approved for five hours for July 2, 2015, but stated that the only other male approved for leave on this date and under his supervision, worked in a different service with no bearing on the approval of Ultrasound Leave Requests. (7-3, Follow-Up Email 12/29/16)

*Event 4: On August 27, 2015, during a conversation with complainant, Angela Geraci-Desimone (AG), Medical Instrument Technician, stated she was a double D and proceeded to pull up her blouse, even though complainant told her she didn't want to see them repeatedly; complainant saw her bra and the size of her breast.*

**Complainant** attested that Witness Geraci-Desimone arrived to their department on August 26, 2015, a day before the incident in question. On the day in question, Witness Geraci-Desimone made a comment about finding a rich husband at the hospital. She asked the Complainant about the marital status of one of the doctors and Complainant responded that she thought he was single but that he was "picky." When Witness Geraci-Desimone asked what she meant, Complainant explained that the doctor liked "blonde girls with big boobs or big breasts." Witness Geraci-Desimone countered that the doctor's preference was not a problem because she had "double Ds." Complainant maintained that Witness Geraci-Desimone proceeded to lift up her shirt and show the Complainant the outline of her bra through her undershirt. Complainant explained that although Witness Geraci-Desimone had an undershirt, the undershirt was tight and she could see the "form of her breasts pushing out of her bra." At the same time, Complainant was asking her not to show her and said no several times while turning her head. Witness Geraci-Desimone said she did not mind. Complainant responded that she could not do that. No one witnessed the incident. Complainant did not complain to

management about the incident because she was scared and did not want to "force the department to have to go through an AIB." (7-1, pp. 62-73)

**RMO Petrillo** stated that Complainant disclosed this event.  Complainant relayed that she was in the company of Witness Geraci-Desimone in the break area during which Witness Geraci-Desimone asked about the marital status of one of the radiologists and also remarked he was "cute."  Complainant replied that she heard he was "picky", and preferred women with blonde hair that were "large chested."  To follow, Witness Geraci-Desimone replied that his preferences were not a problem and began to reach for her own shirt in a motion to raise it up to expose the size of her own chest.  Complainant tried to stop her verbally, explaining that would not be necessary; however, Witness Geraci-Desimone completed the action and raised her shirt.  To be noted, Witness Geraci-Desimone was wearing an undershirt, no flesh was exposed.  The account of this event was reported to RMO Petrillo by Complainant and Witness Geraci-Desimone during a fact-finding that was initiated at the beginning of September 2015.  After the fact finding was completed, it was determined that Witness Geraci-Desimone exhibited a lack of judgement, which was inappropriate and unprofessional, but no harmful intent was shown by Witness Geraci-Desimone.   As a result of the fact-finding, Witness Geraci-Desimone received a written counseling. (7-3, Written Affidavit pp. 2-4)

**Witness Geraci-Desimone** attested that she wears an undershirt to work every day because it is cold.  She said that on the day in question Complainant and she were talking about a radiologist and that Complainant told her that the radiologist liked women with big breasts.  Witness Geraci-Desimone stated that she did lift up her shirt but that Complainant did not see her bra or her breasts because she had an undershirt on.   This event was discussed during the fact-finding with RMO Petrillo but the allegation of showing skin was not part of the complaint.  Witness Geraci-Desimone indicated she was verbally counseled for this during the fact-finding and that she was told that the paperwork related to the fact-finding would remain in her file for some time.  She attested that Complainant later came to her and apologized for the fact-finding. (7-4, pp. 55-57)

**Witness Mitchell-Davis** stated that Complainant came to speak with her, but she was on the phone with a patient.  When she was finally able to speak with Complainant, she realized that Complainant was very upset.  Complainant told her about the incident in question but told her she did not want to complain to RMO Petrillo.  However, Witness Mitchell-Davis told Complainant that due to the sexual nature of the incident she (Complainant) had to tell RMO Petrillo about it.  Complainant went immediately to RMO Petrillo to report the incident. (7-9)

_**Event 5:** In late August 2015, during a conversation with complainant about scanning a transvaginal ultrasound, AG stated, "Why don't you just let me borrow your vagina?"_

**Complainant** maintained her, Witness Martinez, and Witness Geraci-Desimone were eating lunch, and she told Witness Geraci-Desimone that she was thinking it would probably help out better if during a transvaginal ultrasound she started the test and then

ask the patient if she (Witness Geraci-Desimone) could finish the test.  Witness Geraci-Desimone responded by saying "well, why don't you just let me borrow your vagina."  Witness Martinez started laughing, so Witness Geraci-Desimone started laughing.  Complainant told Witness Davis, who was the Lead Technologist, about the incident and Witness Davis took her to see RMO Petrillo.  She told RMO Petrillo about the incident but said she did not want Witness Geraci-Desimone to find out, so RMO Petrillo stated that he would talk to Witness Geraci-Desimone in general terms and advise her she could not use that language.  About three days later, RMO Petrillo told Complainant that he had to go to HR with her allegations and that he was advised he had to conduct a fact-finding. (7-1, pp. 75-90)

**RMO Petrillo** stated that as with the Event 4, Complainant relayed to him that on August 31, 2015, Witness Martinez was on lunch break with Witness Geraci-Desimone.  Complainant joined them for lunch.  Their conversation focused on ways to get Witness Geraci-Desimone more hands-on scan time in real patient cases, as a part of her continuing training.  Complainant explained that once she had completed the primary scan during a pelvic ultrasound, she would be able to rescan the patient as a learning tool.  Witness Geraci-Desimone followed by stating, that she was nowhere ready for that and said to Complainant "how about you let me borrow your vagina to scan."  Complainant replied," there's no way, we don't scan each other here."  The fact-finding resulted in the written counseling referenced in Event 4. (7-3, Written Affidavit pp. 4-6)

**Witness Geraci-Desimone** averred that she did make the statement attributed to her in the event.  She said that she had never done a transvaginal scan and was nervous about it, so she jokingly made the statement.  According to Witness Geraci-Desimone Complainant's response was to giggle. (7-4, pp. 61-62)

**Witness Martinez** stated that on August 31, 2015, he was in the lunchroom when Witness Geraci-Desimone came in and they began a conversation.  Complainant then joined them at the table.  Witness Geraci-Desimone started talking about becoming more proficient in the vaginal pelvic ultrasounds.  Complainant responded that the staff would assist in bringing her up to speed.  Following that response, Witness Geraci-Desimone jokingly stated "I can borrow your vagina."  Witness Martinez stated that Complainant giggled at the remark but surmised that it was probably from shock.  Later, Complainant came to him and told him she felt insulted at Witness Geraci-Desimone's remark.  Witness Martinez told her he did not think Witness Geraci-Desimone meant to be insulting.  Witness Martinez stated that RMO Petrillo asked him about this incident during the fact-finding. (7-5, pp. 10-14)

