UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ERIN TONKYRO,
DANA STRAUSER,
KARA MITCHELL-DAVIS,
YENNY HERNANDEZ

                                             Case No.:8:16-cv-2419-t-36AEP

        Plaintiffs,

v.

DAVID J. SHULKIN, MD *Secretary*,
DEPARTMENT OF VETERANS AFFAIRS,

        Defendant.

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF REQUESTED

    Plaintiffs, Erin Tonkyro, Dana Strauser, Kara Mitchell-Davis and Yenny Hernandez (hereinafter "Plaintiffs") complain of Defendant, David J. Shulkin, MD**,** Secretary, Department of Veterans Affairs as follows:

    **1.**    This court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, including 42 U.S.C. § 2000e-16.

    **2.**    Plaintiff**s** have complied with all jurisdictional prerequisites to action under Title VII of the Civil Rights Act of 1964 as amended including having exhausted their administrative remedies.

    **3.**    James A. Haley VA Healthcare System (Haley VAHCS) is a Veterans Administration (VA) hospital and medical center with related services. It is broken down into various services.  Kathleen Fogarty (Fogarty) was Director at material times until 2015.  Joe D. Battle is the current Director.  Edward Cutolo (Cutolo) is Chief of Staff.    Stephen Stenzler

(Stenzler) is the Chief of the Radiology Service. Joseph Parise (Parise) is Assistant Radiology Chief. John Bennett (Bennett) is currently the Administrative Officer of Radiology and was Plaintiffs second line supervisor as the Chief Radiology Technologist from 2008 to 2012.  Jeri Graham (Graham) was the Plaintiffs' direct supervisor until April 2012 and is currently Plaintiffs' second line supervisor and is the Chief Technologist in the Radiology Department. Carolyn Eubanks was the Plaintiffs' first line supervisor from January 2013 until November 2013. Mario De Leon (De Leon) was Plaintiffs' first line supervisor prior to Scott Petrillo (Petrillo) being hired at the beginning of October 2014.  Dr. Jorge DeVillasante was the Chief of Radiology prior to Dr. Stenzler.  Scott Petrillo (Petrillo) is the Ultrasound and MRI supervisor and the first line supervisor of Yenny Hernandez and of Erin Tonkyro, Dana Strauser and Kara Mitchell-Davis (the Plaintiffs). Each of the employees of the VA as described herein were employed by the Defendant and were acting within the course and scope of his or her employment with the Defendant at the time of the conduct described herein.  Each of the employees was there during relevant times of this complaint.

4.      Erin Tonkyro (Tonkyro) is a Medical Instrument/Ultrasound Technologist (MIT) at the Haley VA. She has worked at VA in her position for over thirteen (13) years.

5.      Kara "Nikki" Davis (Davis) has been a Lead Medical Instrument Technologist (GS-10) since February 2014 at the Haley VA and prior to that was an MIT/ Ultrasound Technologist (GS-9) since November 2008.

6.      Dana "Michelle" Strauser (f/k/a Pryor) (hereinafter Strauser) has been in her position as an MIT/Ultrasound Technologist (GS-9) for over seven (7) years at the Haley VA.

7.      Yenny Hernandez (Hernandez) is a Medical Instrument/Ultrasound Technologist (MIT) (GS-9) since October 2011 at Haley VA.

**8.**     The Defendant has engaged in sexual harassment of several female employees and a pattern and practice of retaliation for engaging in EEO activity including opposing sexual harassment, the filing of informal and formal Equal Employment Opportunity ("EEO") claims, participation in this EEO activity or participation as a witness on behalf of other parties' EEO claims.  This retaliation for EEO activity went on throughout all material times.

**9.**     Tonkyro was a victim of sexual harassment and opposed sexual harassment against herself and several other female employees.  She filed informal EEO complaints on May1, 2012 and March 28, 2014.  She filed formal EEO complaints on June 12, 2012 and July 9, 2014.  She filed her present EEO complaint on July 9, 2014.  She added like or related claims and amendments on November 14, 2012, which were accepted for investigation on November 19, 2012 and on September 24, 2014, which were accepted for investigation on October 1, 2014. She has fully participated throughout the processing of those complaints and the processing of complaints by others, *inter alia,* by providing testimony, documents and deposing witnesses including individuals set forth in Paragraph 3. Tonkyro filed her present formal EEO complaint on July 9, 2014 and more than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c). Tonkryo also filed another informal complaint on September 22, 2015 and filed her formal compliant on November 3, 2015. More than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).

**10.**     Davis was a victim of sexual harassment and opposed sexual harassment against herself and several other female employees.  She filed informal EEO complaints on April 30, 2012 and April 1, 2014.  She filed formal EEO complaints on June 8, 2012 and July 7, 2014. She added like or related claims and amendments on November 14, 2012, which were accepted

for investigation on November 19, 2012, and on November 20, 2014, which were accepted for investigation on November 25, 2014.  She has fully participated throughout the processing of those complaints and the processing of complaints by others, *inter alia,* by providing testimony, documents and deposing witnesses including individuals set forth in Paragraph 3.  Davis filed her present formal EEO complaint on July 7, 2014 and more than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).  Davis also filed another informal complaint on September 23, 2015 and filed her formal compliant on October 28, 2015. More than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).

11.     Strauser was a victim of sexual harassment and opposed sexual harassment against herself and several other female employees.  She filed informal EEO complaints on May 1, 2012 and March 28, 2014.  She filed formal EEO complaints on June 8, 2012 and June 15, 2014.  She has fully participated throughout the processing of those complaints and the processing of complaints by others, *inter alia,* by providing testimony, documents and deposing witnesses including individuals set forth in Paragraph 3.  Strauser filed her formal EEO complaint on July 11, 2014 and more than 360 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).  Strauser also filed another informal complaint on February 10, 2016 and filed her formal compliant on April 4, 2016.  More than 180 days have passed since that date, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).

12.     On May 1, 2015 Plaintiffs' Tonkyro and Davis also moved to amend their original formal EEO complaints.  More than 360 days have passed since that time.

13.     Hernandez' EEO activity included the fact that she was a witness in the AIB and original EEO involving the other three Plaintiffs in May of 2012 and December 2012.  She was also a witness in their EEOs by affidavit dated December 30, 2014.  Hernandez was also a victim of sexual harassment and opposed sexual harassment against herself and others, including the other Plaintiffs. Hernandez filed her informal complaint on July 28, 2016.   She filed her formal complaint on September 8, 2016. She has fully participated throughout the processing of those complaints and the processing of complaints by the other Plaintiffs, *inter alia,* by providing testimony, documents and deposing witnesses including individuals set forth in Paragraph 3. More than 180 days have passed since her filing of the formal complaint on September 8, 2016, thus satisfying the jurisdictional requirements of 42 U.S.C. 2000e- 16(c).

14.     The Plaintiffs' claims arise out of the same transaction or occurrence or series of transactions or occurrences and the claims have common questions of fact and law.

