UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ERIN TONKYRO,
DANA STRAUSER,
KARA MITCHELL-DAVIS,
YENNY HERNANDEZ.

       Plaintiffs                      Case No. 8:16-cv-2419-T-36AEP

       v.

DAVID J. SHULKIN, M.D., Secretary,
DEPARTMENT OF VETERANS
AFFAIRS,

       Defendant.
_____/

## MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

Pursuant to Rule 56, Fed. R. Civ. P., the Secretary of Veterans Affairs moves for summary judgment and in support thereof says:

### Introduction

Plaintiffs Erin Tonkyro, Kara Mitchell-Davis, Dana Strauser, and Yenny Hernandez sue the Secretary of the Department of Veterans Affairs under Title VII, 42 U.S.C. § 2000e-16, alleging retaliation and a retaliatory hostile work environment. Doc. 39, ¶¶ 19 to 31. Hernandez also alleges sexual harassment. Id. For reasons explained in this brief, summary judgment is warranted.

Some of the claims are unexhausted. Davis did not raise her 2016 non-selection during the EEO process and the doctrine of like-or-reasonably related does not save her claim. Similarly, Hernandez failed to timely exhaust her claim of sexual harassment

1

because she failed to contact an EEO counselor within 45 days from the last act of sexual harassment. Plaintiffs also improperly rely on events released by their previous settlement agreements.

Count I lacks merit. The collection of alleged retaliatory acts are not materially adverse, and neither Davis nor Tonkryo can establish retaliation in connection with their non-selection claims.

Count II also lacks merit. Plaintiffs rely on rumors they heard second and third-hand, as well as acts that affected all employees in their department, to establish a retaliatory hostile work environment. No action identified by plaintiffs was physically threatening, and plaintiffs' absences from the workplace removed them from the environment they insist was hostile. While plaintiffs insist that management was determined to hamper their careers and make their work life unbearable, plaintiffs consistently received outstanding performance evaluations, were never disciplined, and Davis was promoted shortly after settling the previous EEO case.

As to Count III, even if Hernandez had exhausted her claim for sexual harassment, the facts show neither severe nor pervasive conduct.

**<u>Statement of Undisputed Material Facts</u>**

A.  **<u>Plaintiffs' Employment and Supervisory Chain</u>**

1.    Tonkyro is a Medical Instrument Technologist ("MIT") at the Tampa VA in the Radiology Service. An MIT performs diagnostic ultrasounds. She has worked at the Tampa VA as an MIT since 2002. Doc. 39 ¶ 4; Exh. A, Erin Tonkyro Depo. 6:11-18.[1]

---

[1] The Exhibits are filed with this motion, and the Exhibit index is attached to this brief.

2.      Davis is the Lead MIT at the Tampa VA. She was hired in 2008 and promoted to the Lead MIT position in February 2014. Doc. 39 ¶ 5.

3.      Strauser began working as an MIT at the Tampa VA in November 2008. Exh. C, Dana Strauser Depo. 8:11-18; Doc. 39 ¶ 6.

4.      Hernandez began working as an MIT at the Tampa VA in October 2011. Exh. D, Yenny Hernandez Depo.14:8-14; Doc. 39 ¶ 7.

5.      From 2010 until November 2013, Carolyn Eubanks supervised the MIT and MRI technologists and was plaintiffs' first-line supervisor. Eubanks retired in late fall 2013. Exh, Z, Carolyn Eubanks Depo. 5:4-8. Mario De Leon became the Acting Supervisor over the MIT and MRI technologists. Exh. A, Tonkyro Depo. 66:24 to 67:13

6.      In October 2014, Scott Petrillo replaced Eubanks as the MIT and MRI supervisor. Before that time, he worked at a private radiology practice. Exh. K, Scott Petrillo EEOC Depo. 4:16 to 5:1; Exh. J, Scott Petrillo Depo. 3:15-19.

7.      Jeri Graham became the Chief Technologist in February 2014. Exh. H, Jeri Graham EEOC Depo. 4:16-23. She is plaintiffs' second-line supervisor. Exh. I, Jeri Graham Decl. ¶2.

8.      John Bennett became the Administrative Officer for the Radiology Service in January 2013. Exh. F, John Bennett EEOC Depo. 4:16 to 5:5.

9.      Dr. Joseph Parise was the Assistant Chief of Radiology from 2008 until 2017. Exh. HH, Joseph Parise EEOC Depo. 5:17-19; Exh. GG, Parise Depo. 4:18-25.

10.     Dr. Steven Stenzler became the Chief of the Radiology Service in approximately October 2012. Exh. M, Stephen Stenzler EEOC Depo. 4:16 to 5:4.

11.      Dr. Edward Cutolo became the Chief of Staff for the Tampa VA in 2006 and oversaw all of the medical services at the hospital, including Radiology. Exh. O, Edward Cutolo EEOC Depo. 4:8-20.

12.      Kathleen Fogarty was the Director of the Tampa VA from August 2011 to November 2014. Exh. Q, Kathleen Fogarty Depo. 4:23 to 5:5. Joe Battle became the Director on July 27, 2015. Exh. P, Joe Battle Depo. 3:15-20.

**B.**      **The 2012 EEO Complaints and Settlement**

13.      In May 2012, Tonkyro, Davis and Strauser filed separate EEO complaints against the Tampa VA, alleging sexual harassment by Parise, Bennett and Graham. Doc. 39 ¶15. Hernandez did not file an EEO complaint alleging sexual harassment at that time. Doc. 39 ¶13.

14.      In September, 2013, the VA settled the EEO cases with Tonkyro, Strauser and Davis, and all parties signed settlement agreements. Exh. A-1, Tonkyro Depo. Exh. 4; Exh. B-1, Davis Depo. Exh. 4; Exh. C, Strauser Depo. 14:22-24 & Exh. C-2.

**C.**      **Tonkyro and Post-Settlement Agreement EEO Activity**

15.      On March 28, 2014, Tonkyro contacted an EEO counselor, alleging retaliation and a retaliatory hostile work environment based upon the settlement of her previous EEO complaint. She filed a formal EEO complaint on July 8, 2014. Exh. A, Tonkyro Depo. 8:1-22 & Depo. Exh. 1.

16.      On September 15, 2014, Tonkyro transferred from the main hospital to the newly opened Primary Care Annex (PCA) on Hidden River Drive in Tampa, where she continues to perform ultrasounds. She visits the main hospital once a month for

4

radiology staff meetings. Exh. A, Tonkyro Depo. 12:7-12; 153:21-23.

17.     On September 24, 2015, Tonkyro again contacted an EEO counselor, alleging retaliation and a retaliatory hostile work environment based upon her prior EEO activity. She filed a formal EEO complaint on November 2, 2015. Exh. A, Tonkyro Depo. 9:19 to 10:6 & Depo. Exh. 2.

18.     From 2012 to 2016, Tonkyro received "exceptional" and "outstanding" performance ratings. Exh. A, Tonkyro Depo. 269:13 to 271:11 & Depo. Exhs. 18, 19 & 20. Tonkyro has no record of discipline since the 2013 settlement agreement. Exh. A, Tonkyro Depo. 271:23-25; Exh. I, Graham Decl. ¶ 3.

**D.     Davis and Post-Settlement Agreement EEO Activity**

19.     In February, 2014, Davis received a promotion to Lead MIT, which increased her salary and pay grade. Exh. B, Davis Depo. 76:20-22; Doc. 39 ¶ 5.

20.     On March 28, 2014, Davis contacted an EEO counselor and claimed retaliation and a retaliatory hostile work environment. She filed a formal complaint on July 7, 2014. Exh. B, Davis Depo. 45:11 to 46:18 & Depo. Exh. 6. On November 20, 2014, she amended her EEO complaint to add "like or related" claims. Doc. 39 ¶ 10.

