ERIN TONKYRO,
DANA STRAUSER,
KARA MITCHELL-DAVIS,
YENNY HERNANDEZ.

       Plaintiffs,                                Case No: 8:16-cv-2419-T-36AEP

       v.

Secretary,
DEPARTMENT OF VETERANS
AFFAIRS,

       Defendant.
_____/

## **O R D E R**

This matter comes before the Court upon Defendant Robert Wilkie[1], Secretary, Department

of Veterans Affairs' Motion for Summary Judgment (Doc. 54), Erin Tonkyro, Dana Strauser, Kara

Mitchell-Davis, and Yenny Hernandez's response in opposition (Doc. 60), Joint Statement of

Agreed Material Facts (Doc. 63), Defendant's reply (Doc. 64), Plaintiffs' surreply (Doc. 67),

Defendant's Renewed Motion for Summary Judgment (Doc. 85), and Plaintiffs' response in

opposition (Doc. 89).[2] The Court, having considered the parties' written submissions, including

the Joint Stipulation of Agreed Material Facts, declarations, depositions and attachments thereto,

and being fully advised in the premises, will now grant the Defendant's Motion for Summary

Judgment.

---

[1] During the pendency of this litigation, Wilkie replaced David Shulkin, M.D. as the Secretary for the Department of
Veteran's Affairs. *See* Doc. 83.
[2] Plaintiffs filed a Third Amended Complaint after the Defendant filed its Motion for Summary Judgment. *See*
Docs. 69, 76. Defendant then filed its Renewed Motion for Summary Judgment.

# I.  BACKGROUND AND STATEMENT OF FACTS[3]

Plaintiffs Erin Tonkyro, Dana Strauser, Kara Mitchell-Davis, and Yenny Hernandez bring this action alleging retaliation and hostile work environment claims under Title VII while working for Radiology Services at the James A. Haley VA Healthcare System. Plaintiffs' claims relate to Equal Employment Opportunity ("EEO") complaints that they settled in 2013. (Doc. 54-1 at 87-96); (Dep. Tonkyro, 45:5-18; Doc. 54-1 at 13)[4]; (Ex. 4; Doc. 54-1 at 87-96).[5]  The Third Amended Complaint ("TAC") alleges the following claims: Count I—Retaliation (Tonkyro, Mitchell-Davis, and Strauser); Count II—Hostile Work Environment (all Plaintiffs); Count III—Hostile Work Environment (Hernandez); and Count IV—Injunctive Relief under 42 U.S.C. § 2000e-16 of Title VII of the Civil Rights Act of 1964 (all Plaintiffs). Doc. 83.[6]

## a.  Defendant's Organizational Structure

The James A. Haley VA Healthcare System ("VAHCS" or the "Tampa VA") is a Veterans Administration hospital and medical center. The chain of command is as follows. Kathleen Fogarty was Director between August 2011 to July 2015. (Dep. Fogarty[7] at 4:23-5:5). Joe D. Battle became the Director on July 27, 2015. (Dep. Battle[8] at 3:15-20). Edward Cutolo became the Chief of Staff for the Tampa VA in 2006 and oversaw all the medical services at the hospital, including Radiology. (EEO Dep. Cutolo[9] at 4:8-20). Dr. Stephen Stenzler became the Chief of Radiology Services at the Tampa VA in approximately October 2012. (Doc. 63 at 2 ¶ 9).  Stenzler is Plaintiffs'

---

[3] The Court has determined the facts based on the parties' submissions, including the Joint Statement of Undisputed Facts, declarations, depositions and attachments thereto.

[4] Deposition of Erin Tonkyro, August 8, 2017, Doc. 54-1 at 2-53.

[5] This EEOC claim for sexual harassment was originally settled in the agreement set forth in Defendant's exhibit 4. Doc. 54-1 at 87-96.

[6] The TAC removed Hernandez from Count I, updated the name of the Secretary of the Department of Veteran's Affairs, and removed the phrase "sexual harassment based on" from the introduction in Count II.

[7] Deposition of Kathleen Fogarty, August 4, 2017, Ex. Q; Doc. 54-6 at 72 - 82.

[8] Deposition of Joe Battle, August 4, 2017, Ex. P; Doc. 54-6 at 59 - 71.

[9] EEO deposition of Edward Cutolo, October 1, 2015, Ex. O; Doc. 54-6 at 51 - 56.

third line supervisor. *Id.* Dr. Joseph Parise was the Assistant Chief of Radiology from 2008 until June 2017. *Id.* at 2 ¶ 11. John Bennett became the Administrative Officer ("AO") of Radiology in January 2013 and was Plaintiffs' second line supervisor as the Chief Radiology Technologist from 2008 to 2012. (Doc. 63 at 2 ¶ 10). Jeri Graham was the Plaintiffs' direct supervisor until April 2012 and is currently Plaintiffs' second line supervisor and Chief Technologist in Radiology. *Id.* at 2 ¶¶ 3, 8). The Chief Technologist is a supervisor over all modalities of radiologic examinations, including MRI, ultrasound, X-ray, CT scan and mammography. *Id.* Graham is Plaintiffs' second line supervisor. *Id.* Carolyn Eubanks was the Plaintiffs' first line supervisor from January 2013 until November 2013. (Doc. 63 at 2 ¶ 5). After Eubanks' retirement, Mario De Leon became the Acting Supervisor over the Medical Instrument Technician ("MIT") and Magnetic Resonance Imaging ("MRI") technologists. (Doc. 63 at 2 ¶ 5, 6).

Due to De Leon's position change, he became the Plaintiffs' first line supervisor prior to October 2014 when Scott Petrillo started as the MIT and MRI supervisor. (Doc. 63 at p. 2 ¶ 6). *Id.* at 2 ¶ 7. Petrillo was the Plaintiffs' first line supervisor at the time of the filing of the Motion. *Id.* The Defendant employed these individuals and they all were acting within the course and scope of their employment with the Defendant at the time of the relevant and material conduct at issue in this case.

### b. Plaintiffs' Backgrounds Generally

Erin Tonkyro is an MIT at the Tampa VA in the Radiology Service. (Dep. Tonkyro at 6:11-18; [Ex. A; Doc. 54-1 at 2-53]). An MIT performs diagnostic ultrasounds. *Id.* She has worked at the Tampa VA as an MIT since 2002. *Id.* Kara Mitchell-Davis is the Lead MIT at the Tampa VA. (Doc. 63 at 1 ¶ 2). She was hired in 2008 and promoted to the Lead MIT position in February 2014. *Id.* Dana Strauser began working as an MIT at the Tampa VA in November 2008. (Dep.

Strauser[10] at 8:11-18). Yenny Hernandez began working as an MIT at the Tampa VA in October 2011. (Dep. Hernandez[11] at 14:8-14).

In May 2012, Tonkyro, Mitchell-Davis, and Strauser filed separate EEO complaints against the Tampa VA alleging sexual harassment by Parise, Bennett and Graham. (Doc. 63 at 2 ¶ 15). Hernandez did not file an EEO complaint alleging sexual harassment at that time. (Dep. Hernandez at 20:20-24 [Ex. D; Doc. 54-4 at 1-59]). But she did testify in support of the other Plaintiffs' claims. Dec. Hernandez[12] at ¶ 1. In September 2013, the VA settled the EEO cases with Tonkyro, Strauser and Mitchell-Davis as evidenced in the written and signed settlement agreements. (Doc. 63 at 3 ¶ 17).

After the settlements, the Plaintiffs allege that their supervisors engaged in retaliatory actions in the workplace. These actions include: initiation of an Administrative Investigative Board ("AIB"), discussion by employees and management indicating that Plaintiffs would never become supervisors, disputes about understaffing in Radiology, a hostile work environment created by rampant spreading of rumors within the Tampa VA, and public disclosure of Plaintiffs' (and other employees) confidential employment records which were placed on the "S drive" accessible by all employees. (Doc. 60-1 at 1 ¶¶ 1-6, 16(a)-(o)).

### c. Plaintiffs' Specific Title VII Claims

#### i. Erin Tonkyro

Tonkyro contacted an EEO counselor alleging retaliation and a retaliatory hostile work environment based upon the settlement of her previous EEO complaint. (Dec. Tonkyro[13] at ¶ 1). She filed an informal EEO complaint on May 1, 2012, and a formal one on June 12, 2012. (Dec.

---

[10] Deposition of Dana Strauser on July 19, 2017. Doc 54-3 pages 1 through 69.
[11] Deposition of Yenny Hernandez on July 20, 2017. Ex. D; Doc. 54-4 pages 1 through 59.
[12] Declaration of Yenny Hernandez on January 29, 2018.  Doc. 60-4 at 1.
[13] Declaration of Erin Tonkyro on January 29, 2018. Doc. 60-1 at 2-9.

Tonkyro at ¶ 1). She filed another informal complaint on March 28, 2014, followed by a formal one on July 9, 2014. (Ex. A; Doc. 54-1 at 2-53); (Dep. Tonkyro at 8:1-22; Dec. Tonkyro at ¶ 1). She added additional claims and amendments on November 19, 2012. (Dec. Tonkyro at 2 ¶ 1). In her EEO complaints, Tonkyro alleged the following discriminatory behavior: Bennett slowly walked past her and glared; Stenzler recommended her application for a supervisory position but Fogarty disagreed; management required a Diagnostic Radiologic Technician ("DRT") license for a supervisory MRI/Ultrasound position which made her ineligible to apply; management disclosed confidential employment records, Parise entered her work area and glared at her, an employee, Warren Rose, made disparaging remarks after accessing the confidential employment records, and Bennett did not provide her with the essential equipment needed to carry out her job duties. (Doc. 60-1 at 123 ¶¶ 1-7, 33). The Tampa VA investigated the EEO claims as evidenced in the Department of Veteran's Affairs Office of Resolution Management's ("ORM") Written Affidavit.