**Witness Axsom** stated that Complainant told of the event in question but she did not witness the event.  She told Complainant to stated pull Witness Geraci-Desimone to the side and let her know that she found the statement offensive. (7-8)

**Witness Mitchell-Davis** stated that Complainant told her about this incident and she advised that Complainant report it to RMO Petrillo.  After Complainant reported it, a fact-finding was conducted. (7-9)

**Event 6:** *Between August 2015 and February 2016, AG reminded complainant that her mom was "close friend" with Jeri Graham, Chief Technologist.*

**Complainant** stated that a couple of hours after the incident during which Witness Geraci-Desimone pulled her scrub top up, she asked Complainant if she knew who RMO Graham was because her mother had told her that if she ever needed anything, that she could go to RMO Graham and that she would handle it. Complainant averred that Witness Geraci-Desimone made a similar comment about RMO Graham several more times after that incident. Complainant stated that Witness Geraci-Desimone used her mother's relationship with upper management to intimidate them so they would not report things. (7-1 Second Transcript, pp. 4-16)

**RMO Graham** denied knowledge of this event and added that Witness Geraci-Desimone's mother works in Radiology at an off-site facility in New Port Richey and that she (Graham) goes to that facility to conduct mammographies. She asserted that she does not have a social relationship with Witness Geraci-Desimone's mother. (7-2, pg. 9-12)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 25)

**Witness Geraci-Desimone** denied telling Complainant that her mother had a close relationship with RMO Graham. She stated that her mother knows RMO Graham because her mother works for Radiology in the New Port Richey clinic and RMO Graham works under the "same umbrella." Witness Geraci-Desimone stated that the relationship between her mother and RMO Graham is strictly professional, not personal. (7-4, pp. 14-17)

**Witness Mitchell-Davis** did not witness the event in question. However, she asserted that on more than one occasion Witness Geraci-Desimone has mentioned her mother's relationship with RMO Graham. Witness Geraci-Desimone has said that her mother and RMO Graham are good friends, so she (Witness Geraci-Desimone) had to be careful what she told her mother because her mother would tell RMO Graham and she would get upset. (7-9)

**Event 7:** *On September 3, 2015, as complainant was walking towards her interview for the sexual harassment fact-finding, AG approached her and asked, "Is the vagina here?" and made a gesture of inserting something into her vagina.*

**Complainant** stated earlier on the day in question, RMO Petrillo informed her that there was going to be a fact-finding. About 20-30 minutes before she was to go to meet with him, Complainant had to take care of a patient who was complaining of pain. Complainant went to get Witness Geraci-Desimone to chaperone her. When she left the room, Witness Geraci-Desimone was coming in her direction and made the statement ascribed to her in the event and made a gesture as if inserting something into her vagina. Complainant stated that she immediately turned and went back into the room. Once she arrived to the meeting with RMO Petrillo and her Union representative she told them what had transpired. (7-1 Second Transcript, pp. 17-27)

**RMO Petrillo** stated that Complainant told him of the event in question the same day it happened.  Complainant relayed what Witness Geraci-Desimone said as described in the event, but did not tell him about the gesture.  This event was included in the fact-finding that began on the same day. (7-3, Written Affidavit pp. 7-9)

**Witness Geraci-Desimone** stated that she might have said "is the vagina scan here", but she denied making any gestures.   Witness Geraci-Desimone stated that Complainant never said that using the term "vagina scan" was offensive to her and that she preferred transvaginal ultrasound. (7-4, pp. 63-65)

**Witness Axsom** stated Complainant told her about the event but did not witness the event. (7-8)

**Witness Mitchell-Davis** stated that on the day in question, they were out in the hallway and she heard Witness Geraci-Desimone refer to a patient as a vagina. (7-9)

***Event 8:** **During the first week of September 2015, complainant reported AG's sexual harassment to SP; however, SP did not notify AG until September 11, 2015 and SP did not interview complainant until September 18, 2015.***

**Complainant** explained that around September 1st she complained to RMO Petrillo about Witness Geraci-Desimone's alleged sexual harassment and on September 3rd she learned that there would be a fact-finding.  He told Complainant that the fact-finding would take some time because the witnesses needed Union representation during their interviews.   RMO Petrillo did not notify RMO Graham about the fact-finding until September 11, 2015. (7-1 Second Transcript, pp. 27-34)

**RMO Graham** attested that she learned from RMO Petrillo that Complainant had complained of sexual harassment.  She advised RMO Petrillo to follow the process on sexual harassment complaints.  RMO Graham explained that it takes time to go through the sexual harassment complaint process. (7-2, pp. 12-16)

**RMO Petrillo** averred he began a fact-finding on September 3, 2015, when he interviewed Complainant.  Complainant went over the allegations that had been brought forward, basically.  RMO Petrillo stated that there was a fair amount of content of what she brought in her interview as what she saw in the complaint.  He explained that he interviewed most of the Ultrasound staff.  Witness Geraci-Desimone was not notified until September 11, 2015, because she was going to be the last person to be interviewed.  At that point, he was trying to collect as much information as he could, so when he sat with Witness Geraci-Desimone his questions were as thorough as possible.  Witness Geraci-Desimone agreed to some of the content of Complainant's allegations but not with the intent alleged by Complaint.  RMO Petrillo asserted that to the Complainant Witness Geraci-Desimone's was sexual harassment.   As far as Witness Geraci-Desimone was concerned, it was more "her over the top personality" trying to fit in within her first couple of weeks.  According to RMO Petrillo, Witness Geraci-Desimone realized it was inappropriate.  RMO Petrillo interviewed a number of

13

people and for the purposes of his findings took their interpretations (whether it was uncomfortable situation and what the intent was) into consideration, especially of those who were present at the time of some things being said.  His fact-finding resulted in Witness Geraci-Desimone receive a Written Counseling. (7-3, pp. 27-34)

**Event 9:** *On September 10, 2015, AG commented she enjoyed working there, but couldn't stand the fact that she had to work with "dirty vaginas."*

**Complainant** attested that they had just finished a pelvic ultrasound and she was complimenting Witness Geraci-Desimone when Witness Davis asked if she was "getting the hang of it."  Witness Geraci-Desimone responded that she enjoyed working there but what she could not "stand the most is scanning the dirty, stinky vaginas." Complainant changed the subject but Witness Geraci-Desimone kept repeating herself. Complainant attested that there were patients nearby that could hear her comments. She averred that she and Witness Davis went to RMO Petrillo and he told them he would speak to Witness Geraci-Desimone (7-1 Second Transcript, pp. 34-38)

**RMO Petrillo** denied knowledge of this event until he was notified that he was listed as a RMO. (7-3, pg. 34)

**Witness Geraci-Desimone** denied making the statement attributed to her.  She stated that what she said was that doing the transvaginal ultrasounds made her uncomfortable. She made this statement about three weeks after she began employment and said it because she was not familiar with that type of ultrasounds.  Her experience was more in other types of ultrasounds. (7-4, pp. 17-21)