## GENERAL ALLEGATIONS

15.     Beginning in 2008 Plaintiffs and others began to suffer from sexual harassment and a hostile work environment caused by supervisory management officials. After numerous complaints to upper management about these issues without meaningful action, EEO complaints were filed in May 2012. An Administrative Investigative Board was commenced by management and an investigation was conducted into the behaviors reported.   On July 9, 2012 an Administrative Investigation Board (AIB) investigation was completed regarding allegations of sexual harassment, creating a hostile work environment, and conduct unbecoming of a federal employee within the Ultrasound Department. The AIB committee was composed of all Haley VA employees other than one individual, despite concerns voiced by the Plaintiffs to Director Fogarty and the Chief of Staff, Cutolo that some members of the AIB possessed a bias.  The AIB

investigation was not a good faith investigation into the allegations of sexual harassment.  It nevertheless concluded that "appropriate administrative action" needed to be taken against Dr. Parise and Bennett.  Appropriate administrative action was not taken.  On November 14, 2012, Plaintiffs Tonkyro, Strauser, and Davis were notified that Bennett and Graham were placed back into their supervisory roles.   On January 17, 2013 Plaintiffs were notified of Dr. Parise's reinstatement as Assistant Chief of Radiology and John Bennett's new position was a promotion to Administrative Officer of Radiology.  Director Fogarty was responsible for making the final decision based on the AIB findings regarding what appropriate administrative actions would or would not be taken.

16.     In May 2012, Plaintiffs, Tonkyro, Strauser and Davis, had filed complaints with the EEO as a result of the sexual harassment and hostile work environment.  Given the lack of good faith in the AIB, their cases proceeded through discovery depositions of John Bennett and Kathleen Fogarty as well as the plaintiffs and a former ultrasound technologist, Megan Green who resigned because of sexual harassment.   Those cases involved most of the same management officials that are involved in this case.  Hernandez was listed as a witness for Plaintiffs Tonkyro, Strauser and Davis. Their cases settled in September 2013. The cases settled for damages, attorney's fees, and other affirmative relief.

17.     During the periods of the AIB and Plaintiffs Tonkyro's, Strauser's, Davis's and Hernandez' EEO cases and subsequently, management officials spread rumors and made denigrating remarks about them to others inside and outside the VA.  These included demeaning their work ethic; falsely describing their conduct; and disparaging their motives and reputations. Plaintiffs Tonkyro, Strauser, Davis and Hernandez were portrayed as falsely claiming harassment, only seeking money and people who should be avoided.

18.     Certain officials also threatened the Plaintiffs and others.  Dr. Parise threatened various doctors that his lawyers would get any statements they made and he would see them. They would know how management felt by the actions that followed.  On or about June 12 or 13, 2013, a meeting occurred in Dr. Parise's office.  Present at the meeting were Dr. Stenzler, Chief of Radiology, Dr. Parise, Dr. Hersh, Dr. Cay, Dr. Brenner and Dr. Andrews.  Dr. Parise told the doctors that he would not go down to the Ultrasound Department because if he saw them (the sexually harassed technologists) he would "put his F****** foot down their throats".  No one spoke up in defense of the ultrasound technologists.  Dr. Parise and Bennett often postured hostility when encountering the Plaintiffs.  Strauser received threatening phone calls from Haley VAHCS by a male claiming to be an attorney and threatening to file a law suit against Strauser on behalf of Dr. Parise's wife, Dominique.  Strauser also received harassing telephone calls from Mrs. Parise on two occasions. Bennett told an outside vendor to only send female representatives to demonstrate equipment because the ultrasound technologists had issues with men.  Strauser and Davis received baseless written counselings.  Hernandez received a counseling when she complained of sexual harassment against another employee.

19.     Since the September 2013 settlement, investigations which were supposed to take place into certain matters referenced above have either not been conducted in good faith or at all. Witnesses that have come forward have had their workload complicated and subjected to baseless fact findings and management lead Administrative Investigative Boards (AIBs). Hernandez was one of those individuals.  Assertions that Parise and Bennett would be taken out of the Plaintiffs' Tonkyro, Strauser, and Davis's chains of command have not actually occurred. These three Plaintiffs have continued to suffer from a hostile work environment based on reprisal and conduct of the type alleged has continued.  These three  Plaintiffs and Hernandez have: been

denied career advancement and promotions; subjected to privacy breaches; threatened and intimidated; and denied compressed work schedules, among other things.

20.     Following the September 2013 settlement, information which is confidential and Privacy Act protected was placed on the VA's intranet available to all other employees and supervisors.  This included information disclosing the fact of the Plaintiffs Tonkyro, Strauser, Davis's EEOs, documents that were supposed to have been removed or expunged from their files as part of the settlement and other documents which placed Plaintiffs Tonkyro, Strauser, and Davis in a bad light. Similar conduct has been found to evidence retaliation. *Mogenhan v. Napolitano,* 613 F.3d 1162, 1166 (D.C. Cir. 2010).  Discovery has shown that the Privacy Office found that this was protected information and ordered an investigation.

21.     The Defendant put Bennett in charge of its investigation into Privacy Act breaches.  Discovery has also shown that Bennett and Stenzler provided false information to the Privacy Office.  The report back to the Privacy Office was under the signature of Service Chief, Stenzler.  However, depositions reflect that the report was prepared by Bennett.  The report reflects that ADPAC coordinator Kevin Miller was designated to investigate the radiology S:/Drive for improper material or unsecured sensitive information.  The report states: "Upon investigation, it was revealed that: the sensitive information referred to did in fact reside on the radiology S:/Drive."  Miller testified that while assigned the investigation, he found no information on the S:/Drive.  On information and belief, evidence will show it had already been moved elsewhere. The report to the Privacy Office next maintains that ". . . it must be deduced that the outgoing Supervisor of [MRI and ultrasound, Carolyn Eubanks] placed the information on the S:/Drive for the service to retain."  Mr. Miller denied discovering that as a result of his investigation.  The report further states that "no person currently working in the service had

knowledge of these files being transferred to the S:/Drive as no notification to any employee was established." Mr. Miller did not make that finding as a result of his investigation.

22.     The report also contains a remediation plan which could not be verified through discovery.  The redress, preservation and protection of the Plaintiffs' Privacy Rights have not occurred.

23.     As the result of the above, Tonkyro, Strauser, and Davis filed new EEOs. Hernandez was a witness for them in these proceedings.   She provided the December 30, 2014 affidavit for Davis and she was named as a witness in their interrogatory answers filed in their EEO administrative proceedings in June and July 2015.

24.     Plaintiffs Tonkyro's, Strauser's and Davis' hostile work environment has continued with new like and related hostile events. Plaintiff Hernandez has both observed and experienced many of those acts as well, including being approached by Dr. Thornton Eastham and told that Dr. Parise was saying that she and other girls in ultrasound would be fired. Members of management have used various means to undermine the Plaintiffs' ability to perform their jobs.  Management has hired supervisors over ultrasound who have no knowledge or experience with ultrasound procedures or techniques.  They have also hired incompetent technologists to work in Ultrasound and placed the health and safety of veterans in danger while ignoring prior decisions by ultrasound technologists and hiring panels rejecting the hiring of these technologists. Tumors, pregnancies, thyroid nodules, and general or miscellaneous pathologies have been missed, but management failed to address these issues when notified. This places the veterans, lead technologist Davis and other ultrasound technologists in jeopardy. Open positions have also not been filled.  Davis's ability to perform through her employees is being impaired.  Other technologists have experienced increased stress from having to carry an

extra load. This burden has fallen primarily upon the Plaintiffs.  This provides management with a pretextual basis to take actions against her and the other Plaintiffs or deny them advancement.

25.     Management has not only hired technologists for the Ultrasound Department who do not know how to perform ultrasound or who have difficulty following the orders given by radiologists or other physicians to check various organs, but one of those technologists has engaged in continuous sexual harassment which is offensive to other ultrasound technologists. Efforts to get Petrillo, Stenzler or others to address each of these issues have failed.  These actions by management have aggravated the hostile work environment that the Plaintiffs are experiencing.