21.     On September 23, 2015, Davis again contacted an EEO counselor and filed another formal complaint on October 28, 2015. Exh. B, Davis Depo. 152:18 to 153:18 & Depo. Exh. 14; Doc. 39 ¶10.

22.     From 2012 to 2016, Davis received "exceptional" and "outstanding" performance ratings. Exh. B, Davis Depo. 247:21 to 250:13 & Depo. Exh. 20. Davis has no record of discipline since the 2013 settlement agreement. Exh. I, Graham Decl. ¶ 3.

23.     Davis took extended leave from April 25, 2014, to February 17, 2015, for a work-related injury. She took maternity leave from October 12, 2015, to the first week of February, 2016, and another maternity leave from October 24, 2016 to the middle of March, 2017. Exh. B, Davis Depo, 260:25 to 262:23; 263:14-22; 264:7-24 & Depo. Ex. 21. In total, Davis was absent from work for approximately 18 months. Id.

**E.      Plaintiff Strauser and Post-Settlement EEO Activity**

24.     On March 28, 2014, Strauser contacted an EEO counselor, alleging retaliation and a retaliatory hostile work environment based upon the settlement of her previous EEO complaint in September 2013. She filed a formal EEO complaint on July 11, 2014. Exh. C, Strauser Depo. 12:3 to 13:4 & Exh. C-1, Depo. Ex. 1.

25.     On January 12, 2015, Strauser left work on maternity leave, returning on May 5, 2015. Exh. C, Strauser Depo. 144:2-13.

26.     On February 10, 2016, Strauser again contacted an EEO counselor, alleging retaliation and a retaliatory hostile work environment. She filed a formal EEO complaint on April 4, 2016. Exh. C, Strauser Depo. 34:21 to 35:7 & Depo. Ex. 2.

27.     From 2013 to 2016, Strauser received "outstanding" performance ratings. Exh. C, Strauser Depo. 221:10 to 222:25 & Depo. Exhs. 13 to 15. Strauser has no record of discipline since the 2013 settlement agreement. Eh. I, Graham Decl. ¶ 3.

**F.      Plaintiff Hernandez and EEO Activity**

28.     Hernandez contacted an EEO counselor on July 28, 2016 and filed a formal complaint alleging sexual harassment and a retaliatory hostile workplace on September 8, 2016. Exh. D, Hernandez Depo. 125:7-17 & Depo. Ex. 1.

29.     Hernandez testified before an Administrative Investigative Board ("AIB") convened in 2012 to investigate the plaintiffs' allegations of sexual harassment. Doc. 39 ¶13. She was also a witness in the 2014 EEO cases filed by her co-plaintiffs. Id.

**G.     The Administrative Investigative Board and Ultrasound Supervisor Position**

30.     Angela Geraci-Desimone began working as an MIT at the Tampa VA in August 2015.   Exh. S, Angela Geraci-Desimone Depo. 4:14-21. She was a direct hire by Petrillo. Exh, K, Petrillo EEOC Depo. 14:1-20.

31.     In March 2016, Geraci complained to Scott Petrillo about issues she was having with Davis.   In April 2016, Geraci prepared a written complaint alleging she was being bullied by Davis and met with Dr. Stenzler regarding her complaint. Exh. S, Geraci Depo. 5:4 to 6:6; 11:24 to 12:1; Exh. S-1 (Complaint); Exh. J, Petrillo Depo. 4:11 to 5:19. Stenzler referred the matter to Cutolo, the Chief of Staff. Exh. L, Stenzler Depo. 5:11 to 6:15. Battle was briefed and decided to empanel an AIB to investigate. Exh. P, Battle Depo. 5:13 to 6:24; Exh. N, Edward Cutolo Depo. 43:2 to 45:12.

32.     The members of the AIB were Gloria Hilton, Rachel Brink, and Yvette Falero-Cruz, none of whom worked in Radiology. Exh. T. Rachel Brink Depo. 4:15-21; 36:14 to 37:11 & Brink Depo. Exh 1, p. 14-16; Exh. C, Strauser Depo. 198:15-24.

33.     Around May 16, 2016, Geraci was detailed to the New Port Richey Clinic. Exh. S, Geraci Depo. 7:20-25; Exh. I, Graham Decl. ¶4.

34.      The AIB heard testimony from various employees in the Radiology Service and found Geraci had been bullied and harassed. The Board recommended remedial training and team building; it did not recommend disciplinary action. Exh. T,

Brink Depo. 13:22 to 21:21; 33:21-24; 40:14-24 & Brink Depo. Exh. 1, p.10-11.

35.     On April 13, 2016, a vacancy announcement was posted for an Ultrasound Supervisor position in the Radiology Service. Davis was the only applicant. The job announcement closed on April 22, 2016. Davis Depo. Exh. 17.

36.     Because of the AIB and the allegations of bullying against Davis, the Ultrasound Supervisor position remains unfilled.   Exh. L, Stenzler Depo. 31:20 to 32:17; Exh. P, Battle Depo. 17:12-21; Exh. R, Andrew Sutton Depo. 14:2 to 15:13.

**Memorandum of Law**

**I.     Some of the Plaintiffs' Claims were not Exhausted through the EEO Process or Released by the 2013 Settlement Agreements**

**A.     Plaintiff Davis failed to raise the Ultrasound Supervisor Position with an EEO Counselor**

Before filing a lawsuit, a federal employee must exhaust administrative remedies by contacting an EEO counselor within 45 days of the alleged discriminatory action, or the claim is barred. Shiver v. Chertoff, 549 F.3d 1342, 1344 (11th Cir. 2008); 29 C.F.R. § 1614.105(a)(1). Davis challenges her non-selection to the Ultrasound Supervisor position. Doc. 39, ¶¶ 29(q)-(t). That position was advertised in April 2016. While Davis contacted an EEO counselor on March 28, 2014 and September 23, 2015, she never raised her non-selection nor did she seek to amend her prior EEO complaints to add this claim. As such, she never exhausted that claim.

Generally, a plaintiff is not required to exhaust administrative remedies for an alleged act of retaliation that can reasonably be expected to grow out of an EEO administrative charge. Gregory v. Georgia Dep't. of Human Res., 355 F.3d 1277, 1280

8

(11th Cir. 2004). However, in <u>Duble v. FedEx Ground Package Sys., Inc.</u>, 572 F. App'x

889 (11th Cir. 2014), the Circuit held the like-or-reasonably related exception to

exhaustion applies only if the unexhausted claim occurs <u>after</u> plaintiff sues in federal

court. In that case, it is unnecessary to return to the administrative process to raise a

claim that grew out of the initial EEO claim. But the alleged retaliatory act must be

exhausted if it occurred while the initial EEO charge was still pending and the employee

"had the opportunity to amend his EEOC charge or file a new charge." <u>Id.</u> at 893.

Davis had the opportunity to amend her EEOC charge or file a new charge

raising the Ultrasound Supervisor position. She did not do so and failed to exhaust that

claim. <u>Jones v. Heritage-Crystal Clean, LLC</u>, No. 8:16-CV-623-T-33JSS, 2016 WL

3406514, at *3 (M.D. Fla. June 21, 2016)(citing <u>Duble</u>, plaintiff did not seek to amend

his EEO complaint to add new claim); <u>Robinson v. Koch Foods of Alabama</u>, No. 2:13-

CV-557-WKW, 2014 WL 4472611, at *2 (M.D. Ala. Sept. 11, 2014) (plaintiff had the

opportunity to amend or file a new EEOC charge to add the act of retaliation).

  B.  <u>**Hernandez failed timely to Contact an EEO Counselor**</u>

    1.  <u>**The Sexual Harassment Claim is Untimely**</u>

Hernandez alleges a sexually hostile work environment by her co-worker Geraci.