On September 15, 2014, Tonkyro transferred from the main hospital to the newly opened Primary Care Annex ("PCA") where she continues to perform ultrasounds. (Doc. 63 at 3 ¶ 18). She visits the main hospital once a month for radiology staff meetings. (Dep. Tonkyro, at 12:7-12, 153:21-23 [Ex. A; Doc. 54-1 at 2-53]). On September 24, 2015, Tonkyro again contacted an EEO counselor, alleging retaliation and a retaliatory hostile work environment based upon her prior EEO activity. (Dep. Tonkyro at 8:13-15 [Ex. A; Doc. 54-1 at 3]). On November 2, 2015, she filed a formal EEO complaint. (Dep. Tonkyro at 9:19-10:6 [Ex. A; Doc. 54-1 at 2-53]). She alleged further retaliation based on her EEO settlement.

From 2012 to 2016, Tonkyro received "exceptional" and "outstanding" performance ratings. (Ex. A; Doc. 54-1 at 2-53); (Dep. Tonkyro at 269:13-271:11 [Exs. 18, 19, 20]). Tonkyro

has no record of discipline since the 2013 settlement agreement. (Dep. Tonkyro, p. 271:23-25 [Ex. A; Doc. 54-1 at 2-53]); (Dec. Graham, Ex. I; Doc. 54-5 at 94 ¶ 3).

    *ii.  Dana Strauser*

Strauser contacted an EEO counselor alleging retaliation and a retaliatory hostile work environment based upon the settlement of her previous EEO complaint in September 2013. (Dep. Strauser[14] at 12:3-13:4 [Ex. C; Doc. 54-3 at 4-5]). Strauser filed an informal EEO complaint on May 1, 2012, and a formal EEO complaint on June 8, 2012. She filed another informal complaint on March 28, 2014, (Dec. Strauser[15] at 2 ¶ 1) and a formal complaint on July 11, 2014. (Doc. 54, at 6 ¶ 24). She filed yet another EEO complaint on June 14, 2015. (Dec. Strauser at 2 ¶ 1).

Strauser alleged that Angel Geraci-DiSimone's bullying claims and the ensuing AIB investigation into it lacked good faith; during the investigation management officials spread rumors and made denigrating remarks about her and the other Plaintiffs. (Dep. Strauser at 13:7-12, 15:7-16:16 [Ex. C; Doc. 54-3 at 5]). Strauser received threatening and harassing telephone calls. (Dep. Strauser at 42:23-43:15 [Ex. C; Doc. 54-3 at 12]). She complained about the public disclosure of the confidential employment records and Bennett's role in investigating it. (Dep. Strauser at 114:6-21 [Ex. C; Doc 54-3 at 30]); (Doc. 54-3 at 75 ¶ b). She also alleged that management created an Ultrasound Supervisor position and then changed the qualifications to purposefully disqualify her from applying. (Doc. 54-3 at 75 ¶ a).

Between January 12, 2015, and May 5, 2015, Strauser took maternity leave. (Dep. Strauser at 144:2-13 [Ex. C; Doc. 54-3 at 37]). On February 10, 2016, Strauser again contacted an EEO counselor and filed an informal EEO complaint alleging retaliation and a retaliatory hostile work

---

[14] Deposition of Dana Strauser on July 19, 2017. Doc. 54-3 at 2-70.
[15] Declaration of Dana Michelle Strauser, January 29, 2018. Doc. 60-3 at 2-24.

environment. She filed another formal EEO complaint on April 4, 2016. (Dep. Strauser at 34:21-35:7 [Ex. C; Doc. 54-3 at 10]).

From 2013 to 2016, Strauser received "outstanding" performance ratings. (Dep. Strauser at 221:10-222:25 [Ex. C; Doc. 54-3 at 57]). Strauser has no record of discipline since the 2013 settlement agreement. (Dec. Graham[16] at ¶ 3 [Ex. I; Doc. 54-5 at 93-95]).

### iii. Yenny Hernandez

Hernandez contacted an EEO counselor on July 28, 2016, and filed a formal complaint alleging sexual harassment and a retaliatory hostile workplace on September 8, 2016. (Dep. Hernandez at 125:7-17; Ex.1 [Ex. D; Doc. 54-4 at 33]). Hernandez testified before an AIB convened in 2012 to investigate the Plaintiffs' allegations of sexual harassment. (Dep. Hernandez at 19:10-15 [Ex. D; Doc. 54-4 at 6]). She was also a witness in the 2014 EEO cases filed by her co-Plaintiffs. (Dep. Hernandez at 20:20-24 [Ex. D; Doc. 54-4 at 6]). Hernandez both observed and experienced much of the complained of conduct, and Dr. Thornton Eastham told her that Parise said that she and others working in ultrasound would be fired. (Dep. Hernandez at 61:5-19 [Ex. D; Doc. 54-4 at 17]).

Hernandez complained of her interactions with Angela Geraci-DiSimone. She characterized Geraci-DiSimone's behavior towards her as harassment and retaliation. Geraci-DiSimone began working as an MIT at the Tampa VA in August 2015. (Dep. Geraci-DiSimone[17] at 4:14-21 [Ex. S; Doc. 54-6 at 96]). Petrillo hired Geraci-DiSimone. (EEO Dep. Petrillo[18] at 14:1-20 [Ex. K; Doc. 54-5 at 124]).

---

[16] Declaration of Jeri Graham on January 4, 2018. Doc. 54-5 at 93-95.
[17] Deposition of Geraci-DiSimone on July 27, 2017. Doc. 54-6 at 96-118.
[18] EEO Deposition of Scott Petrillo on October 1, 2015. Doc. 54-5 at 121-130.

In her complaints regarding Geraci-DiSimone's behavior, Hernandez referenced the following behavior. Geraci-DiSimone pulled up her shirt within three hours of meeting Hernandez. (Dep. Hernandez at 54:16-21 [Ex. D; 54-4 at 15]). On August 27, 2015, Geraci-DiSimone said she was a "double D" and pulled up her blouse to show Hernandez her breasts. (Dep. Hernandez at Ex. D-1; Doc 54-4 at 60-67). Although Hernandez told Geraci-DiSimone she did not want to see her breasts repeatedly, Hernandez saw her bra and the size of her breasts as Geraci-DiSimone was wearing a form-fitting shirt underneath. *Id.* Geraci-DiSimone continued to make similar comments and gestures. At other times she referenced her mother's "close friendship" with Jeri Graham, Chief Technologist. (Dep. Hernandez at 54:22-55:20 [Ex. D; 54-4 at 15]). Geraci-DiSimone made rude and derogatory comments towards Hernandez and other workers, regularly lifted her shirt, and Petrillo did not intervene to Hernandez's satisfaction. (Dep. Hernandez at Ex. D-1; Doc 54-4 at 60-67). She would embrace other coworkers and sit on their laps, make lewd comments and gestures about Hernandez, doctors, and patients, and made repeated references to vaginas, i.e., referring to patients' "nasty vaginas" and asking Hernandez to "borrow her vagina." (Dep. Hernandez at Ex. D-1; Doc. 54-4 at 60-67).

### iv. *Kara "Nikki" Mitchell-Davis*

Mitchell-Davis filed an informal EEO complaint on April 30, 2012, and a formal complaint on June 8, 2012. (Dec. Mitchell-Davis[19] at 2 ¶ 1). She added additional claims and amendments on November 14, 2012. She filed another informal complaint on April 1, 2014, and a formal EEO complaint on July 7, 2014. (Dec. Mitchell-Davis at 2 ¶ 1). She added additional claims on November 25, 2014. (Dec. Mitchell-Davis at 2 ¶ 1); (Dep. Mitchell-Davis at 152:18-153:18 [Ex.

---

[19] Declaration of Kara N. Mitchell-Davis January 29, 2018. Doc. 60-2 at 2-19.

B; Doc. 54-2 at 39-40]). On September 23, 2015, Mitchell-Davis again contacted an EEO counselor and filed another formal complaint on October 28, 2015. (Dec. Mitchell-Davis at 2 ¶ 1).

In her EEO claims, Mitchell-Davis alleged that two unidentified employees informed her that several parties' confidential employment records were available on the public computer drive; including information about her previous lawsuit and other EEO complaints. *See* Mitchell-Davis Dep, Ex. 6 [Doc. 54-2 at 98 to 103]. She alleged that Bennett, Parise, and Stenzler released the information as a form of reprisal, *id.;* supervisors intentionally hired Geraci-DiSimone, who was unfit for the job, "in order to see her fail;" Bennett continued to glare at her; and Parise took threatening actions. (Doc. 54-2 at 101). Mitchell-Davis also alleged that management created a supervisor position restricted to DRT-licensed personnel, only, which disqualified her from applying. And although she received a promotion to Lead Technician, management delayed her promotion and reduced her ability to succeed. (Doc. 54-2 at 101). The ORM investigated her EEO claims as evidenced in its February 24, 2016 Written Affidavit. (Doc. 60-2 at 90-109).

From 2012 to 2016, Mitchell-Davis received "exceptional" and "outstanding" performance ratings. (Dep. Mitchell-Davis at 247:21-250:13 [Ex. B; Doc. 54-2 at 63-64]).[20] Mitchell-Davis has no record of discipline since the 2013 settlement agreement. (Dec. Graham at ¶ 3 [Ex. I; Doc. 54-5 at 93-95]). The February 2014 promotion to Lead MIT increased Mitchell-Davis' salary and pay grade. (Dep. Mitchell-Davis at 76:20-22 [Ex. B; Doc. 54-2 at 20]). Mitchell-Davis took extended leave from April 25, 2014, to February 17, 2015, for a work-related injury. (Dep. Mitchell-Davis at 260:25 to 262:23; 263:14-22; 264:7-24 [Ex. B; Doc. 54-2 at 66-67]). She took maternity leave from October 12, 2015, to the first week of February 2016, and another maternity leave from October 24, 2016, to the middle of March 2017. (Dep. Mitchell-Davis at 32:14-19, 264:7-20 [Ex.