**Witness Mitchell-Davis** stated that she heard Witness Geraci-Desimone say with the earshot of patients that she did not like to work with dirty vaginas.  She said that Complainant was "floored." (7-9)

**Event 10:** *On September 18, 2015, as AG was walking towards her interview on the sexual harassment fact finding, she gave complainant an angry, hostile look.*

**Complainant** stated that after complaining she was walking on eggshells because she did not want anybody saying that she was picking on her.  On the day in question, Complainant passed Witness Geraci-Desimone and said her good mornings, but Witness Geraci-Desimone kept walking without responding.  Complainant described the look Witness Geraci-Desimone gave her as aggressive and intimidating.  No one witnessed the incident. (7-1 Second Transcript, pp. 38-41)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 36)

**Witness Geraci-Desimone** denied this occurred and said that she went to her interview without knowing who had complained.  Ms. Geraci-Desimone speculated that Complainant developed animosity against her after Ms. Geraci-Desimone did not support her during a challenging incident with a Veteran. (7-4, pp. 21-24)

**Event 11:** *On September 21, 2015, complainant reported bullying to SP, as of September 25, 2015, SP has not done anything about it.*

**Complainant** attested that the incidents at issue in this event occurred after the fact-finding was initiated.  She sent an email to RMO Petrillo September 21, 2015, saying she wanted to talk to him about some incidents that occurred after she met with him. Complainant stated Witness Geraci-Desimone had been ignoring her when she talked to her about patients and had refused to chaperone in a transvaginal scan. Complainant averred RMO Petrillo did not address her concerns. (7-1 Second Transcript, pp. 42-52)

**RMO Graham** attested that she was informed by RMO Petrillo about the allegations and that she would have advised him to initiate an internal fact-finding.  RMO Graham could not recall the outcome of the fact-finding.   She stated that RMO Petrillo consistently worked on the addressing the allegations. (7-2, pg. 17)

**RMO Petrillo** averred that this event would have occurred during the fact-finding but he only addressed what Complainant had complained about.  This event was not part of what she included in her complaint.   He also indicated that some of the events Complainant complained about allegedly occurred with no witnesses present. (7-3, pp. 37-39)

**Event 12:** *On September 21, 2015, AG refused to talk to complainant when complainant tried to talk to her about a patient.*

**Complainant** averred that before she sent the email to RMO Petrillo, referenced in the prior event, she had an incident with Witness Geraci-Desimone.  She asked Witness Geraci-Desimone that morning if a patient of hers was there and if the patient was prepared.  Even though she was standing next to her, Witness Geraci-Desimone did not acknowledge Complainant. (7-1 Second Transcript, pg. 53)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 41)

**Witness Geraci-Desimone** stated that at this point she knew about Complainant's complaint and that while there may have been animosity between them, she would have not stopped talking to her about patient care.  Therefore, she denied this occurred. (7-4, pp. 24-26)

**Witness Mitchell-Davis** stated that after the fact-finding, Witness Geraci-Desimone ignored and was very rude to Complainant.   She maintained that she spoke with Witness Geraci-Desimone to prevent her from "attacking" Complainant.   During this conversation, Witness Geraci-Desimone mentioned the relationship between her mother and RMO Graham. (7-9)

**Event 13:** *In September 2015, AG did not acknowledge or look at complainant when she asked AG to chaperone her with a patient, AG just left instead.*

15

**Complainant** stated that on the day in question, she was the Acting Lead.   Five minutes before her first pelvic ultrasound was to come in, Witness Geraci-Desimone and Witness Axsom were in the "pelvic room", so Complainant said to Witness Geraci-Desimone that she (Complainant) had two full pelvic exams which took about an hour each and that it would be "great" if she (Witness Geraci-Desimone) was there.   Without considering the request, Witness Geraci-Desimone refused.   Complainant continued to tell her about the importance of her being at the exam; however, when the appointment time came, Witness Geraci-Desimone was not in the area. (7-1 Second Transcript, pp. 53-57)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 41)

**Witness Geraci-Desimone** stated that at point she was still shadowing other technicians, so if Complainant asked her she may have had to go to shadow another technician.   She did not have any recollection of this event. (7-4, pp. 26-28)

**Event 14:** *Around October 2015, after AG learned about her benefits, she gave complainant a "high five" and purposely put her chest on the complainant while doing a "shoulder bump."*

**Complainant** explained that one day, during open season; Witness Geraci-Desimone asked her what insurance she had because they both are single mothers.   She told Witness Geraci-Desimone that she had to pay full premium even though it was just for two people.   However, Complainant told her that she thought they were going to be offering a self-and-other plan that would be less expensive.   Witness Geraci-Desimone told Complainant she would find out.   When Complainant saw Witness Geraci-Desimone again, Witness Geraci-Desimone was very excited because she found out that the information Complainant had provided was correct.   Witness Geraci-Desimone gave her a high-five and a chest bump.   Complainant told her not to do that and walked away. (7-1 Second Transcript, pp. 57-60)

**RMO Petrillo** denied knowledge of this event. (7-3, Written Affidavit pg. 9)

**Witness Geraci-Desimone** stated that she was happy about the news concerning their benefits so she gave Complainant a high five.   She denied putting her chest on Complainant's shoulder and denied doing a shoulder bump. (7-4, pp. 65-68)

**Witness Mitchell-Davis** maintained that Complainant called her very upset after this incident.   Witness Mitchell-Davis described Complainant as not being a "touchy-feely" kind of person.   She did not know if Complainant reported this incident to RMO Petrillo. (7-9)

**Event 15:** *During October and November 2015, complainant saw AG scan her own abdomen with the door open and her undergarments exposed.*

**Complainant** attested that on several occasions she saw Witness Geraci-Desimone scanning herself.   When Witness Geraci-Desimone scanned herself Complainant saw

16

her bra and/or the top of her underwear.  Witness Geraci-Desimone would scan herself with the door open and on more than one occasion Complainant told that she had to close the door because other people walking by could see her.  However, Witness Geraci-Desimone did not think it was a problem. (7-1 Second Transcript, pp. 60-64)

**RMO Petrillo** denied knowledge of this event. (7-3, Written Affidavit pg. 11)

**Witness Geraci-Desimone** stated that while it was against the rules, all the female technologists scanned each other's uteruses.  She stated that she scanned her abdomen and that none of the technologists, including Complainant, said they were offended.  Further, Witness Geraci-Desimone stated that Complainant scanned other employees.  Witness Geraci-Desimone maintained that the door to the room was never left open and that her undergarments were never exposed. (7-4, pp. 69-73)