26.      Both Davis and Tonkyro have been denied positions for which they were the most qualified.  In addition to statements by Dr. Stenzler to Tonkyro made two months after the September, 2013 settlement agreement that management would not allow her to be a supervisor after her EEO activity, management has made statements to other employees that none of the technologists who filed EEOs would be allowed to advance.

27.     Tonkyro, Davis, Strauser and Hernandez have been subjected to the same or substantially similar hostile work environments based upon reprisal (EEO activity) as set forth below.

28.     In addition to paragraphs 19 to 27, Tonkyro has been subjected to a hostile work environment based upon reprisal (EEO activity) including in the following ways:

      a.     On August 23, 2013 Bennett glared in a threatening manner at Tonkyro when he walked past her.

      b.     On September 13, 2013, Dr. Stephen Stenzler (Stenzler) approached Tonkyro and asked to speak to her in private.   He stated to Tonkyro that an

MRI/Ultrasound supervisor position was about to become available and that she should apply and that she would make a great leader. On December 4, 2013, Stenzler stated that after providing his recommendations to the Director and Dr. Cutolo, they both stated that would not occur and that the Director wanted an external party to be hired for the position.

c. On January 9, 2014, management (Stenzler, Bennett and Parise) modified the job qualifications for the MRI/Ultrasound supervisor position in such a manner to ensure Plaintiffs would not be qualified. They modified it from previously being open to Diagnostic Radiology Technologists (DRTs) and Ultrasound Technologists to just DRTs only, thus excluding Plaintiffs.

d. January 20, 2014, Tonkyro was denied the opportunity to apply for the MRI/Ultrasound supervisor position. Only DRTs, not MITs, could apply for this job.

e. On or around February 12, 2014, management knowingly allowed privacy act protected information relating to Tonkyro, Davis and Strauser relating to their prior EEO complaint, records, and written counseling, as well as HIPAA information to be stored on the "S-drive," which was available to view on the computers of other supervisors and hospital employees. This included information which was supposed to be removed from official files as a result of the September 2013 Settlement Agreement.

f. On or about February 12, 2014, Plaintiffs were notified by another staff employee that confidential information concerning them and their EEOs were on the facility intranet accessible by other employees and supervisors. This placed them in a bad light. Later, several technologists claimed to have knowledge of the Plaintiffs' settlement agreement and made statements denigrating the Plaintiffs. This did not come from the Plaintiffs and must have come from supervisors trying to create hostility

between the Plaintiffs and others because of benefits the Plaintiffs were said to have received.

g.      On March 23, 2014, Tonkyro felt threatened and intimidated when Parise entered her work area and glared at her.

h.      On March 26, 2014 Plaintiffs had a meeting with Stenzler to discuss that they felt uncomfortable with Parise being in their department and informed Stenzler that Parise was in the department unaccompanied.  Stenzler stated during the meeting "you girls will never get past this," referencing their prior EEO complaints.

i.      On or about August 27, 2014, another staff employee made a disparaging comment about female Ultrasound Technologists after allegedly accessing information about the Plaintiffs' prior EEO complaint on a hard drive.

j.      In September of 2014, Tonkyro, who was frustrated by the treatment she received at the main hospital, transferred to the Primary Care Annex (PCA).  On several other occasions Tonkyro had issues with obtaining supplies for her work location in regards to preparing the facility for patient care.  Tonkyro's performance was based in large part upon providing that care.  Bennett was responsible for making sure Tonkyro had the items needed for the start-up of the PCA.

k.      A PCA lead tech position has been approved by upper management since June 27, 2014.  That involves a GS increase from a GS-9 to a GS-10, and increased pay. However, Radiology management has refused to provide the lead technologist position to Tonkyro.  Tonkyro has been provided a number of excuses for why the position which has been approved by upper management for two years has not been made available to her.

l.     On January 26, 2015 during a meeting, MRI/Ultrasound Supervisor, Petrillo, and Chief of Radiology, Stenzler, informed the Ultrasound staff that there was going to be a new position posted for an Ultrasound Supervisor.  Petrillo had no ultrasound experience or training. He stated that he would no longer be the supervisor once the position was filled and that the position would be posted within a week. The position was not posted.  Both Davis and Tonkyro inquired about the position with Petrillo over a two month time period and his response to both of them was he had no knowledge of the new position.

m.     On March 31, 2015 in a department meeting, Petrillo informed the Ultrasound technologists that the supervisor position was not going to be posted and/or filled.  It was decided by upper management that the greater need was for a technologist that can scan patients. Once Tonkyro and Davis showed interest in this upper-level position, management decided that it was no longer needed or available in an effort to retaliate against the Plaintiffs by prohibiting their advancement within the department. This instance was similar to when the MRI/Ultrasound position was posted in January 2014 for DRT's to apply, thus excluding the ultrasound technologists from the possibility of advancing into an upper-level management position.  In addition, this instance is similar to a course previously used by the same management officials named in Plaintiffs' prior EEO complaints where management played favorites by dangling the Lead Ultrasound Technologist position in front of Plaintiffs and used it as a tool in creating a sexually harassing and hostile work environment.

n.     After the PCA lead and ultrasound supervisor issues were made a part of the Plaintiffs' latest EEOs, the ultrasound supervisor's position was posted. An

13

ultrasound supervisor position was posted in April 2016. However, management will not allow any of the three ultrasound technologists to obtain this position which still remains unfilled. In March 2016 Petrillo offered the PCA lead to Davis, not Tonkyro. Petrillo knew Davis would not want to take that position. Davis refused. On June 2, 2016, Tonkyro asked Stenzler why she was not being offered the PCA lead position. Stenzler admitted authorizing Petrillo to offer the PCA lead to Davis as a lateral move, but pretextually told Tonkyro he was now working out organizational chart issues. Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised. Only Davis applied, but she has not received the position. Among the pretextual reasons Davis was given was the need for organization chart changes. During the June 2, 2016 conversation, however, Stenzler, who knows Tonkyro has reported this as part of her EEO claims, told Tonkyro that the Ultrasound supervisor position was "meant for" her and he was surprised that she had not applied for that position. He made this statement despite knowing Tonkyro had already reported his statement that the Director and Dr. Cutolo would not let her have that position as part of her EEO claims. ¶24 b. In or around July 2016 Tonkyro was also told that management had told others that neither Davis, her, or Strauser would ever receive these positions. Rather, someone from outside would be selected as supervisor and make it difficult on them. Management is creating continued disruption by allowing technologists to know positions could be available, but not allowing them to obtain them while offering pretextual excuses instead and conveying conflicting information.

14

o.      From the summer of 2016 until the present several of these issues have continued and new threats have been made.  The ultrasound lead and supervisors' positions have not been filled and despite requests, no one will offer an understandable reason.

p.      On August 25, 2016, Davis, Tonkryo, and Strauser met with Battle to discuss their apprehensions regarding the apparent decline of patient care and safety, as well as threatening and retaliatory practices and deteriorating morale within their service. The next day, Dr. Osman Cay, who was acting chief while Stenzler was out of town and Dr. Parise was off, spoke with some Radiology staff members about it.  This conversation included the fact that they met with Battle the day before, and how this was perceived as going out their "chain of command" by other Radiology staff members.  A few days later Parise began to tell other radiologists that the "problem" ultrasound girls were going to be fired because of the "in-fighting" within the department.  On September 14, 2016, the Plaintiffs disclosed this threating information to Battle by email.  He responded on September 19, 2016 and stated that he would not tolerate retribution and that he did not know how Dr. Cay got the information about the meeting.  No further follow-up has occurred.