Doc. 39, Count III. Hernandez first contacted an EEO counselor about this claim on July

28, 2016. Exh. D, Hernandez Depo. 206:15 to 207:11 & Depo. Exh. 1. The alleged acts

of sexual harassment by Geraci occurred between August 27, 2015 and February,

2016. <u>Id.</u>; Doc. 39 ¶ 31; Hernandez Depo. Exh. 1, pp. 0006-0008. In May, 2016, Geraci

was transferred to the New Port Richey Clinic. Exh. I, Graham Decl. ¶4. Hernandez's

allegations between March and July, 2016 involve non-sexual harassment by Petrillo and another co-worker, Victor Martinez. Hernandez Depo. Exh. 1, pp. 003-008.

A federal employee must contact an EEO counselor within 45 of an alleged discriminatory act. Crawford v. Babbitt, 186 F.3d 1322, 1326 (11th Cir. 1999). Since none of the allegations of sexual harassment by Geraci fell within 45 days of July 28, 2016, Hernandez failed to timely raise that claim. Contact with an EEO counselor raising a hostile environment claim is timely so long as all acts which constitute the claim are part of the same unlawful employment practice and one act falls within the 45-day time period. Ike v. United States Dep't of Veterans Affairs, No. 2:16-CV-0406-JEO, 2016 WL 7094707, at *7 (N.D. Ala. Dec. 6, 2016). The acts comprising Hernandez's sexual harassment claim against Geraci concluded in February, 2016, and the acts after that date involved bullying by Martinez. By contacting an EEO counselor on July 28, 2016, Hernandez timely raised her allegations involving Martinez, which are not part of the claim against Geraci.   Duncan v. Manager, Dep't of Safety, City & Cty of Denver, 397 F.3d 1300, 1309 (10th Cir. 2005) (earlier acts involved instances of physical and psychological abuse, while the latter acts involved off-color remarks and different employees). Hernandez failed to timely exhaust her claim of sexual harassment.

### 2.   Hernandez did not Exhaust Some Acts of Retaliation

In her retaliation claim, Hernandez incorporates the allegations in paragraphs 24 to 27 of the Second Amended Complaint, which include: management's failure to promote Davis and Tonkryo; allegations the plaintiffs would be fired after their August 2016 meeting with Battle; and management endangering patient safety by hiring Geraci-

Desimone. She also alleges intimidation by Bennett and performing extra work due to the hiring of Geraci.   Doc, 39, ¶ 31a, hh, jj. Hernandez did not exhaust these allegations through the EEO process nor amend her EEO to raise these claims. The scope of her retaliatory hostile work environment claim is limited to the acts identified in her formal EEO complaint. Exh. D-1, Hernandez Depo. Exh. 1.

C. **The Allegations in Paragraph 18 of the Second Amended Complaint were Released by the 2013 Settlement Agreements**

Between September 21 and 23, 2013, Davis, Tonkyro, and Strauser each signed a settlement agreement with the VA resolving their claims of sexual harassment. Exh. A-1, Tonkyro Depo. Exh. 4; Exh. B-1, Davis Depo. Exh. 4; Exh. C-2. Each agreement contains a broad release covering "any and all actions, claims, complaints . . . and proceedings of whatever nature" which were or could have been raised as of the day the plaintiff signed the agreement. Id., ¶ 2. Each plaintiff also waived "her right to pursue future causes of action against the Agency based on such actions in existence as of the date of the [plaintiff's] execution of this Agreement, with the exception of any claims that may arise by reason of breach of any term of this agreement." Id. The agreement contains a procedure for claiming a breach and reinstating the EEO complaint. Id., ¶ 10.

Each agreement also contains the following language:

3.   The Agency agrees to

a. conduct a fact finding based on the allegations of the Complaint as detailed in the accompanying attachment (Attachment A) which forms an integral part of this agreement:

Nothing in paragraph 3, subparagraph (a) will give the complainant any right to bring any legal action based thereon. All such rights have been waived and released in paragraphs 1 and 2.

11

Id., p. 2. Attachment A describes the fact-finding as including (1) a request by the hospital director to the VA police to investigate an alleged threatening phone call to Strauser (fka Pryor); (2) an investigation into an alleged comment by Dr. Joseph Parise that he could not go to the ultrasound suite because he did not want to put his foot down the throats of the ultrasound technologists; and (3) an investigation into alleged comments by John Bennett to a product representative that the ultrasound girls disliked middle-aged men. Id., Attachment A.

Despite releasing their right to sue based on the conduct in Attachment A, plaintiffs raise these allegations in the Second Amended Complaint (Doc. 39, ¶ 18) and incorporate it in all three counts. The plaintiffs knowingly and voluntarily released their right to sue based on this conduct, and they cannot use the conduct to support their claims.   "An employee who knowingly and voluntarily releases an employer from liability for [] a Title VII [] claim is bound by that agreement." Taylor v. Camillus House, Inc., 149 F. Supp. 2d 1377, 1379 (S.D. Fla. 2001); 29 C.F.R. § 1614.504(a).

To the extent plaintiffs claim either (1) a breach of the agreement or (2) the continuing violation theory allows them to use released conduct to support their claims, these arguments must be rejected. No plaintiff followed the procedure in the settlement agreement for claiming breach, and the continuing violation theory applies only to conduct falling outside the limitations period—not to conduct resolved through a release. Perryman v. West, 949 F. Supp. 815, 822 (M.D. Ala. 1996) ("the use of the facts from [] settled complaints is precluded under Eleventh Circuit precedent" and quoting Kirby v. Dole, 736 F.2d 661, 662 (11th Cir. 1984) ("[O]ne who agrees to settle

12

his claim cannot subsequently seek both the benefit of the settlement and the opportunity to continue to press the claim he agreed to settle.")).

Accordingly, the plaintiffs cannot use any conduct released by their previous settlement agreement to support their claims in this case.

## III.   <u>The Retaliation Claim Lacks Merit (Count I)</u>

### A.   <u>Davis has not Established Retaliaton in Connection with the Ultrasound Supervisor Position</u>

A Title VII retaliation claim requires that plaintiff establish: 1) she engaged in statutorily protected activity; 2) she suffered an adverse employment action; and 3) there is a causal link between the protected activity and the adverse action.   <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1328 (11th Cir. 1998). If plaintiff establishes a prima facie case, defendant must articulate a legitimate, non-retaliatory reason for its actions. <u>Brooks v. Cty. Comm'n of Jefferson Cty., Ala.</u>, 446 F.3d 1160, 1162 (11th Cir. 2006). Plaintiff must then introduce significantly probative evidence of pretext. <u>Id.</u> at 1163. "A reason is not pretext for [retaliation] 'unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.'" <u>Id.</u>

If the employer's articulated reason is one that might motivate a reasonable employer, plaintiff must meet it head on and rebut it. <u>Wilson</u>, 376 F.3d at 1087-88. "[S]imply quarreling with the wisdom of that reason" is not sufficient. <u>Chapman v. AI Transp.</u>, 229 F.3d 1012, 1030 (11th Cir. 2000). Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." <u>Jackson v. State of Alabama State Tenure Comm'n</u>,

405 F.3d 1276, 1289 (11th Cir. 2005)(quotations and citations omitted).

Furthermore, after Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 133 S. Ct. 2517 (2013), plaintiff "must establish . . . protected activity was a but-for cause of the alleged adverse action by the employer." Id. at 2534. At the summary judgment stage, plaintiff must offer evidence sufficient to permit a reasonable fact finder to conclude that a retaliatory animus was the 'but-for' cause of the adverse employment action. Clark v. South Broward Hosp. Dist., 601 F. App'x 886, 897 (11th Cir. 2015).