---

[20] Plaintiffs maintain that neither Stenzler, Petrillo, nor Graham described the Plaintiffs as outstanding employees as so often referenced in the Motion. *See* Doc. 60 at 5.

B; Doc. 54-2 at 9, 67]). In total, Mitchell-Davis was absent from work for approximately 18 months during the relevant period. *Id.*

In March 2016, Geraci-DiSimone complained to Petrillo about issues she was having with Mitchell-Davis. (Dep. Graham at 20:22-21:10 [Ex. G; Doc. 54-5 at 58-59]). In April 2016, Geraci-DiSimone prepared a written complaint alleging she was being bullied by Mitchell-Davis and met with Stenzler regarding her complaint. (Dep. Geraci-DiSimone at 5:4 to 6:6 [Ex. S; Doc. 54-6 at 97]); (Dep. S. Petrillo at 4:11 to 5:19 [Ex. J; Doc. 54-5 at 103]). Stenzler referred the matter to Cutolo, the Chief of Staff. (Dep. Stenzler at 5:11-6:15 [Ex. L; Doc. 54-5 at 3]). Battle received a briefing and decided to empanel an AIB to investigate. (Dep. J. Battle at 5:13- 6:24 [Doc. 54-6 at 62]). The members of the AIB were Gloria Hilton, Rachel Brink, and Yvette Falero-Cruz, none of whom worked in Radiology. (Dep. Brink at 4:15-21, 36:14-37:11 [Ex. T; Doc. 54-7 at 2, 10-11]); (Dep. Strauser at 198:15-24 [Ex. C; Doc. 54-3 at 51]). Around May 16, 2016, the Tampa VA relocated Geraci-DiSimone to the New Port Richey Clinic. (Doc. 63 at 3 ¶ 22); (Dec. Graham at ¶ 4 [Ex. I; Doc. 54-5 at 94]). The AIB heard testimony from various employees in Radiology and concluded that Mitchell-Davis bullied and harassed Geraci-DiSimone. (Dep. Brink at 13:22-21:21; [Ex. T; Doc. 54-7 at 5-7]); (Dep. Brink, Ex. 1 at 10-11 [Doc. 54-7 at 23-24]). The AIB recommended remedial training and team building; it did not recommend disciplinary action. *Id.*

On April 13, 2016, the Tampa VA posted a vacancy announcement for an Ultrasound Supervisor position in Radiology. (Doc. 63 at 3 ¶ 21). Mitchell-Davis was the only applicant. *Id.* The job announcement closed on April 22, 2016. *Id.* The Ultrasound Supervisor position remains unfilled. (Dep. Stenzler at 31:20 to 32:17 [Ex. L; Doc. 54-6 at 9]); (Dep. J. Battle, p. 17:12-21 [Ex. P; Doc. 54-6 at 65]); (Dep. Sutton at 14:2 to 15:13 [Ex. R; Doc. 54-6 at 87]).

### d. Anonymous Memorandum

On June 23, 2016, a group of colleagues at the Tampa VA (later identified as Dr. Thornton Eastham and Dr. Katie Bailey) sent an anonymous memorandum to Director Battle. Doc. 60-9 at 25-26. In the letter the doctors state that "the leadership of the Radiology service" engaged in numerous "prohibited, illegal, and/or deficient activities." *Id.* at 25. They stated that management engaged in "retaliatory behavior" and intentionally created a "hostile work environment," which included derogatory statements about Plaintiffs in front of other staff, exclusion of Plaintiffs from advancement or promotion within the department, and threats by managers that notice of any staff members' complaints would result in negative consequences. *Id.* at 26, ¶ 2(c)[sic]. They complained that the "sexual harassment lawsuits filed against Administration resulted in compensation to the accusers without repercussions to the Administrators." *Id.* at ¶ 3(b). The doctors also noted that all complaints had to go through the leadership hierarchy even if the person within the hierarchy receiving the report was the source of the wrongdoing. And they noted that the Plaintiffs who were initial victims of the sexual harassment EEO settlements "remain in constant vigilance for continued retaliation." *Id.* at ¶ 3(a). They also complained of inappropriate hiring practices including "multiple technologist hires...from personal friends of the administration." *Id.* at ¶ 1(a)(4).

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying

those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

### III.    DISCUSSION

#### a.  Claim Exhaustion

Defendant argues that Hernandez and Mitchell-Davis did not exhaust certain discrete allegations and claims because they did not amend their EEO claims within 45 days of their occurrence. Specifically, Defendant argues that Mitchell-Davis did not raise the Ultrasound Supervisor position and Hernandez did not raise her sexual harassment claim. Plaintiffs respond that those claims were "like or reasonably related" to those pending in their respective EEO complaints. Thus, they argue, under Title VII jurisprudence, this Court has ancillary jurisdiction over the claims even if they were not specifically raised in the EEO stage of the litigation.

A federal employee must exhaust administrative remedies before suing under Title VII. *Crawford v Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999). The employee must initiate contact with an EEO counselor no later than forty-five days after the alleged discriminatory action. 29 C.F.R. § 1614.105(a)(1). But a plaintiff need not exhaust administrative remedies prior to filing a judicial claim of retaliation if that claim grew out of an earlier charge. The district court has ancillary jurisdiction to hear claims that grow out of an administrative charge. *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988) (quoting *Gupta v. E. Tex. State Univ.*, 654 F.2d 411, 414 (5th Cir. Unit A Aug. 1981)). *See also Litman v. Sec'y, of the Navy*, 703 Fed. Appx. 766, 771 (11th Cir. 2017). This exception does not apply if the plaintiff has no other properly raised judicial claim to which the retaliation claim may attach. Courts are nonetheless extremely reluctant to allow procedural technicalities to bar claims brought under Title VII. The Eleventh Circuit has noted that courts should not strictly interpret the scope of an EEOC complaint. *Litman*, 703 Fed. Appx. at 771 (11th Cir. 2017) (citing Gregory *v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004)).

Defendant relies heavily on *Duble v. FedEx Ground Package System, Inc.,* 572 Fed. Appx. 889, 893 (11th Cir. 2014) for the proposition that the omitted claims are discrete acts that do not enjoy ancillary jurisdiction. Doc. 54 at 9. In *Duble*, the plaintiff filed an EEOC charge alleging disability discrimination and retaliation. *Id*. at 891. When investigating the complaint, the employer's in-house counsel discovered inappropriate e-mails; the company fired Duble as a result. *Id*. After receiving a right-to-sue letter on his EEOC charge, which he never amended, Duble sued alleging discriminatory and retaliatory termination. *Id*. at 891-92. The court held that he did not exhaust his termination claims. *Id*. at 893. The court reached that conclusion based on the

discrete nature of the new alleged discriminatory act and on the fact that Duble had the opportunity to amend his EEOC charge, as he was fired before the EEOC issued a right-to-sue letter. *Id*.

As an unpublished opinion, *Duble* is persuasive, but not binding, authority. *See Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co*., 480 F.3d 1254, 1260 n. 3 (11th Cir. 2007). It is factually distinguishable from the instant case. In *Duble*, the termination of the plaintiff was not a natural outgrowth of the circumstances leading to the EEOC charge, even though Duble alleged that the same types of animus motivated his firing and his earlier discrimination. Here, on the other hand, Mitchell-Davis and Hernandez alleged retaliation and hostile work environment in the EEO claims, and the natural result of those claims would be continued harassment and adverse employment actions. Other district courts have distinguished *Duble* as well. *See Baker v. Nucor Steel Birmingham Inc*., 2:17-CV-01863-KOB, 2018 WL 2959884, at *3 (N.D. Ala. June 13, 2018); *Heard v. City of Union City, Georgia*, 1:15-CV-2228-MHC-JKL, 2017 WL 4334243, at *5 (N.D. Ga. May 23, 2017), *report and recommendation adopted*, 1:15-CV-2228-MHC, 2017 WL 4475926 (N.D. Ga. July 25, 2017). [21]

The Court is not persuaded by *Duble* and will address the specific claims for each Plaintiff below.

### i. Mitchell-Davis

Mitchell-Davis did not raise her 2016 non-selection for the Ultrasound Supervisor position in her EEO claims. Defendant contends that Mitchell-Davis cannot use the doctrine of "like-or reasonably related" to save that claim. Doc. 54 at 1. Defendant relies on *Duble* which is distinguishable, as discussed above. Mitchell-Davis argues that she was unaware that she did not

---

[21] *But see Jones v. Heritage-Crystal Clean, LLC*, 2016 WL 3406514, *3-4 (M.D. Fla. Jun. 21, 2016) (in granting motion to dismiss, applying *Duble* and dismissing retaliation claim that plaintiff did not assert in an EEOC charge).

get the job until 2017. Therefore, she argues, she could not have added the claim for failure to hire to her EEO claim. Doc. 60 at 19-20.

Mitchell-Davis filed the original complaint in August 2016, Doc. 1, within which she alleged disparate treatment for non-selection of the Ultrasound Supervisor position. Doc. 1 at ¶ 26(t). Her argument that the non-selection was not finalized until 2017 notwithstanding, she sufficiently exhausted the claim. The non-selection, although a discrete act, can reasonably be expected to grow out of her pending retaliation claims. *See Parten v. Alabama Dept. of Tourism*, 100 F. Supp. 3d 1259, 1271 (M.D. Ala. 2015) ("Parten's claim that she suffered retaliation for bringing complaints of harassment and sex discrimination to the Personnel Board lawyer is 'like or related to' the claim in her EEOC charge that she was terminated for complaining of harassment to the Governor's Office.").

Mitchell-Davis' challenge of the pay scale for the Ultrasound Supervisor position being reduced from GS-11 to GS-10 as a retaliatory act is also not barred for her failure to exhaust the claim. Although she did not raise it in her EEO complaint, she is ultimately claiming that the reduction was an additional form of retaliation—which could reasonably grow out of her EEO charge.