**Witness Axsom** stated that Witness Geraci-Desimone may have scanned herself for learning purposes, but she always wore an undershirt.  She did not know Witness Geraci-Desimone to expose any undergarments.  Witness Axsom stated that other technologists, including her (Witness Axsom), scanned themselves for educational purposes. .Management was never told her that scanning oneself was not allowed but believes the lead tech said scanning each other was frowned upon. (7-8)

**Witness Mitchell-Davis** has seen Witness Geraci-Desimone scanning the area around her liver on her bare skin.  She has also seen her watching You Tube videos on scanning.  Witness Mitchell-Davis explained that they are not allowed to scan their own bodies unless they are trying out a new machine for educational purposes. (7-9)

**_Event 16:_ _In November 2015, AG instructed complainant in a "condescending and hostile" tone, to use her own assigned room like everybody else, then turned her back on complainant and started talking to Brent Burton (BB), Medical Instrument Technologist, about how she got drunk the night before._**

**Complainant** explained that on the day in question, she had just returned from leave and they had reassigned the rooms but she was not notified.  She thought the room that she was supposed to be in was a different room and it was missing a probe.  Witness Geraci-Desimone walked up to me and asked who took the probe from the room.  Complainant told Witness Geraci-Desimone that she had taken the probe to which Witness Geraci-Desimone responded that she (Complainant) needed to use her assigned room like everyone else.  Complainant attested that she went to RMO Petrillo and complained about this incident because she felt it was retaliatory behavior from Witness Geraci-Desimone because of the sexual harassment complaint. (7-1 Second Transcript, pp. 65-66)

**RMO Petrillo** denied knowledge of this specific instance but stated that the room assignment issue was one concerning a number of employees in the department.  He said it was a "hot" issue not just with Complainant and Witness Geraci-Desimone.  Employees preferred some rooms because the equipment was newer; however, they were supposed to adhere to a rotation.  He addressed the issue by reiterating that

employees had to use the rooms assigned to them.  Eventually, according to RMO Petrillo, the issue resolved itself. (7-3, pp. 42-46)

**Witness Geraci-Desimone** stated that she probably spoke to Complainant about not using her (Complainant's) assigned room.  However, she denied discussing getting drunk with Witness Burton.  Witness Geraci-Desimone stated that she does not drink very much and does not get drunk. (7-4, pp. 28-33)

**Witness Burton** denied knowledge of this event. (7-6, pp. 4-5)

**_Event 17:_** **_In December 2015, AG referred to one of the Radiology Residents as "Dark Chocolate" and described "all the things she would do" to sway him her way._**

**Complainant** attested that there were two Radiology residents who had the Reading Room in their department and had been doing two rotations.  Complainant was walking away from the Technologist Room when Witness Geraci-Desimone told her that "dark chocolate was back."  Witness Geraci-Desimone had previously mentioned that she thought he was attractive and Complainant had told her the Resident was married.  On this occasion, Witness Geraci-Desimone said "mmm, mmm, mmm, the things I would do to him."  Complainant reminded Witness Geraci-Desimone that the Resident was married, to which she responded, "So?  That doesn't mean anything.  People get divorced every day, after I'm done with him he's not going to want to go anywhere else." (7-1 Second Transcript, pp. 66-71)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 47)

**Witness Geraci-Desimone** stated that she did not give the Resident that name; the department gave him that name.  She stated that there was another Resident who was called White Chocolate.  Witness Geraci-Desimone denied the comment about doing things and swaying the Resident.  Witness Geraci-Desimone stated that she was not interested in the Resident because he was too young for her. (7-4, pp. 33-35)

**_Investigator's Note:_** _Events 18 and 19 are interrelated so they are jointly summarized._

**_Event 18:_** **_In December 2015 and January 2016, AG gave complainant "dirty looks" and made disparaging remarks about her eating disorder and stated, "Oh my God, you are obsessed over the stupidest sh*t ever."_**

**_Event 19:_** **_On multiple occasions, AG looked at complainant "disgustingly" while complainant was eating and stated, "I can't believe you're going to eat all that."_**

**Complainant** stated she had been using an app, My Fitness Pal, to track her eating.  She was sitting in the Technologist's room with other technologists, including Witness Geraci-Desimone.  They were talking about tracking their calories, but the conversation did not include Witness Geraci-Desimone.  She said that she was not sure what she was not going to have for dinner because she wanted to stay within certain limits.

18

Witness Geraci-Desimone interjected and said, "Oh, my God, you obsess over the stupidest shit ever." Complainant maintained she has an eating disorder that was triggered by Witness Geraci-Desimone's constant "picking" on her. Complainant stated that every time she talked about eating or was eating in front of Witness Geraci-Desimone, she would get "dirty" looks from her and would get comments as the one listed in Event 19. (7-1 Second Transcript, pp. 72-81)

**RMO Petrillo** denied knowledge of these events. (7-3, pp. 48-49)

**Witness Geraci-Desimone** explained that this event occurred only once and that it was in January. On that occasion Complainant had repeatedly discussed about what she was having dinner. Witness Geraci-Desimone also stated that Complainant had done the same for her lunch, so Witness Geraci-Desimone did say that she (Complainant) obsessed over this matter and that she should just pick something to eat. Witness Geraci-Desimone stated that she did not want to hear Complainant discussing what she was going to eat, so she (Witness Geraci-Desimone) probably did use the expression "the stupidest shit." She denied knowledge of Event 19. (7-4, pp. 36-40)

**Witness Mitchell-Davis** indicated that she was on leave during the period in question and that currently she has been out on maternity leave since October 2016. However, she received a call from Complainant while she was out about Witness Geraci-DeSimone's comments concerning Complainant's eating disorder. Further, Witness Mitchell-Davis knows that Witness Geraci-Desimone has told Complainant that she is "OCD" about things. (7-9)

### *Event 20: In January 2016, AG embraced complainant and kissed her on the cheek after complainant told AG her patient had cancelled an appointment.*

**Complainant** went to the front after eating lunch to check if one of her patients had arrived. The 1:00 pm appointment had cancelled so when Witness Geraci-Desimone walked up looking for her patient, Complainant told the patient had cancelled. Witness Geraci-Desimone got very excited, came around the desk, put her arms around Complainant, and gave her a kiss on the cheek. Complainant told Witness Geraci-Desimone that she could not do that because it made her feel uncomfortable. Witness Geraci-Desimone responded that Complainant would have to get used to it if they were going to get along because that was the way she showed affection. (7-1 Second Transcript, pp. 81-84)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 12)

**Witness Geraci-Desimone** confirmed that she did kiss Complainant on the cheek because she was happy than an appointment had cancelled. When Complainant told her it made her feel uncomfortable, she apologized and told her it was not her intent to make her feel uncomfortable. (7-4, pg. 73-76)