q.      It was brought to Davis's attention by Dr. Katie Bailey, a staff radiologist at James A Haley, that Parise made derogatory gestures and comments about Davis during the October 2016 Radiologist meeting in front of the Chief of Radiology, Stenzler, as well as other physicians. Stenzler stood up in front of all the Radiologists at this meeting and told them that Davis was about to have her baby and that she would be out on maternity leave for four months  Parise then yelled out "Yes" and at the same time

made an arm jerking motion to suggest a celebratory action.   As soon as the meeting was over, Bailey told Davis about the incident.   This was the second time that Parise had threatened or acted inappropriately about Davis in front of Stenzler and nothing had been done about it.  This upset Tonkyro because the techs have been considered as one and criticized as a group.

r.      Davis was also informed by Dr. Thornton Eastham a radiologist, that Parise was speaking out to different individuals about threatening to fire the ultrasound girls,   Davis, Tonkyro, and Strauser, because he heard that they had a meeting with the hospital director.  Dr. Eastham said he was concerned for their wellbeing.

s.      The Ultrasound Department continued to be short staffed and patient care is being interrupted and compromised.  The lack of a sufficient number of competent ultrasound techs has been brought to management's attention on multiple occasions.  The lack of support from Radiology's management team has been part of a desire to harass the Ultrasound Department as a form of retaliation for their prior and current EEOs.

t.      Dr. Aaron Andrews, who met with Stenzler on November 4, 2016, brought to Davis's attention that Stenzler had been making derogatory comments about Davis's performance as the lead of the Ultrasound Department.  During the same meeting Stenzler was discussing Davis, Tonkyro, and Strauser's previous and current private EEO information with Andrews.  Stenzler told Andrews that Davis, Strauser, Tonkyro and ultrasound technologist Hernandez were the reasons for the Ultrasound Department's failures because they were filing frivolous or unfounded EEOs.

**29.**     In addition to paragraphs 19 to 27, Davis has been subjected to a hostile work environment based upon reprisal (EEO activity) including in the following ways:

16

a.      From August 23, 2013 to late March, 2014 Bennett constantly intimidated Davis by glaring at Davis in a threatening manner when he was in close proximity to her.

b.      On January 9, 2014, management (Stenzler, Bennett and Parise) modified the job qualifications for the MRI/Ultrasound supervisor position in such a manner to ensure Plaintiffs would not be qualified.  They modified it from previously being open to Diagnostic Radiology Technologists (DRTs) and Ultrasound Technologists to just DRTs only, thus excluding Plaintiffs.

c.      On February 14, 2014, Davis received a call from an MRI technologist, Gina Feeney, informing Davis that Bennett and Stenzler allowed personal information relating to her previous EEO and other EEO complaints to be stored on a computer hard drive that was accessible to anyone with access to the facility's computers.  She and other technologists complained.  They felt they were being made to look bad.

d.      On or about February 14, 2014, Plaintiffs were notified by another staff employee that confidential information concerning them and their EEOs were on the facility intranet accessible by other employees and supervisors.  This placed them in a bad light.  Later, several technologists claimed to have knowledge of the Plaintiffs' settlement agreement and made statements denigrating the Plaintiffs.  This did not come from the Plaintiffs and must have come from supervisors trying to create hostility between the Plaintiffs and others because of benefits the Plaintiffs were said to have received.

e.      On February 28, 2014 Davis was selected (approving authority information pending) to serve as the Lead Technologist, GS-10.  Davis was told that she would have to be boarded and processed for the position and that it would be finalized no

later than two weeks.  Davis did not receive the promotion or pay until May 2014. Bennett and other members of management attempted to rewrite standards in order to delay her promotion and to reduce her ability to be successful.  Subsequently, management has undertaken efforts which undermine her ability to work and place her at risk for punishment.

f.   On March 21, 2014 Graham convened a hiring panel to conduct interviews that Davis was tasked to participate in.  Throughout the process the individuals not initially qualified to be added to the certificate were added to the inventory and Davis and other panel members interviewed them.  The hiring official, Stenzler, decided against the panel's recommendations and selected someone of his choosing.  Davis had a meeting with Stenzler to express that he, as the hiring official, performed this act as a means to hire unqualified personnel in order to see her (Davis) fail as the lead technologist.

g.   On March 25, 2014 Parise entered Davis' workspace unaccompanied. This action was in violation of a previous agreement between Plaintiffs and management per the previous EEO complaints.

h.   On March 26, 2014 Parise entered Davis' work space and glared at her in an intimidating manner.

i.   On March 26, 2014 Plaintiffs had a meeting with Stenzler to discuss that they felt uncomfortable with Parise being in their department and informed Stenzler that Parise was in the department unaccompanied.  Stenzler stated during the meeting "you girls will never get past this," referencing their prior EEO complaints.

j.   On March 27, 2014, in attempt to see Davis fail as Lead Technologist, Stenzler decided against the recommendations of a panel and selected unqualified

individuals for a position that Davis would have some responsibility for.  Davis had a meeting with Dr. Stenzler regarding this to no avail.

k.    On or about August 1, 2014 management denied Davis' request for a compressed work schedule when they had approved it for other ultrasound technologists within the department.

l.    On or about August 27, 2014, another staff employee made a disparaging comment about female Ultrasound Technologists after allegedly accessing information about the Plaintiffs' prior EEO complaint on a hard drive.

m.    As a result of a workplace injury, Davis went on Workman's Compensation.  When Davis was released from Workman's Compensation in January 2015 for the work related injury, Petrillo under the direction of Bennett denied her return to work in her service area. Davis received paperwork from Human Resources (HR) via mail notifying her that she was denied return to work in her service area and was given an alternate work assignment out at PCA.  A few days after Davis emailed management stating that she felt she was being retaliated against by being prohibited to return to work in her service area when all the employees before in her situation were accommodated, HR informed her that management had a "change of heart" and decided to give Davis an alternate work assignment in her service area at the main hospital.

n.    Petrillo acted disparately towards Davis compared to how he treated the other MRI/Ultrasound technologists upon her return to work.  His actions included placing a large amount of space between them to the point it was difficult to discuss patients, keeping doors open when Davis met with him and closed when other technologists met with him, and demeaning Davis in front of her peers.

19

o.      On January 26, 2015 during a meeting, Petrillo informed the Ultrasound staff that there was going to be a new position posted for an Ultrasound Supervisor.  He stated that he would no longer be the supervisor once the position was filled and that the position would be posted within a week. The position was not posted.  Both Davis and Tonkyro inquired about the position with Petrillo over a two month time period and his response to both of them was he had no knowledge of the new position.

p.      On March 31, 2015 in a department meeting, Petrillo informed the Ultrasound technologists that the supervisor position was not going to be posted and/or filled.  It was decided by upper management that the greater need was for a technologist that can scan patients. Once Tonkyro and Davis showed interest in this upper-level position, management decided that it was no longer needed or available in an effort to retaliate against the Plaintiffs by prohibiting their advancement within the department. This instance was similar to when the MRI/Ultrasound position was posted in January 2014 for DRT's to apply, thus excluding the ultrasound technologists from the possibility of advancing into an upper-level management position.   In addition, this instance is similar to a course previously used by the same management officials named in Plaintiffs' prior EEO complaints where management played favorites by dangling the Lead Ultrasound Technologist position in front of Plaintiffs and used it as a tool in creating a sexually harassing and hostile work environment.

q.      While Davis was not allowed to qualify for a supervisor position and Tonkyro was not allowed to apply for the PCA lead for roughly two years, in the Spring of 2016 management created a series of events designed to create deniability of retaliation while denying any of the Plaintiffs the advancement they wanted.   While