Assuming Davis establishes a prima facie case, the VA must articulate a legitimate, non-retaliatory reason for its decision. Because the only candidate for that job (Davis) was the subject of an investigation into allegations of bullying by Geraci, the VA suspended the selection process and the positon remains unfilled. Exh. L, Stenzler Depo. 31:20 to 32:17; Exh. R, Sutton Depo. 14:2 to 15:13. That is a legitimate reason for not acting on the job vacancy. Sapp v. U.S. Attorney Gen., 676 F. App'x 878, 881 (11th Cir. 2017) (ongoing investigation is a legitimate reason for reassigning plaintiff and denying overtime); Rogers v. Georgia Dep't of Corr., No. 5:10-CV-499 MTT, 2012 WL 5398804, at *9 (M.D. Ga. Nov. 2, 2012) (ongoing investigation was legitimate reasons for reassigning plaintiff).

Davis must offer specific facts showing her EEO activity was the real reason for the decision and defendant's reason is "deceit used to cover one's tracks.'" Davis v. Con-Way Transp. Cent. Express, Inc., 368 F.3d 776, 784 (7th Cir. 2004). She cannot carry this burden. Davis contends the AIB was a sham designed to allow Geraci to transfer to New Port Richey and stop Davis from receiving a promotion. This theory

means Geraci was complicit in retaliating against Davis by preparing a written complaint of bullying, and Battle, as the Director, was also involved since he had to convene the AIB. This unsupported theory is what plaintiffs insist occurred. Exh. B, Davis Depo. 224:12 to 226:13; Exh. C, Strauser Depo. 188:12 to 193:15. But speculation cannot create a triable issue of fact. Cordoba v. Dillard's Inc., 419 F.3d 1169, 1181 (11th Cir. 2005); Weaver v. Yellow Freight Sys., Inc., No. CIV.A.1:96-CV-476WCO, 1997 WL 706477, at *8 (N.D. Ga. May 5, 1997) (unsubstantiated belief of discriminatory conspiracy insufficient).

Significantly, Geraci, Petrillo and Battle started at the Tampa VA well after the settlement of plaintiffs' prior EEO complaints and were not involved in the previous cases. Further, Geraci first complained to Petrillo about bullying in March 2015, before the Ultrasound Supervisor position was advertised, and decided to prepare a written complaint on her own. Exh. S, Geraci Depo. 5:4 to 6:6. Moreover, the three members of the AIB had no connection to Radiology (Exh. C, Strauser Depo. 198:15-24), and, after two days of testimony, concluded Geraci had been bullied. Rachel Brink, an AIB panel member, had no knowledge of Davis' prior EEO activity other than what Davis stated during her AIB testimony. The AIB did not recommend any discipline; just training and team building. Exh. T, Brink Depo. 13:22 to 21:21; 33:21-24; 40:14-24 & Depo. Exh. 1; see also Exh. AA, Brent Burton Depo. 12:1 to 17:7 & Depo. Exh. 1. After Battle received the AIB recommendation, he decided not to accept the report because he did not want

to be perceived as retaliating. Exh. P, Battle Depo. 9:13 to 10:1. None of this evidence supports Davis' speculative conspiracy theory.[2]

### B. Tonkyro has not Established Retaliation in Connection with the Ultrasound PCA Lead Position

To establish a prima facie case of retaliation in connection with the PCA Lead position, plaintiff must identify a vacancy for which the employer was seeking applicants.   See Duffy v. Lowe's Home Centers, Inc., 414 F. Supp. 2d 1133, 1146 (M.D. Fla. 2006) ("absent evidence of a vacancy, [plaintiff] cannot establish a prima facie case."). Even though the PCA Lead position had been approved, that job was never advertised. While the evidence shows conversations between Tonkyro and Stenzler about that position, Stenzler ultimately decided to fill a Lead Mammography position instead, and, as such, the PCA Lead position was never formally advertised. Absent evidence of a vacancy, Tonkyro fails to establish a prima facie case.

Assuming a prima facie case, however, defendant articulates a legitimate, non-retaliatory reason for not posting and filling the PCA Lead position. Even though the PCA Lead position had been previously approved, Stenzler decided the Radiology Service needed a Lead Mammography technician and allocated the position for that job instead. Exh. L, Stenzler Depo. 26:23 to 31:19; Exh. E, Bennett Depo. 34:22 to 35:20.

---

[2] Davis also challenges the delay in her boarding package after being selected as the Lead in February 2014, which she alleges delayed her promotion to May. Doc. 39, ¶ 29(e). The evidence does not support retaliation. Lisa Campbell, the Chief Technologist at Bay Pines who is on the Board, advised Bennett that the delay in acting on Davis' boarding package was due to the schedule of the Board. Exh. FF, Lisa Campbell Depo. 19:5 to 20:19 & Exh. FF-1, Depo. Exh. 1; Exh. B, Davis Depo. 76:20 to 80:20; 88:1 to 91:3 & Depo. Exhs. 12 &13. Davis' contention Bennett delayed her Boarding because of her EEO settlement is pure speculation.

In an effort to demonstrate pretext, Tonkyro points to what she insists are shifting reasons for not offering her the position. But the reasons offered by Stenzler were not shifting or contradictory. His articulated reasons were based on what he felt were the best needs of the Radiology Service in terms of staffing. While he initially envisioned a PCA Lead position held by Tonkyro, he decided that an Ultrasound Supervisor position was a better option for the Service, as well as Lead Mammography position. Exh. L, Stenzler Depo. 26:23 to 31:19; Exh. A-1, Tonkyro Depo. Exhs. 13, 16-17.

**C.**   **The Remaining Retaliatory Acts are not Materially Adverse**

After Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), the standard in a retaliation case is whether a reasonable employee would have found the action materially adverse so as to dissuade that employee from making a charge of discrimination. Id. at 68. Plaintiffs insist each act outlined in the factual chronology in the Second Amended Complaint is a materially adverse action. Doc. 39, Count I, ¶ 38. That contention lacks merit. Other than the Ultrasound Supervisor and PCA Lead positions, the remaining acts did not seriously or materially affect their employment.

Burlington stressed "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . We speak of *material* adversity because we believe it is important to separate significant from trivial harms."   548 U.S. at 67-68.   Courts have routinely found that conduct, such as that relied upon by plaintiffs, does not amount to a materially adverse action.   Burlington, 548 U.S. at 68 (personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable); Hahn v. Bank of Am. Inc., No. 12 CIV.

4151 DF, 2014 WL 1285421, at *24 (S.D.N.Y. March 31, 2014) (a supervisor yelling embarrassing plaintiff does not rise to the level of adverse employment actions); Rivera v. Orange Cty., No. 10 CV 9134 VB, 2013 WL 812016, at *9 (S.D.N.Y. Mar. 5, 2013) (exclusion from meetings and feeling isolated at work do not qualify as an adverse employment action"); Brown v. Advocate S. Suburban Hosp., 700 F.3d 1101, 1107 (7th Cir. 2012)(receiving the cold shoulder and being called a trouble maker are not materially adverse actions).

Moreover, plaintiffs were not dissuaded from invoking their EEO rights and continued to contact an EEO counselor. Burgos v. Napolitano, 330 F. App'x 187, 191 (11th Cir. 2009) (action not materially adverse where employee was not deterred from reinstating EEOC claim); Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 572 (2nd Cir. 2011)("[i]t is relevant that [plaintiff] was not deterred from complaining—he complained numerous times."); Matthews v. Corning Inc., 77 F. Supp. 3d 275, 298 (W.D.N.Y. 2014) (same).

## IV.   The Series of Acts Identified by Plaintiffs do not Rise to the Level of a Retaliatory Hostile Work Environment (Count II)

### A.   The Legal Standard

To support a retaliatory hostile work environment, plaintiffs must prove: 1) they engaged in protected EEO activity; 2) they were subjected to unwelcome harassment; 3) the harassment was based on their protected activity; and 4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment. Gowski v. Peake, 682 F.3d 1299, 1311-1312 (11th Cir. 2012).