### ii. Hernandez

Defendant argues that Hernandez did not raise her sexual harassment claim against Geraci-DiSimone with her EEO counselor within 45 days of the last occurrence, i.e., February 2016. *See* Doc. 39 at ¶ 31; Hernandez Dep., Ex. 1 at 6-8. Because she filed an EEO claim raising the sexual harassment on July 28, 2016, the Tampa VA argues that it was untimely, and she cannot sustain the claim in this lawsuit as a result. Hernandez responds that the sexual harassment claim is really a hostile work environment claim which grew out of her other hostile environment claims. *See*

Doc. 60 at 21 (citing Doc. 60-15 at 112). The Court notes that in an EEO Notice,[22] the EEO accepted the hostile work environment/sexual harassment claim for investigation. The Court also notes that the EEOC's acceptance of a claim for investigation is not necessarily the equivalent of an EEOC adjudication on the timeliness of the claim. *See Fortson v. Carlson*, 618 Fed. Appx. 601, 605 (11th Cir. 2015).

But under these facts, Hernandez properly exhausted her sexual harassment claim as it is like or related to the claims already pending before the EEO. *See Ramirez v. Sec'y, U.S. Dep't of Transp.,* 686 F.3d 1239, 1250–53 (11th Cir. 2012). In *Ramirez*, the court held that the defendant, a government agency, was bound by a decision of the EEOC that an administrative complaint filed with the agency's EEO counselor was not untimely. The court noted that "[s]ignificantly, the [defendant] did not challenge this ruling. Rather, it accepted [the complaint], investigated his allegations, and denied him relief on the merits." *Id*. at 1251.

Defendant also argues that Hernandez did not allege certain actions that are part of her retaliation claim on her EEO complaint, i.e., management's failure to promote Mitchell-Davis and Tonkyro, allegations that the Plaintiffs would be fired after their August 2016 meeting with Battle, and management endangering patient safety by hiring Geraci-DiSimone. *See* Doc. 54 at 10. These allegations are also reasonably related and grow out of her retaliation and hostile work environment claims already pending before the EEO. Therefore, Hernandez sufficiently exhausted all the claims at issue in the Motion.

---

[22] October 11, 2016 "Notice of Corrected Partial Acceptance of the EEO Complaint for Yenny Hernandez, Case No. 2001-0673-2016104480, filed September 8, 2016, against officials of the James A. Haley VA Medical Center in Tampa, FL."

### b. Release of Certain Claims in the 2013 Settlement Agreement

Defendant argues that Tonkyro, Mitchell-Davis and Strauser released some claims referenced in the TAC and may not now raise them in support of their hostile work environment claims. Specifically, Plaintiffs reference verbal threats and strong language from June 2013. *See* Doc. 83 at ¶ 18.[23] Plaintiffs argue that they may rely on pre-settlement conduct to support their current hostile work environment claims.[24] The Court disagrees.

"[O]ne who agrees to settle his claim cannot subsequently seek both the benefit of the settlement and the opportunity to continue to press the claim he agreed to settle." *Kirby v. Dole,* 736 F.2d 661, 664 (11th Cir. 1984). *See also In re Managed Care*, 756 F.3d 1222, 1235 (11th Cir. 2014) (holding that acts which arose prior to the effective date of a settlement agreement are barred); *Perryman v. West*, 949 F. Supp. 815 (M.D. Ala. 1996) (holding that the continuing violation theory did not permit an employee to use EEO complaints against the Army, which she settled pursuant to a written agreement, to determine whether there was a hostile work environment in violation of Title VII). Therefore, a plaintiff who released prior employment discrimination claims in a settlement agreement with her employer may not raise the same claims in a subsequent complaint. *See Brandon v. Lockheed Martin Aeronautical Sys.,* 393 F. Supp. 2d 1341, 1355 (N.D. Ga. 2005) (granting summary judgment on disability discrimination claims released in a signed settlement agreement prior to the complaint at issue).

---

[23] This paragraph alleges that Parise threatened to "put his f****** foot down [the Plaintiffs'] throats" and threatened doctors that he would be on notice of any statements they made; he postured with "hostility' when encountering Plaintiffs, and Plaintiffs received threatening phone calls from unknown men claiming to be attorneys, harassing telephone calls, and baseless written and verbal counseling. It also alleges that Bennett told an outside vendor to send only female representatives. Doc. 83 at ¶ 18.

[24] Plaintiffs cite *N. L. R. B. v. Shurtenda Steaks, Inc*., 397 F.2d 939 (10th Cir. 1968) for the proposition that evidence of an employer's pre-settlement conduct is admissible, not as a ground for relief, but to assist the finder of facts in determining the purpose and intent of the employer's post-settlement conduct. The case is distinguishable on many bases and is therefore not persuasive.

Here, Defendant argues that in September 2013, Plaintiffs Mitchell-Davis, Tonkyro, and Strauser executed settlement agreements which included language releasing the Tampa VA of "any and all actions, claims, complaints...and proceeding of whatever nature" which were or could have been raised as of the day each respective party signed the agreement. Doc. 54 at 11 (citing Tonkyro Dep. Ex. 4; Mitchell-Davis Dep. Ex. 4, Motion Ex. C-2, Doc. 54-3 at 140). Each Plaintiff waived her rights "to pursue future causes of action against the Agency based on such actions in existence as of the date of the [] execution of this Agreement, with the exception of any claims that may arise by reasons of breach of any term of this Agreement." *Id*. The agreements each had an attachment summarizing the conduct complained of in their respective EEO claims. *Id*.

To the extent Plaintiffs attempt to bring the released claims into this action under a "continuing violation theory," they may not do so. Therefore, the Court will not consider conduct which the Plaintiffs released in their respective 2013 settlement agreements in support of their current retaliation or hostile work environment claims and will dismiss the claims in paragraph 18 of the TAC. *Accord Webster v. Wynne*, 2:08-CV-849-MEF, 2010 WL 5394752, at *8 (M.D. Ala. Dec. 28, 2010) (dismissing paragraphs in complaint which pertained to claims settled at EEO stage of litigation).

### c. Count I: Retaliation— Tonkyro, Strauser, and Mitchell-Davis

Defendant argues that Plaintiffs have not established a prima facie case of retaliation because the employment actions they've identified are not sufficiently materially adverse. To the extent they present a prima facie case, Defendant argues that it produced legitimate nonretaliatory reasons for each identified employment action. Further, Defendant argues that Plaintiffs have neither met the high bar of producing evidence that retaliation is the "but for" reason for the actions, nor established that the reasons are pretext.

Plaintiffs argue that they have established a prima facie case of retaliation; the facts establish that the retaliation is the "but for" reason for all adverse employment actions described and the overall hostile work environment; and that Plaintiffs have produced direct evidence of retaliatory animus from Stenzler, Parise, Fogarty, Cutolo and Bennett. *See* Doc. 60 at 26 (without citation).

### i. Underlying Principles Governing Title VII Retaliation

"Retaliation against an employee who engages in statutorily protected activity is barred under...Title VII...." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257–58 (11th Cir. 2012). If a plaintiff has direct evidence, then she can establish a prima facie case of retaliation. Direct evidence is "evidence from which a trier of fact could conclude, based on a preponderance of the evidence, that an adverse employment action was taken against the plaintiff on the basis of a protected personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1303-04 (11th Cir. 1999) (finding direct evidence of age discrimination where two people involved in the decision to terminate plaintiff made discriminatory comments less than three months prior to plaintiff's termination).

The Eleventh Circuit has clarified that "only the most blatant remarks, whose intent could be nothing other than to discriminate [or retaliate] ...constitute direct evidence of discrimination [or retaliation]." *Murdoch v. Medjet Assistance, LLC*, 294 F. Supp. 3d 1242, 1265 n. 27 (N.D. Ala. 2018) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)). *See also Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997) (employer's president's statement that employee's deposition was the "most damning" to employer's case in coworker's Title VII proceeding, and that employee no longer had place at employer, was direct evidence of retaliation in support of employee's action alleging retaliation in violation of Title VII). Most recently, the

Eleventh Circuit held that statements from a supervisor regarding the employer's preferences which related to national origin could be direct evidence of race discrimination. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911 (11th Cir. 2018) (employee testimony that manager of information technology department told her that he could not offer her the position because a higher-ranked manager said that he wanted a Korean in that position was direct evidence of discrimination based on race). *See also Ekokotu v. Boyle*, 294 Fed. Appx. 523, 526 (11th Cir. 2008) (supervisor's alleged statement that she would "get plaintiff back" for filing a discrimination claim was not direct evidence as it required an inference and was subject to more than one interpretation).

If a plaintiff relies on circumstantial evidence, she must follow the Supreme Court's basic allocation of burdens and order of proof as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[25] Under the *McDonnell Douglas* model, a plaintiff first has the burden of proving by a preponderance of evidence a prima facie case of retaliation by showing that: (1) she "engaged in statutorily protected activity"; (2) she "suffered a materially adverse action"; and (3) "there was a causal connection between the protected activity and the adverse action." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010).

### 1. First Element—Protected Activity

Concerning the first element, statutorily protected activity involves opposition to any practice made an unlawful employment practice (the opposition clause) or (2) charging, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing (the participation clause). *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (citing 42 U.S.C. § 2000e–(3)(a)).

---

[25] The Court notes that recently in *Babb v. Sec., Dept. of Veterans Affairs*, 16-16492, 2018 WL 3434500, at *8 (11th Cir. July 16, 2018), the Eleventh Circuit recognized that based on its precedent in *Trask v. Secretary, Department of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016), the *McDonnell Douglas* but-for causation standards govern Title VII retaliation claims brought by federal employees.

The broad coverage afforded under Title VII's participation clause protects employees who "participate[ ] in *any* manner" in an EEOC investigation. 42 U.S.C. § 2000e–3(a) (emphasis added). Because participation in an employer's investigation conducted in response to a notice of charge of discrimination is a form of participation in an EEOC investigation, such participation is sufficient to bring the employee within the protection of the participation clause. *Clover*, 176 F.3d at 1353.