### *Event 21: In January 2016, AG "hollered" at complainant when complainant asked AG to call for an In-House patient.*

**Complainant** stated that she emailed RMO Petrillo about this incident on February 22, 2016, where she stated that Witness Geraci-Desimone was causing a hostile work environment for her. Complainant explained that during this incident, Witness Geraci-Desimone had two pelvic ultrasounds, which were an hour long, that did not show up and she was sitting around for the two hours. They were extremely busy and they were trying to get in as many patients as they could. It was 11:00 am and Witness Geraci-Desimone did not have a patient until 1:00 pm, so she would not have anything to do for four to five hours. Complainant said that she noticed that there was an in-house patient pending to be discharged. She explained that per policy, they have to try to accommodate those patients as soon as possible so they can be discharged and so a bed can freed-up for another Veteran. Since Witness Geraci-Desimone did not have anything to do, Complainant went to her and asked if she could call for the in-house patient. Witness Geraci-Desimone responded that she could not do it because she was going to lunch. Complainant reminded her that lunch was not until Noon, so she had time to do the scan, but Witness Geraci-Desimone said she would not be done by lunchtime. Complainant suggested that she take the patient after lunch, to which she responded that she did not have to do that. Eventually, through the intervention of RMO Petrillo, Witness Geraci-Desimone conducted the exam. (7-1 Second Transcript, pp. 85-91)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 49)

**Witness Geraci-Desimone** stated that it was possible that Complainant, in an Acting capacity, asked her to call for an in-house patient, but she denied hollering at the Complainant. (7-4, pp. 40-42)

**_Event 22:_** **_In January 2016, AG caused complainant to be late for her patient by taking 50 minutes to perform an ultrasound that takes 30 minutes._**

**Complainant** averred she volunteered to chaperone Witness Geraci-Desimone because she was available. Because they were trying to get her to be better on her own, she did not intervene during her study; however, Witness Geraci-Desimone took a lot longer than expected. She took 50 minutes to do a 30-minute study. It was ten minutes before lunchtime and she made Complainant 20 minutes late for her next patient; this was a transvaginal exam patient. Because everybody was already at lunch, Complainant did not have anyone to chaperone so she asked Witness Geraci-Desimone, but she said she had to go to lunch. Complainant told Witness Geraci-Desimone that she was driving her crazy and after an exchange of words, Witness Geraci-Desimone agreed to chaperone her. (7-1 Second Transcript, pp. 91-100)

**RMO Petrillo** explained that it is not uncommon for technologist to run late on patients depending on the test. He stated that technologists deal with a large scope of patients. RMO Petrillo attested that he will not "saddle" technologists with a mandate to stay within a limit of 30 minutes. He maintained that he learned of this instance from Complainant because it affected the lunch breaks that followed. His response was that

whatever the amount of time was necessary to take care of one of their veterans was the time it would take. (7-3, pp. 51-54)

RMO Petrillo indicated that several employees spoke to him about the amount of time it took Witness Geraci-Desimone to complete an exam. However, because Witness Geraci-Desimone's ultrasound experience focused on a different area than what she was required to do in their service, they were working with her. He asserted that Witness Geraci-Desimone was credentialed in ultrasound; however, at any diagnostic center or hospital would have their own protocols. Therefore, an incoming employee could be "set on" understanding how to do a process one way and then come and be told that you'll do it a completely different way; there is a learning curve that goes along with any job. (7-3, pp. 56-59)

**Witness Geraci-Desimone** stated that if this was a transvaginal ultrasound this probably occurred because she was still not familiar with them. However, she also stated that Complainant could have taken over the scan to expedite the process. (7-4, pp. 42-43)

***Investigator's Note:*** *Events 23 and 24 are interrelated so they are jointly summarized.*

***Event 23:*** *Around January/February 2016, complainant saw AG embrace BB inappropriately in the hallway.*

***Event 24:*** *Around January/February 2016, complainant saw AG enter the Tech room and sat on BB's lap and wrapped her arms around his neck and asked how he was doing.*

**Complainant** explained that this event occurred closer to the beginning of March. She said she was walking towards the MRI area and saw Witness Geraci-Desimone and Witness Burton hugging in a "seductive" manner. She said that Witness Geraci-Desimone had her arms around his neck. Complainant did not bring this incident up until the mediation. Complainant also attested that there was an incident during which Witness Geraci-Desimone sat on Witness Burton's lap. Complainant also maintained that there were several incidents that people in the department witnessed during which Witness Geraci-Desimone flirted or behaved "inappropriately" with Witness Burton who is a married man. (7-1 Second Transcript, pp. 100-106)

**RMO Petrillo** attested that Complainant and Witness Mitchell-Davis reported to him about the hug. He maintained that he spoke with Witness Burton and Witness Geraci-Desimone who affirmed that they had hugged but denied the hug had been inappropriate. RMO Petrillo denied that Complainant complained that this was sexual harassment/hostile work environment. RMO Petrillo denied knowledge about Event 24. (7-3, pg. 14-15)

**Witness Geraci-Desimone** denied embracing Witness Burton inappropriately, but said that she hugged Witness Burton more than once because he showed her the ropes and she was grateful for his help and support. She denied any other relationship with

Witness Burton other than coworkers. Witness Geraci-Desimone also denied sitting on Witness Burton's lap. She said she sat on the arm of the chair he was sitting on and that she may have given him a hug. (7-4, pp. 76-81)

**Witness Burton** stated that on one occasion, Witness Geraci-Desimone may have given him a hug. He did not recall who would have witnessed the hug (not an embrace). Witness Burton did not recall the reason for the hug. If he was to guess, it would have been to thank him for helping her with scanning because nobody was really helping her and it was extremely difficult to get help from other techs. He did not remember a time or date. For him it would have been something minor that he did not take any extra intention or meaning behind it. (7-6, pp. 5-6)

Witness Burton also recalled one incident when he was sitting in front of a work computer that Witness Geraci-Desimone sat on the left armrest of the chair that he was sitting on. He did not recall the conversation nor did he recall Witness Geraci-Desimone putting her arm around me. She may have put her arm on the back of the chair to balance herself but he did not recall. (7-6, pg. 6)

**Witness Mitchell-Davis** stated that she has seen Witness Geraci-Desimone sit on Witness Burton's lap on more than one occasion and has seen Witness Geraci-Desimone sit on the arm of Witness Burton's chair and put her legs on his lap. (7-9)

***Event 25:** During January and February 2016, when AG entered the room where complainant was performing an ultrasound on a patient, AG demanded that complainant leave the room.*

**Complainant** stated that for the times that exams were being conducted, there was a sign on the door of the ultrasound room that said "Do not disturb. Study in progress." On several occasions, Witness Geraci-Desimone disregarded the sign. On the same day that Witness Geraci-Desimone made Complainant late for a patient and refused to chaperone and while Complainant was scanning a patient that was an emergent case Witness Geraci-Desimone interrupted several times to ask how long it would take her to finish. Witness Geraci-Desimone told Complainant that she had a patient waiting; however, the appointment was not for another 35 minutes. (7-1 Second Transcript, pp. 106-111)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 55)