20

various excuses have been provided, in March 2016 Petrillo offered the PCA lead to Davis, not Tonkyro.  Petrillo knew Davis would not want to take that position.   Davis refused.  An ultrasound supervisor position was posted in April 2016. Tonkyro asked why she was not being offered the PCA lead position.  Stenzler admitted authorizing Petrillo to offer the PCA lead to Davis, but pretextually told Tonkyro he was now working out organizational chart issues.  Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised.  Only Davis applied, but she has not received the position.  Management is offering pretextual excuses instead. Among the pretextual reasons Davis was given were the need for organization chart changes.  Tonkyro was told that management had told others that neither Davis, her, or Strauser would ever receive these positions.  Rather, someone from outside would be selected as supervisor and make it difficult on them.

r.     Shortly before the selection was to be made for the supervisor position, an Administrative Investigative Board (AIB) was impaneled to purportedly investigate a hostile work environment that existed within the ultrasound area.  The incompetent ultrasound tech was moved to the New Port Richey office without discussion.  Her mother worked in that office and has personal ties with members of management.  While the ultrasound techs were asked to testify before the AIB, none were informed beforehand or during what the alleged hostile work environment was.  They and other ultrasound techs pointed out that there was a hostile work environment caused by management and cited their past and present EEO activity and the methods being used by

management to undermine the section and not provide it with appropriate supervisors or technologists.

s.     Throughout this process, the supervisor position has not been filled. Recently, Tonkyro and Davis have learned that management has privately said that they were hiring someone from the outside to fill this position.  While that person would have ultrasound experience, it would not be good for the ultrasound technologists.

t.     On April 13, 2016, the ultrasound supervisor position was advertised and posted.  On April 21, 2016, Davis was sent a letter by HR that her application had been accepted for the position.  However, management has not accepted her.  Dr. Stenzler separately told another employee that Davis would never be allowed to be the supervisor.

u.     Since February 2015, despite several requests from Plaintiffs (Strauser and Davis) to have it addressed, there has been a black mold infestation within the Ultrasound Department and action or remedy was not timely taken.

v.     Despite the fact Davis disqualified an applicant based on lack of qualifications for a MIT position in March 2014, the same applicant was hired for the MIT position on or about August 24, 2015.  This applicant did not possess basic abilities necessary to be a competent ultrasound technologist.  Since being hired she has missed many abnormalities and potential malignancies. Davis was intentionally excluded from the interview process involving this candidate, which is typically a part of her normal duties.  Again, these actions have acted to undermine Davis' success as lead technologist. When Davis attempted to address deficiencies she was accused of creating a hostile work environment.

w.     While Davis was not allowed to qualify for a supervisor position and Tonkyro was not allowed to apply for the PCA lead for roughly two years, in the Spring of 2016 management created a series of events designed to create deniability of retaliation while denying any of the Plaintiffs the advancement they wanted.  While various excuses have been provided, in March 2016 Petrillo offered the PCA lead to Davis, not Tonkyro.  Petrillo knew Davis would not want to take that position. Davis refused.  Tonkyro asked why she was not being offered the PCA lead position.  Stenzler admitted authorizing Petrillo to offer the PCA lead to Davis, but pretextually told Tonkyro he was now working out organizational chart issues.  Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised.  Only Davis applied, but she has not received the position.  Management is offering pretextual excuses instead.  Among the pretextual reasons Davis was given were the need for organization chart changes.  Tonkyro was told that management had told others that neither Davis, her, or Strauser would ever receive these positions.  Rather, someone from outside would be selected as supervisor and make it difficult on them.

x.     Shortly before the selection was to be made for the supervisor position, an Administrative Investigative Board (AIB) was impaneled to purportedly investigate a hostile work environment that existed within the ultrasound area.  The incompetent ultrasound tech was moved to the New Port Richey office without discussion.  Her mother worked in that office and has personal ties with members of management.  While the ultrasound techs were asked to testify before the AIB, none were informed

beforehand or during what the alleged hostile work environment was.  They and other ultrasound techs pointed out that there was a hostile work environment caused by management and cited their past and present EEO activity and the methods being used by management to undermine the section and not provide it with appropriate supervisors or technologists.

y.      Throughout this process, the supervisor position has not been filled. Recently, Tonkyro and Davis have learned that management has privately said that they were hiring someone from the outside to fill this position.  While that person would have ultrasound experience, it would not be good for the ultrasound technologists.

z.      On April 13, 2016, the ultrasound supervisor position GS-10 was posted was advertised and posted. On April 21, 2016, Davis was sent a letter by HR that her application had been accepted for the position.  However, management has not accepted her.  Dr. Stenzler separately told another employee that Davis would never be allowed to be the supervisor.

aa.     Many of the above issues have continued.  Conflicting reasons are being offered for failure to fill the lead supervisors and lead tach and other positions. Continuing requests for information are being ignored or deflected.

bb.     On August 25, 2016, Davis, Tonkryo, and Strauser met with Battle to discuss their apprehensions regarding the apparent decline of patient care and safety, as well as threatening and retaliatory practices and deteriorating morale within their service. The next day, Dr. Cay, who was acting chief while Stenzler was out of town and Dr. Parise was off, spoke with some Radiology staff members about it.  This conversation included the fact that they met with Battle the day before, and how this was perceived as

going out their "chain of command" by other Radiology staff members.  A few days later Parise began to tell other radiologists that the "problem" ultrasound girls were going to be fired because of the "in-fighting" within the department.  On September 14, 2016, the Plaintiffs disclosed this threating information to Battle by email.  He responded on September 19, 2016 and stated that he would not tolerate retribution and that he did not know how Dr. Cay got the information about the meeting.  No further follow-up has occurred.

cc.    It was brought to Davis's  attention by Dr. Bailey, a staff radiologist at James A Haley, that Parise made derogatory gestures and comments about Davis during the October 2016 Radiologist meeting in front of the Chief of Radiology, Stenzler, as well as other physicians. Stenzler stood up in front of all the Radiologists at this meeting and told them that Davis was about to have her baby and that she would be out on maternity leave for four months  Parise then yelled out "Yes" and at the same time made an arm jerking motion to suggest a celebratory action.   As soon as the meeting was over, Bailey told Davis about the incident.    This was the second time that Parise had threatened or acted inappropriately about Davis in front of Stenzler and nothing had been done about it.

dd.    Davis was also informed by Dr. Eastham a radiologist, that Parise was speaking out to different individuals about threatening to fire the ultrasound girls,   Davis, Tonkyro, and Strauser, because he heard that they had a meeting with the hospital director.  Dr. Eastham said he was concerned for their wellbeing.

ee.    The Ultrasound Department continued to be short staffed and patient care is being interrupted and compromised.  The lack of a sufficient number of competent

ultrasound techs has been brought to management's attention on multiple occasions. The lack of support from Radiology's management team has been part of a desire to harass the Ultrasound Department as a form of retaliation for their prior and current EEOs.

ff.     Dr. Aaron Andrews, who met with Stenzler on November 4, 2016, brought to Davis's attention that Stenzler had been making derogatory comments about Davis's performance as the lead of the Ultrasound Department. During the same meeting Stenzler was discussing Davis, Tonkyro, and Strauser's previous and current private EEO information with Andrews. Stenzler told Andrews that Davis, Strauser, Tonkyro and ultrasound technologist Yenny Hernandez were the reasons for the Ultrasound Department's failures because they were filing frivolous or unfounded EEOs.