18

The harassment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). A hostile work environment requires proof "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

In determining whether a work environment is hostile or abusive, courts consider: 1) the frequency of the conduct; 2) the severity of the conduct; 3) whether it is physically threatening or humiliating; and 4) whether it unreasonably interferes with the employee's job performance. Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999)(en banc). In assessing these factors, the workplace must be "'hostile or deeply repugnant,'" not "'merely unpleasant,'" to be actionable. Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir.1996).

Causation still "matters in a retaliatory hostile work environment claim—that is, the severe and pervasive accumulation of actions that would not have occurred but-for the retaliatory reason, even if each action alone was justifiable." Gowski, 682 F.3d at 1313; see also Mason v. Geithner, 811 F. Supp. 2d 128, 179 (D.D.C. 2011) ("[E]vidence that bears no connection to the plaintiff's protected status cannot support a hostile work environment claim."); Noviello v. City of Boston, 398 F.3d 76, 93 (1st Cir. 2005) ("It is only those actions, directed at a complainant, that stem from a retaliatory animus which may be factored into the hostile work environment calculus.").

B.     **The Retaliatory Hostile Work Environment Claim by Tonkyro, Davis and Strauser Fails**

1.     **The Acts were not Frequent or Severe**

a.     **Office Gossip and Rumor**

Plaintiffs support their retaliatory hostile work environment claim with statements made by other employees. Plaintiffs overheard only a few of these comments, none of which can be characterized as frequent or severe. For instance, after Eubanks retired, Stenzler suggested that Tonkyro apply for Eubanks' position. In December 2013, however, Stenzler advised Tonkyro that he discussed this with Fogarty and Cutolo, who decided Eubanks' position would be filled by someone outside of the facility. Doc. 39, ¶28(b); Exh. A, Tonkyro Depo. 39:19 to 42:12; 53:22-25 & Depo. Exh. 1 (Dec. 4, 2013 event). Tonkyro interpreted this as a rejection because of her EEO settlement agreement. Exh. A, Tonkyro Depo. 41:23 to 42:5.

In March 2014 when plaintiffs complained to Stenzler about seeing Parise in the Ultrasound suite, Stenzler said "you girls will never get past this." Doc. 39, ¶¶ 28(h), 29(i), 30(e); Exh. A, Tonkyro Depo. 53:4-13; Exh. C, Strauser Depo. 41:18 to 42:20; 138:23 to 139:6; Exh. B, Davis Depo. 133:9 to 134:4. Stenzler acknowledges making this remark. Exh. M, Stenzler EEOC Depo. 39:12 to 40:20.

Apart from these remarks, plaintiffs heard other comments second or third-hand. Plaintiffs heard comments about the settlement of their previous EEO cases. For example, Tonkyro recalls Dr. Chuang, a radiologist, informing her in late 2013 or early 2014 that he had heard about her settlement. Margaret Becker, a mammography technician, told the plaintiffs that Chuang told her plaintiffs had settled their EEO cases,

received $250,000, and must resign if they accepted the money. Exh. A, Tonkyro Depo. 85:11 to 92:6; 93:3-7 & Depo. Exh. 6 (Interrog. No. 1); Exh. C, Strauser Depo. 47:4-23; Exh. B, Davis Depo. 36:19 to 38:21 & Depo. Exh. 5 (Interrog. No. 1). Becker also told plaintiffs about a conversation with a Human Resources employee who said plaintiffs had a new case that would cost the agency money. Exh. B, Davis Depo. 36:24 to 37:18; 39:5 to 40:24; Exh. A, Tonkyro Depo. 202:5-13.

Similarly, Geraci learned about plaintiffs' EEO settlements in December 2015 or January 2016 from someone at a bar who identified himself as a VA employee, telling her plaintiffs had settled their claims for $120,000. Exh. S, Geraci Depo. 51:17 to 53:25. Geraci told Dyanith Axsom, another ultrasound technologist, who told Hernandez, who then told Tonkyro and Davis. Exh. A, Tonkyro Depo. 95:11 to 97:6 & Depo. Exh. 6 (Interrog. No. 1); Exh. B, Davis Depo. 30:11 to 32:24 & Depo. Exh. 5 (Interrog. No. 1); Exh. BB, Dyanith Axsom Depo. 22:15 to 25:25. Davis was on maternity leave and did not learn about it until April 2016. Exh. B, Davis Depo. 32:16-19.

Dr. Eastham, a radiologist, also told plaintiffs he heard general conversations in radiology about the settlement of their previous case, but he did convey a specific dollar amount. Exh. B, Davis Depo. 40:25 to 41:16 & Depo. Exh. 5 (Interrog. No. 1); Exh. A, Tonkyro Depo. 97:7 to 98:20; 112:4-15 & Depo. Exh. 6 (Interrog. No. 1).

Plaintiffs also rely on alleged comments by Radiology managers that the plaintiffs heard from other employees. For instance, after Tonkyro, Davis and Strauser met with the hospital Director in August 2016, Hernandez told them that Dr. Eastham said that Parise said the plaintiffs were going to be terminated. Exh. B, Davis Depo. 216:9 to

21

  
219:18; Exh. A, Tonkyro Depo. 114:13 to 116:12; 144:19 to 146:12; Exh. C, Strauser

Depo. 54:14 to 56:10. Similarly, during an October 2016 Radiology meeting, Stenzler

announced Davis was going on maternity leave. Parise apparently yelled out "Yes," and

made a "fist pumping" gesture. Dr. Bailey, a radiologist, told Davis and Strauser about

this. Exh. B, Davis Depo. 219:22 to 220:22; Exh. C, Strauser Depo. 56:11 to 57:8.

Davis, in turn, told Tonkyro. Exh. A, Tonkyro Depo. 257:22 to 260:25. Similarly, Davis

asserts an ultrasound technologist at Bay Pines, Kathy Arruda, told her that Jeri

Graham advised Arruda about job openings at Tampa that were meant for Hernandez

and Strauser and, further, discussed problems in ultrasound. Exh. B, Davis Depo.

111:23 to 114:1; 143:22 to 145:18.[3]

In November 2016, Dr. Andrews told plaintiffs that Stenzler said they were filing

frivolous EEO complaints which he felt was affecting the Ultrasound section. Exh. C,

Strauser Depo. 45:4 to 46:11; Exh. B, Davis Depo. 42:10 to 44:22. Tonkyro learned

about this comment from Davis, who learned about it from Dr. Andrews since she was

on maternity leave. Exh. A, Tonkyro Depo. 159:13 to 162:13 & Depo. Exh. 5 (Interrog.

No. 1) & Depo. Exh. 15; Exh. B, Davis Depo. 43:1-10.

Moreover, plaintiffs allege they have been portrayed as "money hungry," Exh. B,

Davis Depo. 38:22 to 39:3; 81:11 to 82:5, or "money-grubbing bitches." Exh. A, Tonkyro

Depo. 201:23. Tonkyro testified "that term has been used and shared with many staff

---

[3] Arruda denies discussing problems in the Tampa VA ultrasound with Graham and recalls
Davis asking her about bad-mouthing by Graham. Exh. EE, Kathy Arruda Depo. 6:21 to 7:21;
9:23 to 11:6; 15:18-24; Exh. G, Jeri Graham Depo. 40:10 to 41:23.

members," Id. at 201:24-25, but she could not identify the source. Davis recalled

hearing it from a co-worker while on maternity leave. Exh. B, Davis Depo. 82:1-5. Dr.

Andrews recalls hearing that reference but not the source of it. Exh. U, Aaron Andrews

Depo. 76:14 to 77:15. Other employees did not use those terms when recalling

discussions about the plaintiffs' settlements. Exh. BB, Axsom Depo. 22:15 to 25:21;

Exh. CC, James Kennedy Depo. 12:16 to 13:15.