### 2.  **Second Element—Materially Adverse Action**

A materially adverse action is one that is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 57, 126 S.Ct. 2405; *see also Gate Gourmet*, 683 F.3d at 1259 (same); *id.* at 1260 (finding material adversity in an employer's decision to deny a light-duty position to the plaintiff after she filed and refused to settle an EEOC charge). A materially adverse action can arise within or without the workplace. *See Burlington Northern*, 548 U.S. at 57 ("[T]he antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.").

### 3.  **Third Element—Causal Connection**

The third element requires proof of a causal connection between the plaintiff's protected activity and the materially adverse action. As a divided Supreme Court held, Title VII retaliation requires proof of customary but-for causation, rather than the less burdensome motivating-factor standard applicable to Title VII discrimination claims. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, (2013). This proof must show that the unlawful retaliation would not have occurred in the absence of the employer's alleged wrongful actions. *Id*.

### 4.  **Post–Prima Facie Case Considerations**

Once a plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory reason for its employment decision. If the defendant carries its burden of production, "[t]o survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination [or retaliation]." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143, (2000)).

A plaintiff can prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *McCann v. Tillman,* 526 F.3d 1370, 1375 (11th Cir. 2008), *cert. denied,* 555 U.S. 944 (2008) (quoting *Cooper v. Southern Co.,* 390 F.3d 695, 740 (11th Cir. 2004)). Ultimately, the plaintiff must show that retaliation was the "but for" reason for the employment action. *Nassar*, 570 U.S. 338, 360.

### ii. Claims Common to Tonkyro, Strauser, and Mitchell-Davis

Plaintiffs rely on several comments made by managers and colleagues in the Tampa VA as direct evidence of retaliatory animus. For example, Parise stated that he will see any testimony in the EEO case and if employees made negative comments or complaints "there would be consequences." Eastham Dep.[26] 29:13-3. Plaintiffs argue that Parise's threats made witnesses uncooperative for fear of retaliation. Andrews Dep.[27] at 59:14-61:19 (work and physical fears); Chaung Dep.[28] at 33:1-3425 (admitting a lack of recollection of statements while admitting he

---

[26] Deposition of Dr. Thornton Eastham August 2, 2012. Doc. 60-9 at 2-27.
[27] Deposition of Dr. Aaron Andrews on August 2, 2017.  Doc. 54-7 at 38-60.
[28] Deposition of Dr. Lanny Chuang on September 3, 2017. Doc. 60-9 at 50-65.

knew management would review his testimony); Bailey Dep.[29] at 19:16, 21:3 (discussing sending anonymous memo).

Plaintiffs also point to statements made during lunch meetings including discussions about their EEO activity and retaliation: the settlement payments the Plaintiffs received, statements that the "ultrasound girls would get fired for infighting," Plaintiffs receipt of settlement money while being able to keep their jobs, demeaning stereotypical comments, derogatory statements about Plaintiffs, and statements to physicians to stay away from the Plaintiffs. *See* Doc. 60 at 7 (citations therein). And Plaintiffs rely on the June 23, 2016 anonymous letter by Eastham, Andrews, and Bailey as direct evidence. Doc. 60-9 at 25-26. Plaintiffs rely on this evidence to support both retaliation and hostile work environment claims.

Because Plaintiffs cannot attribute any of the statements that reflect retaliatory animus to any of the decisionmakers in their adverse employment actions, it is not direct evidence. *See Bass v. Board of County Commissioners*, 256 F.3d 1095, 1105 (11th Cir. 2001) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision.").

As to establishing a prima facie case of retaliation through circumstantial evidence, there is no dispute that all Plaintiffs participated in EEO activity and thus satisfy the first element. But the parties dispute whether the identified employment actions are materially adverse and whether Plaintiffs have established both a causal connection and that retaliation was the "but for" cause.

Plaintiffs allege that certain conduct relates to them collectively, so the Court will address them accordingly.

---

[29] Deposition of Dr. Katie Bailey on August 2, 2017. Doc. 60-9 at 29-48.

### 1. Mold in the Ultrasound Suite

Plaintiffs complain that management did not remediate mold growth in the Ultrasound Suite. They contend that it went unresolved in retaliation for their EEO claims. But they admit that other co-workers also complained of the mold issue based on health problems. Strauser Dep. 163:11-23, Davis Dep. 200:1-3; Martinez Dep.[30] 9:23-12:4. Assuming, without deciding, that Plaintiffs could establish that the failure to remediate the mold was an adverse employment action, they have not presented evidence tending to show a causal connection between their EEO complaints and management's failure to remediate the mold. Thus, they do not establish a prima facie case for retaliation on this basis.

### 2. Publication of Personnel Files

Defendant argues that publication of the confidential employee records is not an adverse employment action because the documents published included other employees' personnel files, did not reference the Plaintiffs' EEO settlement, and Plaintiffs did not present evidence that their information circulated throughout the workplace.[31] Thus, it argues, the public disclosure did not materially alter their work environment. Defendant also proffers a legitimate nonretaliatory reason for the posting. Because Eubanks was leaving her position, she needed to transfer the files to the person who would assume her duties, DeLeon. Bennett instructed her to move the employee personnel files to the public drive so that DeLeon could copy them to his computer once he assumed his new role. Defendant has met its burden with this explanation.

In response, Plaintiffs argue that this reason is pretext because Bennett ordered the information published, and once employees complained about the publication, he investigated the

---

[30] Deposition of Victor Martinez on October 31, 2017. Doc. 54- 8 at 48-55.
[31] Although Tonkyro mentions that a colleague, Mr. Rose, stated that he knew how difficult it was to work with female ultrasound technologists, she has no evidence that he saw the employee records in the public drive Doc. 60-1 at 129 ¶¶ 30-31.

situation himself. They argue that the investigation was therefore a sham, and his true purpose for instructing Eubanks to put the files on the public drive was to retaliate against Plaintiffs for their participation and opposition to discriminatory acts within the Tampa VA. They otherwise rely on the totality of the circumstances to support their retaliation claims. The evidence and Plaintiffs' arguments are insufficient to rebut this nonretaliatory reason and demonstrate pretext.

### 3. Hiring Geraci-DiSimone

Plaintiffs argue that the Tampa VA hired Geraci-DiSimone, an unqualified person, to make Plaintiffs appear incompetent and increase their workload. Plaintiffs do not establish a prima facie case of retaliation based on her hiring. Although their interactions with her involved conflict, and they felt she was not qualified to do the job, the evidence does not support that her hiring was a material adverse employment action against them. Nor have Plaintiffs established a causal connection between their protected activity and her hiring. There is no direct evidence that Petrillo hired Geraci-DiSimone to make the Plaintiffs' jobs more difficult or otherwise retaliate. All ultrasound technologists assisted Geraci-DiSimone to improve her scanning. Strauser Dep. at 194:21-25; Axsom Dep. 14:22-19;10, 36:9-39:10. Neither the inconvenience caused by her alleged lack of experience nor her constant reminder that her mother's connection to people of influence at the Tampa VA create an inference of retaliation. *See Burlington*, 548 U.S. at 68 (personality conflicts at work that generate antipathy and snubbing by supervisors and coworkers are not actionable). If anything, the evidence suggests nepotism was the basis for her hiring.

Even if Plaintiffs established a prima facie case, the Defendant produced a legitimate nonretaliatory reason for hiring Geraci-DiSimone. Petrillo hired her, and he started at the Tampa VA after the parties entered into the EEO settlements. Plaintiffs do not present sufficient evidence to show that this reason is pretextual, and that their EEO activities are the "but for" cause for the

decision to hire Geraci-DiSimone. Further, it is improper for the Court to reexamine an employer's hiring decisions. *See Davis,* 245 F.3d at 1244.

Overall, the Court agrees with the Defendant that these allegedly adverse employment actions, common to all Plaintiffs, are neutral on their face and are not materially adverse employment actions as contemplated by Title VII. *See Mason*, 811 F. Supp 2d at 180. They affected all employees and did not ultimately deter Plaintiffs from pursuing their EEO claims. *See Burgos v. Napolitano*, 330 Fed. Appx. 187, 191 (11th Cir. 2009) ("DHS's failure to consult Burgos's physician was not a materially adverse action because the evidence shows that Burgos was not deterred in reinstating her EEOC claim."). *See also Jarvis v. Griffin*, 608-CV-138-ORL-19KRS, 2009 WL 3781587, at *3 (M.D. Fla. Nov. 9, 2009), *aff'd sub nom. Jarvis v. Bolden*, 417 Fed. Appx. 925 (11th Cir. 2011) ("In fact, Plaintiff was not so deterred [by her employer's decision to ignore EEOC recommendation] and subsequently filed two more formal EEOC discrimination complaints.").

### iii. Tonkyro

Tonkyro asserts that she was denied the PCA Lead position in retaliation for her EEO activity. The Tampa VA approved a PCA Lead position which was then reassigned to another department. There is no dispute that Tonkyro qualified for the position. Tonkyro relies on the overall hostile work environment as a basis for establishing causation.

Defendant argues that the position was approved in the budget, but not advertised, and thus not "vacant." Therefore, Defendant maintains, it cannot serve as a basis for an adverse action. Case law supports that contention. *See Duffy v. Lowe's Home Centers, Inc*., 414 F. Supp. 2d 1133 (M.D. Fla. 2006) (holding that employee did not establish prima facie case of discrimination

regarding position that employer advertised twice and for which he applied both times, where that position was ultimately never created or filled.).

Even assuming Tonkyro can establish a prima facie case, Defendant proffers a legitimate nonretaliatory reason— Stenzler decided that Radiology needed a Lead Mammography technician instead and asserted funding issues, the organizational chart, and management approval of the position. Although the Tampa VA acknowledges that Stenzler initially envisioned Tonkyro in the PCA Lead position, the position was no longer available and management created an Ultrasound Supervisor position instead to meet staffing needs in Radiology. *See* Stenzler Dep. 26:23-31:19; Tonkyro Dep. Exs. 13, 16-17.