**Witness Geraci-Desimone** stated that she would not have demanded that Complainant leave a room while she was conducting an ultrasound on a patient. She said that she probably asked Complainant how much longer she thought she would need. (7-4, pg. 44)

***Event 26:** Between January, February, and March 2016, AG pulled up her shirt multiple times to show complainant her abs.*

**Complainant** averred on several occasions Witness Geraci-Desimone lifted up her shirt.  On one occasion she lifted up her shirt to show her the tattoo on her abdomen.  On another occasion, while talking to several male staff members, Witness Geraci-Desimone lifted up her shirt to show them that she needed to tone her abdomen.  She did not complain to management about this because she felt it would be of no consequence; nothing would be done. (7-1 Second Transcript, pp. 112-117)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 18)

**RMO Geraci-Desimone** stated that she may have lifted her shirt to compare her abs with someone else but that she really could not remember. (7-4, pp. 82-86)

***Investigator's Note:***   *Events 27 and 33 are interrelated and will be summarized together.*

***Event 27:*** *During January, February, and March 2016, Victor Martinez (VM), Medical Instrument Technician, taunted complainant by stating that AG was her best friend, asking her where her best friend was, knowing AG had sexually harassed and bulled her.*

***Event 33:*** *Around June 27, 2016, VM taunted complainant continually by telling her he was going to take her job, he was going to allege she was harassing him, and he would conduct a fact finding, in order to get his way.*

**Complainant** attested that during the time Witness Geraci-Desimone was allegedly sexually harassing her, Witness Martinez would find her in the Tech room or in the exam rooms hiding.  He would ask her what she was doing and she responded by telling him that she was staying away from Witness Geraci-Desimone.   Witness Martinez would say "Where is your best friend?  How come you're not hanging out with your best friend?"  He knew that she was trying to get away from Witness Geraci-Desimone but he constantly "taunted" her.  Complainant also stated sometime in June 2016, she had a conversation with Witness Martinez during which he told her he wanted to leave the job.  She asked him if he had applied somewhere and responded that he was going to take away Primary Care Annex (PCA) from her.  Complainant explained that he knew why she wanted to go to PCA and that she had the seniority if a position was open at PCA; however, Witness Martinez still taunted her with telling her he would be taking the spot from her. (7-1 Second Transcript, pp. 117-133; and Written Affidavit pp. 10-11)

**RMO Petrillo** denied knowledge of these events. (7-3, pg. 55 and pg. 73)

**Witness Martinez** stated that the joking about Witness Geraci-Desimone was initiated by Complainant after he was interrogated by RMO Petrillo on September 29, 2015.  On September 30, 2015, Complainant came into the scan room where he was preparing for his next patient and told him to be cautious around Witness Geraci-Desimone.  Complainant asked him if he knew that Witness Geraci-Desimone had "fake boobs", that Witness Geraci-Desimone would "rub them" on him and that she would "try to have

23

her way" with him eventually.  Complainant told him that Witness Geraci-Desimone's parents work for the VA in Tampa and know "higher ranking people", so if he made her mad she would put his job on the line.  On another occasion in October Complainant laughingly said that she did not think the fact-finding should have gone that far.  She also revealed that she knew he had not "stuck up" for her when he was interviewed.  The next day, Complainant joked with him and said that he was Witness Geraci-Desimone's new best friend.  Complainant continued to make similar jokes about him and Witness Geraci-Desimone and about him and Witness Burton.  Witness Martinez contended that Complainant initiated the jokes about being best friends with Witness Geraci-Desimone and that he joked back in return.  He denied it was taunting. (7-5, pp. 14-24)

Witness Martinez also attested that the joke concerning the new primary care clinic (PCA) ultrasound job started in May 2016 when RMO Petrillo announced that the VA would possibly place a second an Ultrasound Technologist at that clinic.   In the meantime, RMO Petrillo established a rotation to help PCA's patient load on Fridays because their tech was off on Fridays.  The Lead Technologist, Witness Mitchell-Davis, told them that it would be a good experience for anyone who would be interested in transferring to PCA when the position became available.  However, it was not clear, whether it would be competitive placement or if it would go by seniority.  Witness Martinez stated that shortly after this information was shared with the ultrasound department, Complainant started once again joking around and frequently saying that the PCA position should go by seniority, and in that case, she should get first choice over everyone.  Witness Martinez joked back saying that if they did not go by seniority she would have some friendly competition from her peers including him.  Complainant laughed back and stated that she would claim she was stressed out and on medication, and needed a change of atmosphere.  She also said that he was lucky there were patients and coworkers present and that she liked him like a brother, otherwise she would "stab" him with her pen.  Witness Martinez jokingly replied that if she kept harassing him with the pen, he would conduct a fact-finding so he would get the PCA position. (7-5, pp. 24-29)

***Investigator's Note:*** *Events 28 and 32 are interrelated so they are jointly summarized.*

**Event 28:** *On February 16, 2016 and several occasions, AG, as a chaperone to complainant for a transvaginal ultrasound, interrupted complainant several times and rudely hollered, "You need to hurry up, how much longer, I have a patient," in front of the patient.*

**Event 32:** *From March 3, 2016 to present, AG continues to ignore complainant when complainant asks for assistance, and continues to interrupt complainant's procedures by knocking on the door and telling complainant to hurry up.*

**Complainant** attested that on the date in question, there was an incident towards the end of the day.  Witness Geraci-Desimone was assigned a patient who had driven a far distance and was late because she had a hard time finding parking.  The patient was getting a pelvic ultrasound.  Witness Geraci-Desimone told the patient that they could

not take care of her but Complainant had finished early with another patient and had 15 minutes. She told Witness Geraci-Desimone that she could do the ultrasound as long as Witness Geraci-Desimone was the chaperone. During the ultrasound, Witness Geraci-Desimone kept interrupting to ask how much longer it would take and if she could accelerate the exam. Complainant attested that Witness Geraci-Desimone engaged in similar conduct on several occasions. (7-1 Second Transcript, pp. 133-135)

**RMO Petrillo** stated that around the time frame in question (March 2016) Complainant brought to his attention that Witness Geraci-Desimone continued to interrupt her procedures. He spoke with Witness Geraci-Desimone and she told him that she felt it was quite the opposite; she felt Complainant was aggressive with her and was treating her poorly. Witness Geraci-Desimone also told him she was not performing well because of the stress caused by Complainant. RMO Petrillo stated that during that period he started to get more of a sense that both of Complainant and Witness Geraci-Desimone were extremely upset and were vocal about the way they were being treated by each other. RMO Petrillo indicated that shortly after the conversation with Witness Geraci-Desimone, she moved forward with meeting with their Chief about issues that led to a separate AIB. (7-3, pp. 69-71)