**30.**     In addition to paragraphs 19 to 27, Strauser has been subjected to a hostile work environment based upon reprisal (EEO activity) including in the following ways:

a.     On January 9, 2014, Stenzler, Bennett, and Parise created a position for MRI/Ultrasound supervisor, Posting ID: X-14-TSC-102-5906, with qualifications of a DRT which purposely disqualified Strauser from applying for the position.

b.     On February 12, 2014, MRI Technologist Gina Feeney, notified Strauser that information relating to Strauser's previous EEO complaint, records and written counseling were available on the S:/ drive of the computer system making the information accessible to the entire medical center.

c.     February 2014 Ms. Graham interrupted Strauser during the training for a new piece of equipment, and in front of numerous parties, began questioning Strauser about a patient who was allegedly unhappy with the bathroom facility.

d.      On March 18, 2014 while returning from a portable exam, Strauser saw Parise down the hall from her.  Once Parise saw Strauser, he glared at her and shook his head in an intimidating manner.

e.      On March 26, 2014, Strauser, Davis and Tonkyro had a meeting with Stenzler to let him know they felt uncomfortable with Parise being in their department and that he was there unaccompanied, Stenzler stated, "You girls will never get past this," referring to a prior EEO complaint in which she had participated.

f.      On January 26, 2015 during a meeting, Petrillo informed the Ultrasound staff that there was going to be a new position posted for an Ultrasound Supervisor.  He stated that he would no longer be the supervisor once the position was filled and that the position would be posted within a week. The position was not posted.  Both Davis and Tonkyro inquired about the position with Petrillo over a two month time period and his response to both of them was he had no knowledge of the new position.

g.      Since February 2015, despite several requests from Plaintiffs (Strauser and Davis) to have it addressed, there has been a black mold infestation within the Ultrasound Department and no action or remedy was taken in a timely manner.

h.      On March 31, 2015 in a department meeting, Petrillo informed the Ultrasound technologists that the supervisor position was not going to be posted and/or filled.  It was decided by upper management that the greater need was for a technologist that can scan patients. Once Tonkyro and Davis showed interest in this upper-level position, management decided that it was no longer needed or available in an effort to retaliate against the Plaintiffs by prohibiting their advancement within the department. This instance was similar to when the MRI/Ultrasound position was posted in January

2014 for DRT's to apply, thus excluding the ultrasound technologists from the possibility of advancing into an upper-level management position.  In addition, this instance is similar to a course previously used by the same management officials named in Plaintiffs' prior EEO complaints where management played favorites by dangling the Lead Ultrasound Technologist position in front of Plaintiffs and used it as a tool in creating a sexually harassing and hostile work environment.

i.      While various excuses have been provided, in March 2016 Petrillo offered the PCA lead to Davis, not Tonkyro.  Petrillo knew Davis would not want to take that position.   Davis refused.  An ultrasound supervisor position was posted in April 2016. Tonkyro asked why she was not being offered the PCA lead position.  Stenzler admitted authorizing Petrillo to offer the PCA lead to Davis, but pretextually told Tonkyro he was now working out organizational chart issues.  Moreover, shortly after he had offered Davis the PCA lead tech position and she refused, it was announced that there would be an ultrasound supervisor position opening at the main hospital in Tampa that the Plaintiffs supposedly could qualify for, and that position was advertised.  Only Davis applied, but she has not received the position.  Management is offering pretextual excuses instead.  Among the pretextual reasons Davis was given were the need for organization chart changes.  Tonkyro was told that management had told others that neither Davis, her, or Strauser would ever receive these positions.  Rather, someone from outside would be selected as supervisor and make it difficult on them.

j.      Between April 2016 and May 2016 Parise and Stenzler hired a radiologist who had previously had a personal relationship with Strauser before she came to the Haley VAHCS.  The relationship ended badly.  Strauser had discussed this with Parise

and gave him information which should have caused him to know that hiring the radiologist to work around Strauser would be difficult for Strauser.  Regardless, the radiologist was hired over concerns she expressed to Stenzler when she heard he was being considered.  The radiologist has come on board.  He has blamed Strauser for impairing his ability to do or obtain work.

k.     From the summer of 2016 until the present several of these issues have continued and new threats have been made.  The ultrasound lead and supervisors' positions have not been filled and despite requests, no one will offer an understandable reason.

l.     On August 25, 2016, Davis, Tonkryo, and Strauser met with Battle to discuss their apprehensions regarding the apparent decline of patient care and safety, as well as threatening and retaliatory practices and deteriorating morale within their service. The next day, Dr. Cay, who was acting chief while Stenzler was out of town and Dr. Parise was off, spoke with some Radiology staff members about it.  This conversation included the fact that they met with Battle the day before, and how this was perceived as going out their "chain of command" by other Radiology staff members.  A few days later Parise began to tell other radiologists that the "problem" ultrasound girls were going to be fired because of the "in-fighting" within the department.  On September 14, 2016, the Plaintiffs disclosed this threating information to Battle by email.  He responded on September 19, 2016 and stated that he would not tolerate retribution and that he did not know how Dr. Cay got the information about the meeting.  No further follow-up has occurred.

m.    It was brought to Davis's  attention by Dr. Bailey, a staff radiologist at James A Haley, that Parise made derogatory gestures and comments about Davis during the October 2016 Radiologist meeting in front of the Chief of Radiology, Stenzler, as well as other physicians. Stenzler stood up in front of all the Radiologists at this meeting and told them that Davis was about to have her baby and that she would be out on maternity leave for four months  Parise then yelled out "Yes" and at the same time made an arm jerking motion to suggest a celebratory action.   As soon as the meeting was over, Bailey told Davis about the incident.     This was the second time that Parise had threatened or acted inappropriately about Davis in front of Stenzler and nothing had been done about it.  This upset Strauser because the techs have been considered as one and criticized as a group.

n.    Davis was also informed by Dr. Eastham a radiologist, that Parise was speaking out to different individuals about threatening to fire the ultrasound girls,  Davis, Tonkyro, and Strauser, because he heard that they had a meeting with the hospital director.  Dr. Eastham said he was concerned for their wellbeing.

o.    The Ultrasound Department continued to be short staffed and patient care is being interrupted and compromised.  The lack of a sufficient number of competent ultrasound techs has been brought to management's attention on multiple occasions.  The lack of support from Radiology's management team has been part of a desire to harass the Ultrasound Department as a form of retaliation for their prior and current EEOs.

p.     Dr. Andrews, who met with Stenzler on November 4, 2016,   brought to Davis's attention that Stenzler had been making derogatory comments about Davis's performance as the lead of the Ultrasound Department.   During the same meeting

Stenzler was discussing Davis, Tonkyro, and Strauser's previous and current private EEO information with Andrews.  Stenzler told Andrews that Davis, Strauser, Tonkyro and ultrasound technologist Hernandez were the reasons for the Ultrasound Department's failures because they were filing frivolous or unfounded EEOs.

**31.**     In addition to paragraphs 24 to 27 Hernandez has been subjected to a hostile work environment based upon reprisal (EEO activity) and sex  including in the following ways:

a.     Hernandez is a single mother of a special needs child who was intimidated by John Bennett when he was her supervisor.  She did not file an EEO until 2016 because she had seen the retaliation which the other girls had experienced and did not want it to happen to her. That fear was reflected in her December 30, 2014 affidavit in Davis' EEO case at the administrative stage.

b.     During January through March 2015, Petrillo denied Hernandez's request for help in general as she was the only female technologist during this period.  As a result she was required to perform numerous procedures on female veterans that males were either not trained or unwilling to perform.  Davis stated that she frequently was told by Hernandez that she was "drowning" and getting no help. Hernandez told Davis that she had to scan all the females and that staff was not listening to her.  Davis contacted Petrillo to alert him to the difficulties Hernandez was having and Petrillo promised her he would speak to the staff.  He did not speak to the staff.  In addition, in or around August 2015 Petrillo with the approval of upper management hired an ultrasound technologist who was not competent, Angela Geraci DeSimone (AG).  AG had previously been rejected by a hiring panel which included persons who worked in ultrasound such as Davis.  AG was hired over other applicants who were competent and who had been recommended by Davis.