     Given the second and third-hand nature of these comments, it is impossible to

tell how frequently the remarks were made or by whom. Without tracing the rumor to an

admissible evidentiary source, such comments are hearsay. Macuba v. DeBoer, 193

F.3d 1316, 1323 (11th Cir. 1999)(at summary judgment, hearsay can be considered "if

the statement could be reduced to admissible evidence at trial or reduced to admissible

form."). Furthermore, from the standpoint of severity, "hearing about harassment is less

severe than experiencing harassment directly." Washington v. Util. Trailer Mfg. Co., No.

1:13-cv-610-WKW, 2017 WL 924469 at *11 (M.D. Ala. March 8, 2017); Yuknis v. First

Student, Inc., 481 F.3d 552, 556 (7th Cir. 2007) (second-hand comments less likely to

create an objectively hostile work environment). As the court noted in Hudson v. Norfolk

S. Ry. Co., 209 F. Supp. 2d 1301, 1330-31 (N.D. Ga. 2001), a case based on office

gossip and rumor allows "the same few incidents, repeated in the echo chamber of a

small workplace, [to] be magnified into the proverbial 'federal case.'"

     The pitfalls of office gossip are evident in the divergent witness recollections of

how much money plaintiffs received in settlement of their EEO cases. The amounts

included: $25,000, $50,000, $70,000, $100,000, $120,000, $200,000 and $300,000.

Exh. V, Thornton Eastham Depo. 28:15 to 29:18; Exh. W, David Cartaya Depo. 6:11 to

7:10; Exh. U, Andrews Depo. 77:17-24; Exh. X, Nancy Murphy Depo. 12:14 to 13:3;

Exh. Y, Margaret Becker Depo. 9:25 to 10:14; Exh. S, Geraci Depo. 51:17 to 53:25.

Office discussions of this type are not retaliatory or disparaging, and plaintiffs were not

harmed by this hallway gossip. Derringe v. Old Nat. Bank, No. 3:04-CV-217-RLY-WGH,

2006 WL 3076679, at *6 (S.D. Ind. Oct. 27, 2006) (gossip itself is insufficient to

establish a hostile work environment); Treaster v. Conestoga Wood Specialties, Corp.,

No. 4:09-cv-00632, 2010 WL 2606479, at *17 (M.D. Pa. April 29, 2010)(office rumors

not physically threatening and a handful of rumors is not severe and pervasive conduct).

### b.   Acts Affecting all Employees in Radiology

Apart from rumors, plaintiffs also rely on actions that affected everyone in the

ultrasound section, not just them. Plaintiffs identify as retaliatory: 1) management's

failure to promptly remediate mold in the Ultrasound suite; 2) management's decision to

hire Geraci in August 2015, who plaintiffs insist was unqualified and hired to retaliate

against them; 3) Eubanks uploading her "employee issues" folder to the S-drive; and 4)

the advertisement for Eubanks' position as a Diagnostic Radiologic Technician (DRT).

Plaintiffs insist these events were taken because of their previous EEO

settlements. For instance, plaintiffs insist Geraci was incompetent and her hiring done to

make them look bad and increase their workload. As Tonkryo stated:

Q.   But are you contending, though, that she was intentionally hired in order to
retaliate against you and Ms. Davis and Ms. Strauser by making your work
more difficult because she didn't know what she was doing?

A.   Absolutely.

Q. What about the other ultrasound techs who don't have any EEO activity? . . .

A. It creates a culture in the department, and that is where the retaliation lies. . . . If they can make the work environment more difficult for any one of us, and Scotty Simpson and Jay Martinez have to do it too, then so be it.   But if it can make the lead technologist look bad, Nicky Davis, and senior technologists like myself and Michelle Strauser who had been doing this for years look bad, it's a win-win situation.

Exh. A, Tonkryo Depo. 186:14 to 187:9; <u>see also</u> Exh. C, Strauser Depo. 193:3-15; Exh. B, Davis Depo. 126:24 to 127:11. Plaintiffs ignore that Petrillo, who started at the VA after they settled their EEO cases, hired Geraci. Exh. K, Petrillo EEOC Depo. 14:1-20.

Similarly, the S-drive documents were the precipitating event in February 2014 that led plaintiffs to file new EEO cases. Exh. A, Tonkyro Depo. 8:8 to 9:6; Exh. C, Strauser Depo. 12:12 to 13:12. When Eubanks retired in late 2013, she moved her supervisory files from her personal computer to the Radiology S-drive, which is accessible to all Radiology staff. Eubanks Depo. 6:5 to 8:8; 10:1-12 & Depo. Exh. 3; Strauser Depo. Exh. 9. According to Eubanks, she needed to transfer her files to Mario DeLeon, who was taking over as acting supervisor, and Bennett told her to place those files on the S-drive and inform DeLeon so he could move them. Exh. Z, Eubanks Depo. 7:19 to 8:8; 42:12-14. The plaintiffs' subfolders included requests for documents by the EEO investigator assigned to their 2012 EEO complaints. Tonkyro Depo. Exh. 7, pp. 610-613; Davis Depo. Exh. 10; Strauser Depo. Exh. 10, pp. 603-604.

Plaintiffs insist Bennett, Parise and Stenzler were responsible for having their EEO information posted on the public S-drive in Radiology and did so to embarrass and retaliate against them. Exh. A, Tonkyro Depo. 77:4 to 79:12; Exh. B, Davis Depo. 65:11-20; Exh. C, Strauser Depo. 121:1-23. All of the plaintiffs, however, admitted having no

evidence that Bennett, Parise or Stenzler knew what was on Eubanks' H-drive. Exh. A, Tonkyro Depo. 78:15-20; 80:6-13; Exh. C, Strauser Depo. 121:14-23; Exh. B, Davis Depo. 65:11-20; 61:5-24; see also Exh. E, Bennett Depo. 81:5-18; Exh. Z, Eubanks Depo. 40:3 to 41:1; 43:2-11. They admitted that their documents on the S-drive did not reference their EEO settlements, and they never saw copies of their documents circulated in the workplace. Exh. A, Tonkyro Depo. 76:6 to 77:12; Exh, C, Strauser Depo. 115:21 to 116:17; 118:21 to 120:24; Exh. B, Davis Depo. 68:17 to 76:13.

Despite plaintiffs' contentions, none of these actions were connected to their EEO activity and, moreover, affected all ultrasound employees. For instance, Eubanks' "employee issues" folder contained supervisory documents for all of her employees, not just plaintiffs. Exh. Z-1, Eubanks Depo. Exh. 3; Exh. C-1, Strauser Depo. Exh. 9. Further, plaintiffs admitted their co-workers complained about the mold growth because it was causing health concerns. Exh. C, Strauser Depo. 163:11-23; Exh. B, Davis Depo. 200:1-3; Exh, DD, Victor Martinez Depo. 9:23 to 12:4. After the hiring of Geraci, all technologists helped her scan to improve her proficiency. Exh. C, Strauser Depo. 194:21-25; Exh. BB, Axsom Depo. 14:22 to 19:10; 36:9 to 39:10. Finally, no MIT could apply for Eubanks' position because it required the applicant be a DRT like Eubanks was. Exh. A, Tonkyro Depo. 58:7 to 67:4 & Depo. Exh. 5; Exh. C, Strauser Depo. 53:14 to 56:5 & Depo. Exh. 8.

Events that are neutral on their face and affect other employees in the workplace cannot be characterized as severe acts to support a hostile work environment.   Mason, 811 F. Supp. 2d at 180 (while facially neutral incidents may be considered as part of the

totality of the circumstances, this is appropriate only if a trier of fact could reasonably

conclude those incidents were, in fact, based on protected EEO activity).