Tonkyro argues that this reason is pretextual because the Defendant has offered shifting reasons for reassigning the position. She argues that two of the reasons are false, i.e. the lack of management approval for the position and funding issues. *See* Tonkyro Dec. at ¶ 16n. And she argues that Bennett controlled the organizational chart, and therefore could adjust it to put her in that position. These arguments are insufficient to raise a genuine issue of fact regarding pretext. *See Sapp v. U.S. Atty. Gen.*, 676 Fed. Appx. 878, 883 (11th Cir. 2017) (holding that varying reasons were not evidence of pretext because employer's three different reasons for termination were not inconsistent and employer could have relied on all three simultaneously); *Alexander v. Fulton County*, 207 F.3d 1303, 1339 (11th Cir. 2000) ("[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reasons, at least not where ... the reason is one that might motivate a reasonable employer."); *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001) ("Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions."). Defendant is entitled to summary judgment in its favor on Tonkyro's retaliation claim.

### iv.  Mitchell-Davis

Mitchell-Davis asserts that her AIB investigation was a sham proceeding. She contends that Geraci-DiSimone was the bully, and she was the only person who addressed Hernandez's complaints about her behavior.  Thus, she maintains, the only reason the Tampa VA proceeded with the AIB was as retaliation for filing her EEO claims.  And she argues that the following actions were retaliatory: designating the new Ultrasound Supervisor position at a GS-10 pay grade; delaying her "boarding package" for three months; and suspending the Ultrasound Supervisor position selection process.

The AIB investigation is an adverse employment action because it disqualified Mitchell-Davis for the Ultrasound Supervisor position. *See cf. Vandesande v. Miami–Dade Cnty.*, 431 F.Supp. 2d 1245, 1253 (S.D. Fla. 2006) ("An internal investigation is not an adverse employment action when it does not result in a significant change in employment status, such as termination, demotion, failure to promote, significant reassignment or a significant change in benefits.").  The incorrect pay grade for the position is also an adverse action because it would have deprived her of part of the benefit of the promotion—increased pay.  *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (holding that denial of transfer to a position that had additional responsibilities and prestige is a material adverse action). And the delay in her boarding package which denied her the benefits of her promotion for three months may be an adverse employment action. *See Blue v. Dunn Construction Co.*, 453 Fed. Appx. 881 (11th Cir. 2011) ("This circuit has not yet determined whether a delayed promotion can satisfy the adverse employment action prong"). But the suspension of the vacancy for the Ultrasound Supervisor position is not an adverse employment action because the position must have been open and available to support her claim. *See Duffy,* 414 F. Supp. 2d at 1143.

Mitchell-Davis has not clearly established the causal connection between these adverse actions and her protected activity. Although there is evidence that some in management openly discussed Plaintiffs' EEO activity, Mitchell-Davis has not connected the statements to Stenzler, Cutolo and Battle (the managers who made the decisions in her case) or any of the members of the AIB. *See Walker v. Prudential Prop. & Cas. Ins. Co*., 286 F.3d 1270, 1274 (11th Cir. 2002) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent. When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker.").

Further, the time between her last EEO claim and the AIB investigation is six months, too distant to infer causation. *See Williams v. Waste Mgmt., Inc*., 411 Fed. Appx. 226, 229-30 (11th Cir. 2011) ("However, a two-month gap between the two events has been found to be enough of a delay to preclude an inference of causation."). The causal connection between the last EEO claim and the suspension of the Ultrasound Supervisor position is also tenuous. Mitchell-Davis relies on the totality of the circumstances, i.e. the over-all hostile environment created by the EEO settlement, as a basis for showing causation. That evidence is insufficient.

But assuming Mitchell-Davis can establish a prima facie case of retaliation, Defendant met its burden to produce a legitimate nonretaliatory reason for the three actions. The GS-10 pay grade for the Ultrasound Supervisor position was the top pay grade for an MIT. Campbell Dep.[32] 11:24 to 12:3 Doc. 60-10 at 23; Doc. 60-14, p. 114-118. As for the delay in boarding package, board member Lisa Campbell advised that the board's meeting schedule did not allow them to approve it sooner. Campbell Dep. at 19:5-20:19, Ex. 1; Mitchell-Davis Dep. 76:20-80:20, 88:1-91:3, Exs. 12, 13. Battle, Petrillo and Geraci-DiSimone started their positions after the EEO settlement. Thus,

_____
[32] Deposition of Lisa Campbell on September 22, 2017. Doc. 54-8 at 62-70.

Defendant argues, their actions cannot be retaliation for it. It also argues that Geraci-DiSimone initiated the bullying complaint of her own volition. She first complained about Mitchell-Davis' bullying before the Tampa VA advertised the opening for the Ultrasound Supervisor position.[33] Geraci Dep. 5:4 to 6:6. She verbally complained about bullying, and in April 2016, she submitted a written complaint. She met with Stenzler who sent the complaint up the chain of command to Battle, who decided to empanel the AIB. Defendant maintains that empaneling the AIB is the appropriate response to a bullying complaint. The three members of the AIB panel were not part of Radiology. After two days of investigation they concluded that Mitchell-Davis bullied Geraci-DiSimone. *See* Brink Depo. At 13:22 to 21:21; 33:21-24; 40:14-24; Ex. 1;[34] *see also* Burton Dep. at 12:1 to 17:7, Ex. 1.[35] And Battle rejected the AIB recommendation to avoid the perception of retaliation. Battle Dep. 9:13-10:1.

As to Mitchell-Davis' application for the Ultrasound Supervisor position, her active AIB investigation disqualified her for the position and the position remains unfilled; this explanation satisfies the Defendant's burden. *See Sapp*, 676 Fed. Appx. at 883 (holding that proffered legitimate, nonretaliatory reason by employer for denying employee overtime work— that he was under investigation for allegedly providing confidential information to inmates and all positions in which overtime could have been made available involved inmate contact or entailed working without supervision— was not pretext for retaliation in violation of Title VII). *See also Trask v. Sec., Dept. of Veterans Affairs,* 822 F.3d 1179, 1191 (11th Cir. 2016), *cert. denied sub nom. Trask v. Shulkin*, 137 S. Ct. 1133 (2017) (stating that in a typical failure to hire scenario plaintiff must demonstrate she was qualified for the position for which the employer was accepting applications).

---

[33] The parties dispute whether Petrillo was aware of the bullying complaint prior to the April 20, 2016 meeting with Stenzler. *Compare* Doc. 60-7 at 20 *to* Doc. 60-8 at 180. This dispute is not ultimately material.
[34] Deposition of Rachel Brink. Doc. 54-7 at 2-12.
[35] Deposition of Brent Burton on October 26, 2017. Doc. 54-8 at 2-17.

Mitchell-Davis argues that the AIB investigation is pretext for retaliation because there was a conspiracy among the supervisors to deny her the position and create a reason to transfer Geraci-DiSimone. *See* Mitchell-Davis Dep. 224:12-226:13; Strauser Dep. 188:12-193:15. And she argues that the "standard practice" for a bullying complaint is to conduct a fact-finding investigation, not empanel an AIB, citing the Sutton Dep.[36] at 15:19-16:25. She also points out that when Hernandez complained to Petrillo about Geraci-DiSimone harassing her, he took no action. *See* Hernandez EEO Dep.[37] at 12:15-15:15; Hernandez Dep.[38] at 48:12-19. And, she argues, she was on maternity leave for four months, returning in mid-February 2016, which belies Geraci-DiSimone's bullying claim. Thus, she argues, the supervisor's investigation into the bullying claim is pretext for both the AIB investigation and the suspension of the Ultrasound Supervisor position.

And as to the unfilled position, Mitchell-Davis adds that the position remained opened and unfilled for more than 180 days. She argues that timeframe was well beyond the norm of what the Office of Personnel Management allows. *See* Dep. Sutton at 32:20-34:9. She argues that all these inconsistencies provide further evidence of pretext.

But the evidence is insufficient to support her theory of pretext; speculation cannot create a triable issue of fact. *See Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact."). *See also Merritt*, 120 F.3d 1181 (stating that the anti-retaliation provision of Title VII does not prohibit employer from imposing discipline on any employee who harasses or otherwise discriminates against other employees, so long as

---

[36] Deposition of Andrew Sutton on September 13, 2017. Doc. 60-9 at 98.
[37] EEO Deposition of Yenny Hernandez on October 27, 2016. Doc. 60-5 at 2.
[38] Deposition of Yenny Maritza Hernandez on October 31, 2017. Doc. 60-4 at 123.

discipline is based on reason other than employee's participation in Title VII proceeding). Mitchell-Davis has not established that retaliation is the "but for" reason for the Defendant's conduct.

### 1. Cat's Paw Theory

In the alternative, Mitchell-Davis relies on the "cat's paw theory" as articulated in *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011). Doc. 60 at 27. She argues that the Tampa VA empaneled the AIB based on assertions by individuals with retaliatory animus, i.e., Stenzler who said that Mitchell-Davis made frivolous EEO claims, and Petrillo and Graham who allegedly gave false and misleading testimony. *Id*. She also argues that Battle's decision to reject the AIB recommendation is evidence that he inappropriately considered her EEO activity in his decision.

In *Staub*, the Supreme Court explained that the cat's paw theory applies when an employee seeks to hold her employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. 562 U.S. at 415. It concluded that an independent investigation did not relieve an employer of fault where the supervisor's biased act was intended to cause and proximately caused an adverse employment action. *Id*. at 422. In any event, the Supreme Court stated there is no proximate cause, and therefore no liability, if the adverse action is entirely justified apart from the biased supervisor's recommendation. *Id*. at 421-22. And "while the cat's paw theory may be appropriate in cases in which the plaintiff is required to prove only that the protected characteristic was a motivating factor...the theory is inappropriate when the statute requires but-for causation." *Duncan v. Alabama*, --- Fed. Appx. ---, 17-12406, 2018 WL 2126698, at *2 (11th Cir. May 9, 2018) (citing *Staub*, 562 U.S. 421-22).