**Witness Geraci-Desimone** denied that she would engage in the conduct described. (7-4, pg. 45)

**Witness Mitchell-Davis** indicated that she witnessed this conduct from Witness Geraci-Desimone and reported it to RMO Petrillo. (7-9)

### *Event 29: On February 19, 2016, AG approached complainant, and in an angry, hostile tone, stated, "It is your responsibility to close one of the rooms."*

**Complainant** maintained on the day in question she had just finished the pelvic portion of a patient's exam and was waiting for the patient outside when Witness Geraci-Desimone came by and asked in an "authoritative way" if Complainant had been assigned to the Women's Center that week. When Complainant responded that she was, Witness Geraci-Desimone told her she needed to start closing the rooms. Witness Geraci-Desimone told Complainant that she had not closed the room the day before. Complainant refuted Witness Geraci-Desimone's assertion but Witness Geraci-Desimone insisted. (7-1 Second Transcript, pp. 135-139)

**RMO Petrillo** attested that as in Event 16 with the room assignments, the issue about closing the rooms was also a department-wide conflict. However, they were not even sure that people were not coming in after hours and utilizing those spaces that would have been outside of their service. (7-3, pp. 61-63)

**RMO Geraci-Desimone** stated that she probably made this statement but she denied making it in an angry or hostile tone. (7-4, pp. 45-48)

**Event 30:** *On February 19, 2016, while complainant was on break, AG approached her, stared at the computer, and asked complainant in a condescending and angry tone, "Did those outpatient requests get done?"*

**Complainant** stated that after Event 29, Witness Geraci-Desimone left the room for a couple of minutes and came back, sat down, and while staring at the computer asked in an "angry, demeaning, and demanding tone" if the outpatient requests had been done. The outpatient bin was empty, so Complainant pointed out that it was empty. Witness Geraci-Desimone ignored Complainant's response. Complainant indicated that Witness Geraci-Desimone did not have the authority to question Complainant about her job duties. (7-1 Written Affidavit, pp. 2-3)

**RMO Petrillo** denied knowledge of this event. (7-3, pg. 65)

**Witness Geraci-Desimone** stated that she asked the question because the requests were not being done during the day and a stack was being left for the evening staff. However, she said that the question was not just for Complainant, it was a general question about the requests being done. (7-4, pp. 49-51)

**Event 31:** *On February 25, 2016, when complainant went to SP and told him about AG's actions, he told complainant there were more pressing issues so he couldn't get to it, and for her to do what she has to do.*

**Complainant** averred she sent RMO Petrillo a follow-up email on February 25, 2016, to her February 22, 2016. In the email she stated that she felt he was not taking the situation seriously. She told him (Petrillo) that she had to schedule an appointment with her doctor to prescribe additional anxiety medication to be able to come to work and that it was unfair to her that she had to endure a hostile work environment. Complainant stated that no action was taken. (7-1 Written Affidavit, pp. 2-3)

**RMO Petrillo** stated that Complainant approached him on the date in question and he recalled apologizing to her if she felt that her concerns were taking a backseat to anything else. He maintained that he told Complainant that there were many things that were going on inside both of the services at that point but that her concerns were not taking a backseat. Complainant told him that she might have to move forward and get counsel or seek advice from the union. He advised that she should do what she needed to do. RMO Petrillo told Complainant that they were working on her concerns and completing the fact-finding. (7-3, pp. 65-68)

**Witness Mitchell-Davis** indicated that she witnessed Complainant upset and when she asked, Complainant told her about RMO Petrillo's comment. Witness Mitchell-Davis spoke to RMO Petrillo about the comment. (7-9)

**Event 34:** *On June 28, 2016, SP instructed Michelle Strauser, Medical Instrument Technologist, to inform the department, which includes the complainant, to perform the Doppler ultrasounds for AG.*

26

**Complainant** averred that on the day in question, RMO Petrillo instructed them not to send liver Doppler ultrasounds, kidney transplant Doppler ultrasounds, pelvic ultrasounds, and breast ultrasounds to the New Port Ritchey facility where Witness Geraci-Desimone was placed as the ultrasound technologist. Complainant told RMO Petrillo that this decision was unfair to the rest of us in the department. That they all had the same job description and the same pay, and that the decision was going to cause more hostility in the department. Witness Strauser agreed and voiced similar concerns. (7-1 Written Affidavit, pp. 13-15)

**RMO Graham** denied knowledge of the event but stated that if RMO Petrillo did what was ascribed to him in the event it would have been for training purposes so that all could have hands-on training in an area that was not done regularly. (7-2, pp. 19-22)

**RMO Petrillo** attested that when Witness Geraci-Desimone was detailed out to New Port Richey, it was brought to his attention that the exposure that she would have had to this type of Doppler exam, a vascular study, would have been limited. This type of exam is also limited as a whole in their department because it is something that is not generally ordered; it is not one of the routine exams. Initially, when Witness Geraci-Desimone was detailed, he gave the directive that he did not want the Dopplers scheduled in New Port Richey. He later met with the Ultrasound Radiologist and it was agreed that one of the Ultrasound doctors would go to New Port Richey when the next Doppler was ordered at that facility, do the Doppler and train Witness Geraci-Desimone. RMO Petrillo stated that up to the point of his testimony the opportunity to do this had not come up. (7-3, pp. 74-75)

**Witness Strauser** averred Witness Geraci-Desimone had recently been moved out to the New Port Richey CBOC by management with no explanation. They still had not been given any directive as to what exams were to be forwarded out there and what was to stay in Tampa. RMO Petrillo had mentioned that he would be sending out an email to the department as to what would stay and what would be sent to the New Port Richey CBOC. When Witness Strauser saw him the afternoon of June 28, she asked him if he knew what was to be done, as they had not sent an email with the instructions. He started with the basics, livers, gallbladders, kidney, bladders, aortas and thyroids. RMO Petrillo said that since they still did not have a way to sterilize the transvaginal probes correctly at CBOCs, the pelvic and the transvaginal exams would stay in Tampa. Witness Strauser asked about scrotal ultrasounds and he said that as long as there was a male or female chaperone they could be done out at the New Port Richey location. Witness Strauser also asked him about the liver and kidney Doppler. He responded that they were staying in Tampa. When she asked why he stated it was because Witness Geraci-Desimone did not know how to perform them. Witness Strauser told RMO Petrillo told him that that was not their problem and that it was not fair. Witness Strauser asserted that Witness Geraci-Desimone was given time to learn them but never took the initiative to learn them. Complainant overheard her telling RMO Petrillo that the other technologists would have a problem with this decision, so Complainant confirmed what Witness Strauser stated. Witness Strauser maintained that she was never told to inform the other staff that this decision had been made. Since she is not

the Lead, she told RMO Petrillo that he needed to send an email out with this information. (7-7, pg. 4)