AG later reportedly boasted her mother was close to CRT Graham.  Hernandez' work increased in order to compensate for AG's deficiencies, and Petrillo ignored the Plaintiffs' complaints about AG's lack of competence.

c.      On June 12, 2015, Petrillo denied complainant's request for leave but gave leave to a male employee.

d.      On August 27, 2015, during a conversation with complainant, AG stated she was a double D and proceeded to pull up her blouse, even though Hernandez told her she didn't want to see them repeatedly; Hernandez saw her bra and the size of her breast. Hernandez told Davis about the situation who told her to report it to Petrillo.

e.      In late August 2015, during a conversation with Hernandez about scanning a transvaginal ultrasound, AG stated, "Why don't you just let me borrow your     vagina?" This statement was reported to Petrillo.  Afterward Petrillo conducted a fact finding investigation about this. Petrillo decided to counsel both AG and Hernandez.  Hernandez was given a verbal warning.  She felt revictimized.

f.      Between August 2015 and February 2016, AG reminded Hernandez that her mom was a "close friend" with Jeri Graham, Chief Technologist.  Davis stated that she had heard these comments.  Davis stated that AG was hired while Davis was on leave.   AG did not have the experience to do the job of scanning but was hired anyway.

g.      On September 3, 2015, as Hernandez was walking towards her interview for the sexual harassment fact-finding, AG approached her and asked, "Is the vagina here?" and made a gesture of inserting something into her vagina.  Davis stated she heard similar comments.  She heard AG referring to a patient as a vagina.   Hernandez told Strauser about these references.

h.      During the first week of September 2015, Hernandez reported AG's sexual harassment to Petrillo; however, Petrillo did not notify AG until September 11, 2015 and Petrillo did not interview AG until September 18, 2015.

i.      On September 10, 2015, AG commented she enjoyed working there, but couldn't stand the fact that she had to work with "dirty vaginas." Davis heard this comment, and stated that Hernandez was "floored" by this comment. Davis stated that other patients and other staff were within earshot of the comment.  Davis also stated that AG was very rude to Hernandez. Davis spoke to AG about this comment. During this conversation, AG told Davis about her and her mother's relationship with Graham.

j.      On September 18, 2015, as AG was walking towards her fact finding interview on the sexual harassment fact finding, she gave Hernandez an angry, hostile look.

k.      On September 21, 2015, Hernandez reported bullying to Petrillo.  Petrillo did not address it.

l.      On September 21, 2015, AG refused to talk to Hernandez when Hernandez tried to talk to her about a patient.  AG would later bully Hernandez.

m.      In September 2015, AG did not acknowledge or look at Hernandez when she asked AG chaperone her with a patient, AG just left instead.

n.      Around October 2015, after AG learned about her benefits, she gave Hernandez a "high five" and purposely put her chest on Hernandez while supposedly doing a "shoulder bump." Hernandez was amazed and called Davis and told her about this incident.

o.      During October and November 2015, Hernandez saw AG scan her own abdomen with the door open and her undergarments exposed.  She later did this on multiple occasions despite the fact that she knew she should not be doing it.

p.      In November 2015, AG instructed Hernandez in a "condescending and hostile" tone, to use her own assigned room like everybody else, then turned her back on Hernandez and started talking to Brent Burton (Burton), Medical Instrument Technologist, about how she got drunk the night before.

q.      In December 2015, AG referred to one of the Radiology Residents as "Dark Chocolate" and described "all the things she would do" to sway him her way.

r.      In December 2015 and January 2016, AG  gave Hernandez "dirty looks" and made disparaging remarks about her eating disorder and stated, "Oh my God, you are obsessed over the stupidest sh*t ever."

s.      On multiple occasions, AG looked at Hernandez"disgustingly" while Hernandez was eating and stated, "I can't believe you're going to eat all that."

t.      In January 2016, AG embraced Hernandez and kissed her on the cheek after Hernandez told AG her patient had cancelled an appointment.

u.      In January 2016, AG "hollered" at Hernandez when Hernandez asked AG to call for an In-House patient.

v.      In January 2016, AG caused Hernandez to be late for her patient by taking 50 minutes to perform an ultrasound that takes 30 minutes.  When Hernandez then asked for assistance with the patient AG hollered at Hernandez.

w.      Around January/February 2016, Hernandez saw AG embrace Burton inappropriately in the hallway.

x.      Around January/February 2016, Hernandez saw AG enter the Tech room and inappropriately sit on Burton's lap and wrap her arms around his neck and ask how he was doing.

y.      During January and February 2016, when AG  entered the room where complainant was performing an ultrasound on a patient, AG demanded that Hernandez leave the room.

z.      On February 19, 2016, AG "slung" a request at Hernandez and "went off" on her stating, "Why the hell I need to do this again?"

aa.      Between January, February, and March 2016, AG  pulled up her shirt multiple times to show Hernandez her abs despite knowing Hernandez did not like it.

bb.      During January, February, and March 2016, Victor Martinez (VM), Medical Instrument Technologist, taunted Hernandez by stating that AG was her best friend, asking her where her best friend was, knowing AG  had sexually harassed and bullied her.

cc.      On February 17, 2016 and several occasions, AG, as a chaperone to Hernandez for a transvaginal ultrasound, interrupted Hernandez several times and rudely hollered, "You need to hurry up, how much longer, I have a patient," in front of the patient. Davis witnessed this action and reported it to Petrillo.

dd.      On February 19, 2016, AG approached complainant, and in an angry, hostile tone, stated, "It is your responsibility to close one of the rooms."

ee.      On February 19, 2016, while Hernandez was on break, AG approached her, stared at the computer, and asked Hernandez in a condescending and angry tone, "Did those outpatient requests get done?"

ff.    On February 22, 2016, Hernandez verbally and by email reported AG's bullying to Petrillo.  No action was taken and on February 25, 2016, Hernandez went to Petrillo and told him about a series of AG's actions.  He told Hernandez there were more pressing issues so he couldn't get to it, and for her to do what she has to do.   Afterwards, Hernandez spoke to Davis about this, and that Hernandez was very upset about it.  Davis talked to Petrillo about it.   Petrillo did nothing to address Hernandez' harassment.  Hernandez was now taking medication and having panic attacks but Petrillo did nothing and instead opened an AIB to investigate the hostile work environment being created for AG.  Hernandez began to email Petrillo and copy Graham and Stenzler.  None stepped in to assist her in addressing the harassment.

gg.    Davis and Strauser also raised their concerns about AG, her treatment of Hernandez, her incompetence and VM's conduct including his failure to do certain exams.  Management ignored those complaints.

hh.    While the AIB was going on, management moved AG to the New Port Richey CBOC, a location where her mother worked.  Management told Strauser, Davis, and Hernandez that they would have to do a number of ultrasound procedures for patients that should be handled by the technologist at New Port Richey.  When they objected that this would increase their workload, they were told that AG was not competent to do those procedures. The decision to hire AG over more competent technologists continued to increase the workload and harm the Plaintiffs.  During this time, Parise complained about ultrasound technologists to other radiologists.  From March 3, 2016 until she left for the New Port Richey VA facility, AG  continued to ignore Hernandez when Hernandez asked

for assistance, and continued to interrupt Hernandez's procedures by knocking on the door and telling Hernandez to hurry up.

ii.      Around June 27, 2016, VM taunted Hernandez continually by telling her he was going to take her job, he was going to allege she was harassing him, and he would conduct a fact finding, in order to get his way.

jj.      On June 28, 2016, Petrillo, who knew the Plaintiffs objected to his hiring of an incompetent technologist, instructed Strauser to inform the department, which includes Hernandez, to perform the Doppler ultrasounds for AG. Strauser stated that AG did not know how to perform liver and kidney dopplers.    This made the environment more hostile for the Plaintiffs.

kk.     On June 30, 2016, Martinez became hostile towards Hernandez because she refused to perform a scan he had been assigned to do but scanned the wrong organ.

ll.      On July 12, 2016, Hernandez sent an email to Petrillo regarding Martinez's taunting and approaching her saying, "Oh you think you're perfect", and Martinez stopped talking to Hernandez after she told him to stop.

mm.   As of July 27, 2016, Petrillo had not taken action about the February 19, 2016 incident and the incidents above that Hernandez had reported to him.   Neither had Graham or Stenzler.