### c. **Plaintiffs' Absences from the Workplace**

Plaintiffs' absences from the workplace are a significant factor in assessing the

frequency and severity of the conduct. Tonkyro moved to the PCA in September 2014

and visits the main hospital for quarterly radiology staff meetings. Exh. A, Tonkyro

Depo. 153:21 to 154:4. As such, Tonkyro learned about all of the post-September 2014

events by telephone or email. As noted in the facts, Davis took extended leave from her

job at the Tampa VA, which removed from the workplace for approximately 18 months

between April 2014 and March 2017. On January 12, 2015, Strauser left work on

maternity leave, returning on May 5, 2015. Exh. C, Strauser Depo. 144:9-13. These

absences are significant. As Tonkyro described the PCA,

> I want to stay here. This is where I feel comfortable. This is where I feel
> safe. I feel I can make a big impact on patient care. Feel like I can actually do my job
> without distraction. So that's where I want to be.

Exh. A, Tonkyro Depo. 168:7-10. Assessed objectively, Tonkyro's work at the PCA

removed her from the acts she alleges created a hostile work environment. Davis also

missed many of the events comprising her claim during her 18 months away from the

workplace; her knowledge was based on what others told her by telephone or email.

### 2. **The Acts were not Physically Threatening**

Even if plaintiffs were able to satisfy the frequency and severity factors, that does

not "compensate for the absence of the other factors." Mendoza, 195 F.3d at 1248.

Plaintiffs present no evidence of physically threatening conduct. "The rumors were not

physically threatening. Rather, they were merely offensive utterances," Treaster, 2010 WL 2606479 at *17. Only plaintiffs' brief encounter with Parise in March 2014 in the ultrasound suite has any hint of intimidation, which prompted their complaint to Stenzler.

Since that time, plaintiffs' contact with Parise and Bennett has been minimal. Strauser has had no face-to-face contact or conversations with Parise since March 2014, and no conversations with Bennett since the settlement of her previous EEO case. Exh. C, Strauser Depo. 49:14-25; 60:18 to 61:3. After March 2014, Tonkyro saw Parise less than 5 times in the hospital before moving to the PCA in September 2014, and all of those contacts were in passing. "There was no interaction like it was on the day [in March 2014] in our department." Exh. A, Tonkyro Depo. 56:20-23. After she moved to the PCA in September 2014, she saw him once in June 2017 at a department meeting. Id. 57:3-17. Tonkyro's interactions with Bennett have been similarly limited. Id. 29:1-24.

Davis has not seen Bennett since August 2013 and has had no conversations with him. Exh. B, Davis Depo. 52:5-12. After the event of March 2014, Davis has not seen Parise in the ultrasound suite, only encountering him in the hospital hallways or parking lot. She has had no conversations with him. Id., 132:7 to 133:8.

These limited interactions are significant in assessing plaintiffs' claim. Plaintiffs insist Parise and Bennett are the driving force behind the actions taken against them. Stenzler is just a figurehead. Exh. A, Tonkyro Depo. 61:20 to 62:7. With the two men they fear largely out of sight for the last three years, plaintiffs offer no evidence of a work environment that is physically threatening. Rowe v. Jewell, 88 F. Supp. 3d 647,

676 (E.D. La. 2015)(in a retaliatory hostile work environment case, alleged conduct by supervisors not physically threatening); McLaughlin v. Brennan, 3:13-cv-987-J-34MCR, 2016 WL 1271514, at *6 (M.D. Fla. March 31, 2016)(no evidence of physically threatening conduct in a racial harassment case).

### 3.   Plaintiffs' Job Performance Remained Exceptional

Plaintiffs also fail to demonstrate that the alleged acts affected their work performance. Plaintiffs have received outstanding performance evaluations since the settlements of their previous EEO cases, and while they insist actions were taken to make them look bad and undermine their performance, that is not reflected in their evaluations. Nor is there any evidence Radiology managers criticized their work as MITs. Berry v. Chicago Transit Auth., 618 F.3d 688, 691–92 (7th Cir. 2010) (affirming summary judgment as to one defendant where plaintiff failed to show, among other things, negative effect on work performance); McLaughlin, 2016 WL 1271514 at *6 (no evidence racial harassment interfered with plaintiff's performance as he continued to do his job with no discipline).

### 4.   The Totality of the Circumstances

To evaluate the objective severity of an allegedly retaliatory hostile work environment, courts consider the totality of the circumstances, assessing all of the factors outlined above as a whole. Kelly v. Dun & Bradstreet, Inc., 641 F. App'x. 922, 924 (11th Cir. 2016). In making this assessment, "[c]ommon sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish ... conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 83 (1998).

In Gowski, 682 F.3d 1299, where the Circuit recognized a retaliatory hostile work environment, the facts were far more severe and damaging. The facts, in part, included: 1) the revocation of privileges necessary for working in critical-care units; 2) a two-week suspension based on unprofessional behavior; 3) the rescinding of the employees' medical committee membership; 4) a two-year suspension from participating in research; 5) merging the Neurology Service into the Medicine Service, thereby stripping one of the plaintiffs from her job as the Chief of Neurology; and 6) reducing the patient compliment of one plaintiff, thereby impacting her research. Acts such as these, which demonstrated real harm and a toxic workplace, do not exist here. See also Baroudi v. Shinseki, No. 8:14-CV-1099-T-30TBM, 2015 WL 6165496, at *2 (M.D. Fla. Oct. 20, 2015)(forty-three incidents, including being called a troublemaker, given a downgraded performance evaluation, having patient care criticized, and computer access temporarily blocked, do not create a retaliatory hostile workplace); Odom v. Holder, No. 2:11-cv-3086-SLB, 2014 WL 1233709, at *26 (N.D. Ala. Mar. 25, 2014)(no retaliatory hostile workplace where over a four year period plaintiff alleged loss of merit pay, removal from meetings, removal of significant duties and employees, increased surveillance, administrative inquiries, and employees conspiring to fabricate negative information).

**C.   The Acts Identified by Hernandez do not Rise to the Level of a Retaliatory Hostile Work Environment (Count II)**

The acts Hernandez relies on to support a retaliatory hostile work environment fail to satisfy the legal requirements established in Gowski, 682 F.3d at 1311–1312.   As a threshold mater, Hernandez's retaliatory hostile work environment claim is a

30

combination of acts of alleged sexual harassment by Geraci, bullying by Martinez, and the alleged failure of Petrillo to conduct an investigation. Doc. 39, ¶ 31(d)-(gg), (ii)-(mm). Thrown into this mix are claims that Hernandez had to perform certain ultrasounds that Geraci was not conducting at New Port Richey. Id., ¶ 31(hh). This list, however, does not portray a workplace characterized by actions taken because of her EEO activity. Hernandez must demonstrate that the "accumulation of actions that would not have occurred but-for" retaliation. Gowski, 682 F.3d at 1313. She offers no evidence to satisfy that standard, other than asserting she signed an EEO affidavit in support of the plaintiffs' 2014 EEO complaints. That alone does not establish that the actions of Geraci, Martinez and Petrillo were "because of" her EEO activity.

Even if this causation standard is satisfied, however, Hernandez's claim fails when assessed against the factors routinely considered in assessing a claim: 1) the frequency of the conduct; 2) the severity of the conduct; 3) whether it is physically threatening or humiliating; and 4) whether it unreasonably interferes with the employee's job performance. Mendoza, 195 F.3d at 1246.

Hernandez's list does not depict a workplace permeated with frequent and severe acts of retaliation. The comments she identifies relate to her sexual harassment claim against Geraci and bullying allegations against Martinez. There are no derogatory remarks that have any bearing on her EEO activity. Further, she fails to describe any actions that were physically threatening or intimidating. The isolated acts she describes as physical relate to her claim against Geraci. Finally, she does she offer any evidence her work performance was negatively impacted. When the totality of circumstances are

assessed, she fails to depict a hostile and abusive retaliatory work environment.