In this case, Mitchell-Davis needs to show "but for" causation to establish a prima facie case of retaliation; thus, the cat's paw theory is inapplicable. She has not met her burden to show

pretext, and the Defendant is entitled to summary judgment in its favor on Mitchell-Davis'
retaliation claim.

### v. Strauser

Strauser relies on the claims affecting all Plaintiffs. She did not identify a specific adverse
employment action unique to her retaliation claim. Thus, she does not establish a prima facie case
of retaliation under this theory. She also relies on the totality of the circumstances, i.e., the overall
hostile environment created by the EEO settlement, as a basis for establishing causation. As
discussed *supra*, the evidence is insufficient to establish that retaliation was the but for cause for
the employment actions affecting all Plaintiffs. Thus, Defendant is entitled to summary judgment
in its favor on Strauser's retaliation claim.

### d. Count II: Hostile Work Environment— All Plaintiffs

### i. Underlying Principles in Hostile Work Environment Claims

To state a claim for "retaliatory hostile work environment," a plaintiff must allege that she
engaged in statutorily protected activity; that she suffered a materially adverse employment action;
that a causal link exists between the protected activity and the adverse action; and that "the
workplace [was] permeated with discriminatory intimidation, ridicule, and insult that is
sufficiently severe or pervasive to alter the conditions of the victim's employment and create an
abusive working environment." *Gowski v. Peake*, 682 F.3d 1299,1312 (11th Cir. 2012).

When courts evaluate the objective severity of the harassment, they look at the totality of
the circumstances and consider the following, among other things: "(1) the frequency of the
conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or

humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with employee's job performance." *Gowski,* 682 F.3d at 1312.

### ii. Plaintiffs' Hostile Work Environment Claims

Although the Court discusses Plaintiffs' retaliation claims above and concludes they have not met their burden, assuming the Plaintiffs could establish retaliation, the Court must decide whether the behavior was sufficiently severe and pervasive as to create a hostile work environment. Defendant argues that Plaintiffs' absences from the workplace counteract their argument that the allegedly harassing conduct was severe and pervasive. For example, Tonkyro moved to another department in September 2014 and only comes to the main hospital quarterly; Mitchell-Davis took extended leave from April 2014 to March 2017; and Strauser took leave form January 2015 to May 2015. Further, it argues that the actions were not physically threatening but mere offensive utterances; and therefore, they were not sufficiently severe. Also, it argues, the interactions were too limited and isolated to be pervasive. Lastly, Plaintiffs continued to receive good evaluations on their performance, which undermines the Plaintiffs' arguments that the acts negatively affected their work. Under the totality of the circumstances, Defendant argues that the allegedly harassing behavior was not objectively severe and pervasive.

Plaintiffs argue the following.

### 1. Tonkyro, Mitchell-Davis and Strauser

Plaintiffs assert a retaliatory hostile work environment based on their supervisors' and colleagues' interactions with them after their EEO settlement. For example, they point to Stenzler's suggestion that Tonkyro apply for Eubanks' position once he retired, after which management

decided to fill the position another way, Tonkyro Dep. 39:19-42:12, 53:22-25, Ex. 1; upon complaining to Stenzler about Parise being in the ultrasound suite, Stenzler stated "you girls will never get past this," Tonkyro Dep. 53:4-13, Ex. C; Strauser Dep. 41:18-42:20, 138:23-139:6, Ex. B; Mitchell-Davis Dep. 133:9-134:4; Chuang told Tonkyro that he heard about the settlement; Margaret Becker told Plaintiffs that Chuang told her that they received $250,000 in settlement, and a human resources employee stated that the Plaintiffs have a new case which would cost the agency money. Davis Dep. 36:24 to 37:18; 39:5 to 40:24; Tonkyro Dep. 202:5-13.

Plaintiffs also rely on Geraci-DiSimone's knowledge of the EEO settlements which she heard from an unidentified Tampa VA employee. Geraci-DiSimone Dep. 51:17-53:25. Geraci-DiSimone told Dyanith Axsom, who then told Hernandez, who then told Tonkyro and Mitchell-Davis. Tonkyro Dep. at 95:11-97:6, Ex. 6; Mitchell-Davis Dep. at 30;11-32:24, Ex. 5; Axsom Dep.[39] at 22:15-25;25. Mitchell-Davis learned about it around April 2016. Mitchell-Davis Dep. at 32:16-19. Eastham told Plaintiffs that he heard general conversations about the EEO settlement. Mitchell-Davis. Dep. 40:25-41:16, Ex. 5; Tonkyro Dep. 97:7-98:20, 112:4-15, Ex. 6. Also, in March 2014, Plaintiffs encountered Parise in the ultrasound suite which prompted a complaint to Stenzler.

There are also other alleged comments by managers relayed to Plaintiffs by other employees including: Parise told Eastham that Plaintiffs would be terminated; Bailey reported that Parise yelled "yes" and made a "fist pumping gesture" when he heard that Mitchell-Davis was going on maternity leave; Kathy Arruda reported to Mitchell-Davis that Jeri Graham advised her of openings in Tampa and discussed problems in the ultrasound department; and Andrews told Plaintiffs that Stenzler reported that they were filing frivolous EEO complaints which affected the

---

[39] Deposition of Dyanith Axsom on October 26, 2017. Doc. 54-8 at 26-38.

ultrasound department. *See* Doc. 54 at 22 (citations therein). Plaintiffs also complain of being portrayed as "money hungry" and "money grubbing bitches." *See* Mitchell-Davis Dep. at 38:22-39:3, 81:11-82:5; Tonkyro Dep. at 201:23. Although Plaintiffs contend that many staff members used the term, they could not identify any by name or the source of their knowledge. *See* Tonkyro Dep. at 201:24-25; Mitchell-Davis Dep. at 82:1-5; Andrews Dep. at 76:14-77:15.

Several of the acts Plaintiffs identify as retaliatory involve negative consequences that affected the entire department. These acts include management's failure to promptly remediate the mold in the ultrasound suite; management's decision to hire Geraci-DiSimone in August 2015; Eubanks' publication of the confidential employee records; and the advertisement of the position created by Eubanks' retirement as a DRT licensed position.

Based on the foregoing, the Court agrees with the Defendant that none of the Plaintiffs identify behavior so severe and pervasive as to establish a retaliatory hostile work environment claim. *See Gowski*, 682 F. 3d 1299. *See also Baroudi v. Shinseki*, 8:14-CV-1099-T-30TBM, 2015 WL 6165496 (M.D. Fla. Oct. 20, 2015) (holding that forty-three incidents which included being labeled as a troublemaker, receiving a downgraded performance evaluation, having patient care criticized, and blocking of computer access temporarily did not create retaliatory hostile workplace); *Odom v. Holder*, 2:11-CV-3086-SLB, 2014 WL 1233709 (N.D. Ala. Mar. 25, 2014) (holding that plaintiff did not establish a retaliatory hostile workplace when evidence demonstrated loss of merit pay, removal from meetings, loss of significant duties, increased surveillance, and employees conspiring to fabricate negative information over four year period).

There is evidence of some resentment towards the Plaintiffs for having brought EEO claims and having received settlement money because of it. And this evidence implicates their protected status and demonstrates hostility among some of their colleagues. But by itself it is insufficient.

Plaintiffs must also show sufficient severity or pervasiveness to significantly alter their work environment. *See Babb v. Sec., Dept. of Veterans Affairs*, 16-16492, --- Fed. Appx. ----2018 WL 3434500, at *9 (11th Cir. July 16, 2018) (holding that summary judgment in favor of the Department of Veterans Affairs regarding hostile work environment claim was proper where plaintiff suffered from denial of training, failure to hire and unprofessional comments regarding her age and gender). These allegations do not compare to the sort of conduct deemed sufficiently "severe and pervasive" to create an objectively abusive environment. *See e.g.*, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811–14 (11th Cir. 2010) (plaintiff's coworkers made gender-specific derogatory comments and showed plaintiff pornography); *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (supervisor gave plaintiff unwanted massages and stood so close that his body parts touched her). *See also Smelter v. S. Home Care Services Inc.*, 16-16607, --- F.3d ----, 2018 WL 4560684, at *6 (11th Cir. Sept. 24, 2018) (reversing summary judgment in favor of defendant on hostile work environment claim where plaintiff testified that she heard racist comments every day, on her last day of employment was called a "dumb black nigger" and heard other comments referring to "racial slurs conveying highly offensive and derogatory stereotypes of black people" including references to black people as "lazy," "scum of the earth," and monkeys, among other things; and concluding this behavior was sufficiently severe and pervasive especially because it was directed at plaintiff in an offensive and humiliating manner, described her, and it was the culmination of two months of racists comments).

Further, the lack of physically threatening conduct weighs against finding a hostile work environment. Rumors were mere offensive utterances, and Plaintiffs' encounter with Parise in March 2014 may very well have been intimidating, but that's it. Plaintiffs have had minimal

contact with Parise and Bennett thereafter. The Eleventh Circuit recently clarified that the behavior can be physically threatening *or* humiliating to satisfy the objective component of the hostile work environment claim. *Smelter*, 2018 WL 4560684, at *7 (citing *Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1246 (11th Cir. 1999)) (emphasis in original). In this case, the behavior was not sufficiently humiliating to satisfy this prong.

Accordingly, Defendant is entitled to summary judgment in its favor on Tonkyro, Mitchell-Davis, and Strauser's retaliatory hostile work environment claim.

### e.  Hernandez

Hernandez points to Geraci-DiSimone's bullying and Petrillo's failure to act on her complaints of it as a basis for her retaliatory hostile work environment claim. Also, she asserts that she had to perform additional ultrasounds because Geraci-DiSimone was not performing her duties. Though Hernandez's dealings with Geraci-DiSimone include a list of unpleasant interactions that could be viewed as frequent, they were not sufficiently severe or physically threatening. Geraci-DiSimone made physical contact with Hernandez (chest bump and kiss on the cheek) but they were isolated incidents. And although Hernandez frequently describes the stress she endured from her interactions with Geraci-DiSimone, including physically shaking with anger or fear, Hernandez continued to receive positive performance reviews even with the additional stress and distractions from the incidents.  As to Hernandez's arguments supporting a hostile work environment based on sexual harassment and sex discrimination, the Court will address them below.