**Event 35:** *On June 30, 2016, VM became hostile towards complainant because she refused to perform a scan after he had scanned the wrong organ.*

**Complainant** maintained that on the day in question, Witness Martinez became hostile and angry towards her because she did not feel comfortable putting signature on a study that he had already attempted but had scanned the wrong organ. She had approached Witness Martinez and told him that she was going to do an emergent testicular ultrasound instead of the liver ultrasound that she was scheduled for, because it was assigned to her in error. She explained to Witness Martinez that this was the patient that had to be called back because he had scanned an aorta instead of what the order stated which was to scan the liver. Witness Martinez told her it was okay for her to do the scan but she replied she did not feel comfortable doing. According to Complainant, Witness Martinez became hostile and angry and demanded she scan the study. He stated that they were all responsible to scan this specific patient because it was nova repeat study. Complainant told him that she was sorry, that she did not feel comfortable doing it, and that she was not going to do it. After this incident Complainant limited her interactions with Witness Martinez because of his "hostile behavior and disregard for the patient's life" made her feel uncomfortable. (7-1 Written Affidavit, pg. 18)

**RMO Petrillo** attested he was not sure that the date given in this event is accurate, but stated that he became aware of this issue through either Complainant or through Witness Mitchell-Davis. He was involved in the issue because he gave Witness Martinez the exam to repeat. RMO Petrillo averred that he was not aware that Witness Martinez became upset about doing this repeat exam. He explained that it is customary that a repeat exam be conducted by the same Technologist who conducted the initial one. (7-3, pp. 77-79)

**Witness Martinez** explained that on the date in question after he finished scanning his last patient he sat in the main tech room to ice his arm. A couple of minutes later Complainant came in and said he had to add on a bladder scan. He replied he could not scan the patient because he was having some discomfort and needed to take a break. Witness Martinez stated that Complainant became angry and said she could not scan the patient. She told RMO Petrillo that he had to refuse to do patient care. RMO Petrillo came in asked his side of the story. After the explanation, RMO Petrillo stated that he understood why he needed a short break. Witness Martinez was unaware of who ultimately conducted the scan. (7-5, pp. 29-31)

**Event 36:** *On July 12, 2016, complainant sent an email to SP regarding VM's taunting and approaching her saying, "Oh you think you're perfect", and VM stopped talking to complainant after she told him to stop.*

**Complainant** stated that on the day in question, she was in Witness Mitchell-Davis' office waiting for her to provide information on a patient. Witness Martinez came in the

room to bring up a mistake she had made with a patient by scheduling him for an ultrasound when had already had one in April 2016. According to Complainant, Witness Martinez started to make unnecessary remarks about how she made a mistake. Although she asked him to stop he continued to "bully" her by stating that she thought she was perfect and made no mistakes. When Complainant sternly told him he needed to stop and that she would not tolerate the behavior, Witness Martinez told her not to speak to him again and he walked out. (7-1 Written Affidavit, pg. 19)

**RMO Petrillo** indicated that Complainant did advise him of this event and that he brought her email to leadership. Leadership indicated to RMO Petrillo that they would initiate a fact-finding concerning bullying allegations made by Complainant against Witness Martinez. At the time of this testimony, the findings had not been reported to RMO Petrillo. (7-3, pp. 81-83)

***Investigator's Note:*** *Requests were made to the EEO Manager to provide a copy of the Fact-Finding. The EEO Manager delivered the requests to leadership but the fact-finding documents concerning the bullying allegations were not provided.*

**Witness Martinez** stated that on July 12, 2016, he noticed that his patient had been scanned the month before and the Radiologist had suggested a six-month follow-up. Before sending the patient home, he went to Witness Mitchell-Davis' office. Complainant happened to be in Witness Mitchell-Davis' office. Witness Mitchell-Davis looked at the records and confirmed that the patient was due back in six months, but that the Complainant had failed to note in his record. Being that Complainant in the past had jokingly said she was awesome and never made mistakes, he jokingly said he thought she was perfect. Witness Martinez averred that Complainant then came into his personal space and with a raised voice warned him to leave her alone and not speak to her again. Later that day, Complainant passed by him and said, "You are toast". He felt threatened and the situation increased his stressed, which resulted in a physical reaction that led to a hospital visit. (7-5, pp. 32-35)

***Event 37:*** *As of July 27, 2016, SP has not taken action about the February 19, 2015 incident (event 2) and the incident above that complainant had reported to him.*

**Complainant** asserted that on the day in question, she sent an email to RMO Petrillo with copy to RMO Graham and Witness Mitchell-Davis, asking for a response to several concerns she had brought up earlier and that he had not followed up on or addressed. In this email she specifically addressed conversations on June 14, 2016, June 28, 2016, and July 12, 2016, in which she complained of colleagues causing a hostile work environment, putting patients' lives at risk, delaying patient care, and breaking VA policies. RMO Petrillo did not respond to this email until two days later. (7-1 Written Affidavit, pg. 21)

**RMO Graham** denied knowledge of this event. (7-2, pg. 24)

29

**RMO Petrillo** stated that based on what leadership told him the issue was going to be taken outside of his service and it would be investigated. (7-3, pg. 84)

***Event 38:*** *On July 29, 2016, SP sent an email stating technologists were not to cc: the Lead Technologist on emails, in response to complainant's July 27, 2016 request for status on her harassment complaints.*

**Complainant** indicated that on the day in question RMO Petrillo responded via email to Complainant's email of July 27, 2016.  In his response, he stated that some of the issues she brought up had already been addressed and that others were still being considered.  A couple of minutes after he responded to her email, RMO Petrillo sent out a department-wide email regarding inter-departmental correspondence.  He stated that they were not to include their lead technologist in correspondences regarding another bargaining unit employee.  She replied to his email stating that she needed clarification because she wanted to make sure that she was following her chain-of-command properly.  Complainant also mentioned that after the most recent AIB board she was specifically told to follow her chain-of-command starting with the lead technologist.  RMO Petrillo did not respond to her email.  (7-1 Written Affidavit, pg. 23-25)

**RMO Petrillo** attested that it is not in the functional statement of the Lead Technologist where she should be involved in matters that involve more than one bargaining union employee.  If there is an allegation or if somebody is making a statement about another bargaining union employee, it should come directly to him.  RMO Petrillo averred that what he stated in the email was that if the issue in an email was something that concerned another employee, the Lead Technologist should not be copied in the email.  However, if the issue was work related then it would be appropriate to include the Lead Technologist in the email. (7-3, pg. 88)



**Complainant** refuted management's response and reiterated her testimony. (7-16)

The information in this report was obtained from witness testimonies, affidavits and documentation provided by complainant and /or the Agency.

*Doralisa Wroblewski*

Doralisa Wroblewski
EEO Investigator

January 13, 2017

Date