**nn.**    On July 29, 2016, Petrillo sent an email stating technologists were not to cc: the Lead Technologist on emails in response to Hernandez's July 27, 2016 request for status on her harassment complaints.    Hernandez had copied Davis on numerous emails concerning her treatment.

**32.**    Between September 2013 and present, each Plaintiff either observed or became aware of actions which affected the other plaintiffs.

## COUNT I: Retaliation

**33.**    Plaintiffs, Tonkyro, Strauser, Davis and Hernandez sue David J. Shulkin, MD as Secretary of the Department of Veterans Affairs, for retaliation under Title VII. In addition, Hernandez sues David J. Shulkin, MD as Secretary of the Department of Veterans Affairs for retaliation based upon sex.

**34.**    Plaintiffs incorporate and re-allege paragraphs 1 through 32**.**

**35.**    Plaintiffs engaged in EEO activity which is protected under Title VII.  Including participation in their individual EEO case as well as participation in each other's cases.

**36.**    As alleged in paragraphs 8 and 15-32 above the Defendant was aware of the Plaintiffs' protected EEO activities.

**37.**    As alleged, the adverse actions followed after Plaintiffs engaged in EEO activity and included loss of pay, reputation, opportunity for advancement and positions.

**38.**    As alleged in paragraphs 8 and 15-32, the aforesaid adverse employment actions, other adverse actions, misconduct, and other conduct, acts and omissions to the Plaintiffs' detriment, were all taken (or failed to be taken) by administrators, managing and supervisory personnel with the Haley VA in retaliation for the protected or EEO activity of the Plaintiffs including those set forth above.  They are the direct and proximate result of the EEO activity.

**39.**    The Defendant, through the supervisors of the Plaintiffs, has engaged in, directed, and/or ratified retaliatory conduct, and has frustrated the Plaintiffs' efforts to obtain relief and intentionally maintained these retaliatory and unlawful practices to the detriment of its

employees.  The Defendant at all relevant times knew or should have known of the retaliatory actions being taken against the Plaintiffs and failed to take necessary action to prevent or correct the retaliatory actions being taken and, in fact, ratified such conduct.

40.     As a result of the foregoing, Plaintiffs have been damaged.  Such damages include, but are not limited to loss of pay; loss of benefits; payment of attorneys' fees and legal costs; loss of an amicable work environment; loss of career and professional opportunities; harm to professional reputations; and humiliation, anxiety, degradation, embarrassment, and severe emotional suffering and distress.  Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

41.     Plaintiffs have satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiffs request prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## Count II: Hostile Work Environment

42.     Plaintiffs, Tonkyro, Strauser, Davis and Hernandez sue David J. Shulkin, MD as Secretary of the Department of Veterans Affairs, for hostile work environment based upon retaliation. Plaintiffs incorporate and re-allege paragraphs 1 through 32.

43.     Included within this hostile work environment are adverse actions or material adverse actions within 45 days of filing the complaint.  In the case of retaliatory hostile work environment, the environment includes the material adverse actions alleged in paragraphs 15-32.

44.     The aforesaid actions and conduct have created an intolerable hostile work

environment.

45.     As a result of the foregoing, Plaintiffs have been damaged.  Such damages include, but are not limited to payment of attorneys' fees and legal costs, loss of an amicable work environment, humiliation, anxiety, degradation, embarrassment, physical injury or illness, and severe emotional suffering and distress.  Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

46.     Plaintiffs have satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiffs request prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

## Count III: Hostile Work Environment

47.     Hernandez sues David J. Shulkin, MD as Secretary of the Department of Veterans Affairs, for hostile work environment based upon sexual harassment based on reprisal and sex.  Plaintiff incorporates and re-alleges paragraphs 1 through 32.

48.     Included within this hostile work environment are adverse actions or material adverse actions within 45 days of filing the complaint.  In the case of retaliatory hostile work environment, the environment includes the material adverse actions alleged in paragraphs 8, and 15-32.

49.     The aforesaid actions and conduct have created an intolerable hostile work environment.

50.     As a result of the foregoing, Plaintiffs have been damaged.  Such damages

include, but are not limited to payment of attorneys' fees and legal costs, loss of an amicable work environment, humiliation, anxiety, degradation, embarrassment, physical injury or illness, and severe emotional suffering and distress.  Plaintiffs will continue in the future to suffer the same damages absent relief from this Court.

51.     Plaintiffs have satisfied all conditions precedent to the filing of this suit or have been prevented by the Defendant from satisfying such conditions or are excused under the law from satisfying any other conditions.

WHEREFORE, Plaintiffs request prospective relief, a judgment for damages, attorneys' fees and costs and such other and further relief as this Court deems just and proper and for a trial by jury on all issues so triable.

**Count IV**
**<u>Injunctive Relief</u>**

52.     Plaintiffs, Tonkyro, Strauser, Davis, and Hernandez sue Defendant, David J. Shulkin, MD as Secretary of the Department of Veterans Affairs.

53.     Plaintiffs incorporate and re-allege paragraphs 1 through 28.

54.     Unless the above practices are enjoined, Plaintiffs will suffer irreparable harm.

55.     There is (1) a substantial likelihood of success on the merits; (2) irreparable injury that will be suffered unless an injunction is issued; (3) the threatened injury to the Plaintiffs is greater than any damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, will not disserve the public interest.

56.     Plaintiffs request the Court award their attorneys' fees and costs and enter preliminary and permanent injunctions enjoining the following practices, actions and conduct:

a.       Violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* as described above including retaliation against Plaintiffs for protected or EEO activity and

41

breach of the Privacy Act.

        b.    Such other practices, actions or conduct that the court deems appropriate and proper to enjoin.

WHEREFORE, Plaintiffs demand trial by jury of all issues so triable and such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, Erin Tonkyro, Dana Strauser, Kara Mitchell-Davis and Yenny Hernandez hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*/s/  Joseph D. Magri*
Joseph D. Magri
Florida Bar No.: 0814490
Merkle Magri & Meythaler, P.A.
5601 Mariner St., Suite 400
Tampa, FL 33609
Fax.: (813) 281-2223
Email: jmagri@merklemagri.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 16, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:

Scott H. Park
Lindsay Griffin
Assistant United States Attorney
Identifying No. USA 084
400 W. Washington, Street, Suite 3100
Orlando, FL 32801
Telephone: (407) 648-7543
Facsimile: (407) 648-7588
Email: Scott.Park@usdoj.gov
Email: Lindsay.Griffin@usdoj.gov

*/s/  Joseph D. Magri*
Joseph D. Magri