**V.    The Series of Acts Identified by Hernandez do not Rise to the Level of a Sexually Hostile Work Environment (Count III)**

"Title VII is not a general civility code." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010). To establish a violation of Title VII, a plaintiff must show conduct constituting "discrimination because of sex," and not simply conduct "tinged with offensive sexual connotations." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). In other words, the "critical issue" is whether a member of one sex is exposed to "disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id. at 80.

Sexual harassment is actionable only if "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). This requirement contains an objective and a subjective component. Mendoza, 195 F.3d at 1246. The employee must "'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Id. As with a retaliatory hostile workplace, courts consider the same four factors: 1) the frequency of the conduct, 2) the severity of the conduct, 3) if the conduct is physically threatening or humiliating, or a mere offensive utterance, and 4) if the conduct unreasonably interferes with the employee's job performance. Id. "The prohibition of harassment on the basis of sex requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the "conditions" of the victim's employment." Oncale, 523 U.S. at 81.

32

In her formal EEO complaint, Hernandez identifies eight events:

(1) On August 27, 2015, during a conversation about a doctor, Hernandez said that the doctor liked blondes with big breasts and Geraci responded by lifting her shirt to show Hernandez the size of her breasts despite Hernandez saying she did not want to see them. Geraci was wearing a form-fitting undershirt.

(2) On August 31, 2015, during a conversation with Hernandez about Geraci learning to do pelvic/vaginal ultrasounds, Geraci asked if she could borrow Hernandez's vagina.

(3) On September 3, 2015, Geraci asked Hernandez "is the vagina here" in reference to a patient arriving for an appointment and gestured as if inserting something in her vagina.

(4) On September 10, 2015, Geraci said she enjoyed working at the VA but not the fact that she had to work with "dirty vaginas."

(5) In October, 2015, after learning good news about her employment benefits, Geraci gave Hernandez a high-five and in the process Geraci's chest touched Hernandez's chest.

(6) In January, 2016, after Hernandez informed Geraci of a patient cancelation, Geraci kissed Hernandez on the cheek.

(7) In January or February, 2016, Hernandez witnessed Geraci hugging a male co-worker.

(8) In February, 2016, Hernandez saw Geraci sit on a male co-worker's lap, wrap her arms around his neck, and ask how he was doing.

Exh. D-1, Hernandez Depo. Exh. 1.

This conduct, occurring over a 7-month period, was not severe and pervasive. Most of the alleged acts occurred in the first two months of Geraci's employment, and on October 9, 2015, she received a written counselling from Petrillo for inappropriate conversation and behavior. Exh. I, Graham Decl. ¶ 5. After the counseling, the conduct of that nature stopped. Geraci's later physical contact with Hernandez—the high five/chest bump and kiss—was incidental and not repeated. The final two events in

January and February 2016 involved Geraci's interaction with a male co-worker, showing that, if anything, Geraci was physically affectionate with both men and women.

When comparing the few, isolated comments identified by Hernandez to hostile work environment precedent, Hernandez's claim fails. For example, even when sexually explicit comments have occurred, courts have found no actionable harassment. Webb-Edwards v. Orange Cty. Sheriff's Office, 525 F.3d 1013, 1027 (11th Cir. 2008) (comments including that female employee "looked hot," should wear tight clothing, and had issues at home since she dyed her hair, were not severe or pervasive); Gupta v. Florida Bd. of Regents, 212 F.3d 571, 578–79 (11th Cir. 2000), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) (supervisor's touching plaintiff's hand and thigh, lifting her dress hem, repeatedly asking her to lunch, telling her she was beautiful, staring at her, calling her home on numerous occasions at night, and asking about personal matters was not sufficiently severe or pervasive).

Even when construed favorably to Hernandez, Geraci's conduct was far from severe. Although the manner in which Geraci used the term "vagina" offended Hernandez, Geraci's statements were not so objectively offensive as to alter the conditions of Hernandez's employment. Although Geraci lifted her shirt to show Hernandez the size of her breasts, Geraci was wearing an undershirt and did not expose her breasts. Furthermore, Hernandez encouraged the inappropriate conversation by saying that the doctor liked blondes with big breasts.

Geraci's physical contact with Hernandez was not objectively severe, even if the Court infers Geraci intentionally bumped chests with Hernandez when giving a high-five.

34

The circumstances show Geraci was excited about receiving good news and reacted in a relatively normal manner in that social context. This type of garden variety behavior is not in the purview of Title VII. DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir. 1995) ("[a] hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace.").

Hernandez's allegations fall far short of the Title VII standard. Therefore, the defendant deserves summary judgment on Count III.

## Conclusion

For these reasons, defendant's motion for summary judgment should be granted.

Dated:   January 8, 2018                     Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:     /s/ Scott H. Park
        SCOTT H. PARK
        Assistant United States Attorney
        Identifying No. USA084
        400 W. Washington Street, Suite 3100
        Orlando, Florida 32801
        Telephone No: (407) 648-7543
        Fax No.: (407) 648-7588
        Email:   Scott.Park@usdoj.gov

        LINDSAY SAXE GRIFFIN
        Assistant United States Attorney
        Florida Bar No. 72761
        400 N. Tampa Street, Suite 3200
        Tampa, Florida 33602
        Telephone No.: (813) 274-6000
        Fax No.: (813) 274-6198
        Email:   lindsay.griffin@usdoj.gov

## Certificate of Service

I HEREBY CERTIFY that on January 8, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notice of the filing to the following CM/ECF participant:

Joseph D. Magri
Merkle Magri
5601 Mariner Street, Suite 400
Tampa, FL 33609
Email: jmagri@merklemagri.com

/s/ Scott H. Park
Assistant U. S. Attorney


## Appendix of Exhibits to Summary Judgment

| Exhibit | Description |
| --- | --- |
| A | Erin Tonkyro Deposition (Vol. I & II) |
| A-1 | Tonkyro Deposition Exhibits |
| B | Kara Mitchell-Davis Deposition |
| B-1 | Davis Deposition Exhibits |
| C | Dana Strauser Deposition |
| C-1 | Strauser Deposition Exhibits |
| C-2 | Strauser 2013 Settlement Agreement |
| D | Yenny Hernandez Deposition |
| D-1 | Hernandez Deposition Exhibits |
| E | John Bennett Deposition |
| F | John Bennett EEOC Deposition |
| G | Jeri Graham Deposition (Vol. I & II) |

| | |
|---|---|
| H | Jeri Graham EEOC Deposition |
| I | Jeri Graham Declaration |
| J | Scott Petrillo Deposition |
| K | Scott Petrillo EEOC Deposition |
| L | Dr. Stephen Stenzler Deposition |
| M | Dr. Stephen Stenzler EEOC Deposition |
| N | Dr. Edward Cutolo Deposition |
| O | Dr. Edward Cutolo EEOC Deposition |
| P | Joe Battle Deposition |
| Q | Kathleen Fogarty Deposition |
| R | Andrew Sutton Deposition |
| S | Angela Geraci-Desimone Deposition |
| S-1 | Geraci Written Complaint |
| T | Rachel Brink Deposition |
| T-1 | Brink Deposition Exhibits |
| U | Dr. Aaron Andrews Deposition |
| V | Dr. Thornton Eastham Deposition |
| W | Dr. David Cartaya Deposition |
| X | Dr. Nancy Murphy Deposition |
| Y | Margaret Becker Deposition |
| Z | Carolyn Eubanks Deposition |
| Z-1 | Eubanks Deposition Exhibits |

| | |
|---|---|
| AA | Brent Burton Deposition |
| BB | Dyanith Axsom Deposition |
| CC | James Kennedy Deposition |
| DD | Victor Martinez Deposition |
| EE | Kathy Arruda Deposition |
| FF | Lisa Campbell Deposition |
| FF-1 | Campbell Deposition Exhibits |
| GG | Joseph Parise Deposition |
| HH | Joseph Parise EEOC Deposition |