### f.  Count III: Hostile Work Environment— Hernandez[40]

---

[40] Although the TAC labels Count III as a hostile work environment, the first paragraph states that the claim is based on "reprisal and sex." Doc. 83 at ¶ 47.

Defendant argues that Hernandez does not meet her burden to demonstrate behavior so severe and pervasive as to support a hostile work environment based on sexual harassment. Hernandez contends that her claim is less about sexual harassment and more about a hostile work environment generally. *See* Doc. 60 at 21. Nonetheless, since arguments regarding Geraci-DiSimone's behavior permeate the Plaintiffs' response, and the TAC is filled with references to sexual harassment and discrimination, the Court will address sexual harassment and gender discrimination separately, and in addition to, the hostile work environment claim. *See Babb*, 2018 WL 3434500, at *4 (reversing grant of summary judgment on gender discrimination claim although not raised in the complaint because plaintiff sufficiently raised a mixed-motive theory in response to the defendant's summary judgment motion).

Hernandez raised the following eight acts in her formal August 25, 2016 EEO complaint: Geraci-DiSimone raised her shirt to show Hernandez her breasts (August 27, 2015), asked Hernandez to borrow her vagina (August 31, 2015), asked whether the "vagina" had arrived for an exam (September 3, 2015), made a reference to having to deal with "dirty vaginas" (September 10, 2015), "chest-bumped" Hernandez (October 2015), kissed Hernandez (January 2016), hugged a male co-worker (January or February 2016), and sat on a male coworker's lap, put her arm around his neck, and spoke to him (February 2016). Doc. 54-4, Ex. D-1, Hernandez Dep. Ex. 1.

### i. Underlying Principles Governing Sexual Harassment and Gender Discrimination

To prevail in a suit against her employer for a fellow employee's sexual harassment that resulted in a hostile work environment, a plaintiff must prove five elements: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the harassment complained of was "sufficiently severe or pervasive to alter the terms and conditions of employment"; and (5) a basis

for holding the employer liable. *Wilcox v. Corrections Corp. of Am.*, 892 F.3d 1283, 1286–87 (11th Cir. 2018) (quoting *Reeves v. C.H. Robinson Worldwide, Inc*., 594 F.3d 798, 808 (11th Cir. 2010) (en banc)).

With respect to the fifth element, the employer can be responsible for the harassing conduct under a theory of either vicarious liability or direct liability. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). When, as here, the perpetrator of the harassment is not the plaintiff's supervisor, the employer will be held directly liable only if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002). The analysis is fact intensive, and the Court will examine the same four factors discussed *supra* to determine whether Hernandez establishes the objective component of the "severe and pervasive" analysis.

Generally, to establish a claim for sex discrimination, a plaintiff must demonstrate: "(1) she is a member of a protected class (female); (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) [the defendant] treated similarly-situated males more favorably." *Scott v. Sarasota Doctors Hosp., Inc.*, 145 F. Supp. 3d 1114, 1125 (M.D. Fla. 2015), *aff'd*, 688 Fed. Appx. 878, 886 (11th Cir. 2017).

But a plaintiff alleging a mixed-motive Title VII sex discrimination claim does not have to satisfy *McDonnell-Douglas*'s "overly burdensome" standard. *Quigg v. Thomas County Sch. Dist.,* 814 F.3d 1227, 1239 (11th Cir. 2016). Instead, a plaintiff must offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action." *Id*. at 1239 (emphasis added) (internal quotation marks omitted). Gender discrimination constitutes a motivating factor if it "factored into [the employer's] decisional process." *Id*. at 1241.

In *Quigg*, the Eleventh Circuit concluded that the plaintiff met her burden by showing that several members of a school board made statements which provided direct evidence indicating that gender bias was a motivating factor in the adverse employment action. *Id.*

### 1. Sexual Harassment/ Hostile Work Environment Claim

The evidence in the record establishes that Hernandez and Geraci-DiSimone did not get along. And Geraci-DiSimone made various statements and acted in a way that a jury could consider crude, condescending, inappropriate, and otherwise offensive to Hernandez. *See* Doc. 83 at ¶ 31 (acts and conduct described therein). Also, Hernandez had to perform certain ultrasounds that Geraci-DiSimone did not. As Defendant points out, Hernandez's claim is really a combination of sexual harassment by Geraci-DiSimone and failure by Petrillo to investigate the foregoing.

Hernandez established that she is in a protected group, was subject to unwelcome sexual harassment that was based upon sex, and that she reported it to management which did not act in a timely manner to address it. But the conduct complained of is not sufficiently severe and pervasive to support a sexual harassment claim based on a non-supervisory employee's behavior. At most it was offensive; at no time was it physically threatening. And Geraci-DiSimone stopped making comments regarding "vaginas" after receiving counseling from management. Further, Geraci-DiSimone's references to vaginas were comments typically describing the patients, while only once referring to Hernandez. Although Geraci-DiSimone's use of the word vaginas may have been inappropriate, it is the correct medical term, and she did not use it in an objectively hostile or humiliating way towards Hernandez, given their work as ultrasound technicians. *See cf. Smelter*, 2018 WL 4560684, at *6 ("Here, Smallwood did not simply use the epithet in Smelter's presence; instead, she directed it at Smelter as a means of insulting her in the midst of an argument.").

Therefore, to the extent Hernandez raised a hostile work environment claim based on sexual harassment, Defendant is entitled to summary judgment in its favor.


### 2. Sex/Gender Discrimination

Hernandez appears to raise a gender discrimination claim within her hostile work environment claim; *see* Doc. 83 at ¶¶ 5,15-32, and in her response in opposition to the Motion, *see* Doc. 60 at 25. Although it is not clearly argued in the pleadings, the Court will address it. *See Babb*, 2018 WL 3434500, at *4 ("Babb sufficiently raised her mixed-motive theory in the district court by arguing it in response to the Secretary's summary judgment motion.").

The Court presumes that the adverse action upon which Hernandez relies is the suspension of the Ultrasound Supervisor position. Plaintiffs argue that the supervisory position was structured to "prevent all Plaintiffs from obtaining it." Doc. 60 at 9. The Tampa VA structured it to require DRT or X-ray specialty, which Hernandez did not have. Hernandez Dec. at ¶ 5. She argues that according to the Defendant's handbooks, that requirement was incorrect. Doc. 60-14 90-99, 114-118. She also points to Bennett's decision to exchange the GS-11 Ultrasound Supervisor position for a PCA Lead position on March 11, 2015, as a basis for discrimination. By exchanging the positions, Hernandez did not have an opportunity to apply for a GS-11 pay grade position.

Defendant's nondiscriminatory reason for exchanging the position is that Stenzler decided that Radiology needed a Lead Mammography technician and allocated the position for that job. Stenzler Dep. 26:233-31:19; Bennett Dep. at 34:22-35:20. Hernandez argues that any reason given for this decision is pretext because mammography was overstaffed and did not need the position. But Hernandez does not present evidence that her gender played any role in these decisions.

Therefore, under a mixed-motive analysis, her claim fails as a matter of law. *See Williams v. Fla. A. U.*, 728 Fed. Appx. 996, 999 (11th Cir. 2018) (affirming summary judgment in favor of defendant because plaintiff presented no evidence that her gender played any role in the adverse employment action); *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[A]n employer has the "right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.").

She also points to other complaints she had concerning failure to promote others, concerns about being fired, patient safety, and having to do additional work because Geraci-DiSimone was not qualified and they did not fill all the approved positions. *See* Doc. 60 at 22. There are several other complained of acts, i.e., intimidation from Bennett when he was her supervisor; denial of request for help from January to March 2015; denial of Hernandez's request for leave on June 12, 2015; Geraci-DiSimone's bullying and other allegedly hostile behavior against her. *See* Doc. 83 at ¶ 31. To the extent Hernandez relies on them to demonstrate sex discrimination under a mixed motive analysis, they do not suffice. They either do not relate to an adverse employment action or do not suggest that Hernandez's gender played a role in the action. Many of them relate to the type of personnel disputes that Title VII is not meant to address. The Court cannot second-guess the wisdom of an employer's decision, and it does not "sit as a super-personnel department that reexamines" hiring decisions. *Alexander*, 207 F.3d at 1341(quoting *Davis*, 245 F.3d at 1244).

Accordingly, Hernandez's claims—under either a sexual harassment hostile work environment theory or a gender discrimination theory—do not establish sufficient evidence to survive summary judgment.

## IV. CONCLUSION

Plaintiffs describe a work environment plagued with uncertainty, rumors, and hostility based on their previous claims of sexual harassment and continued opposition to behavior they perceived as discrimination and retaliation. But the evidence is insufficient to establish legally impermissible retaliation, hostile work environment, sexual harassment or gender discrimination. Plaintiffs must provide more than isolated incidents and comments from colleagues and supervisors, and must establish but for causation, severe and pervasive behavior, and motive, respectively, to survive summary judgment. They did not do so here. Defendant is entitled to judgment in its favor.

**Accordingly, it is ORDERED and ADJUDGED**:

1.     Defendant's Renewed Motion for Summary Judgment (Doc. 85) is **GRANTED.**

2.     All other motions are **DENIED AS MOOT.**

3.     The Clerk is directed to enter judgment in favor of Defendant Secretary, Department of Veteran's Affairs and against Plaintiffs Erin Tonkyro, Dana Strauser, Kara Mitchell-Davis, and Yenny Hernandez and close this case.

**DONE AND ORDERED** in Tampa, Florida on November 7, 2018.

Charlene Edwards Honeywell
United States District Judge