[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10014

_____

D.C. Docket No. 8:16-cv-2419-CEH-AEP

ERIN TONKYRO,
DANA STRAUSER,
KARA MITCHELL-DAVIS,
YENNY HERNANDEZ,

Plaintiff – Appellant,

versus

SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant – Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 20, 2021)

Before JORDAN, TJOFLAT, and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

We *sua sponte* vacate our previous opinion and substitute the following in lieu thereof.

\*      \*      \*

This appeal arises from a Title VII action filed by four ultrasound technologists at the James A. Haley VA Healthcare System ("Tampa VA") against the Secretary of the Department of Veterans Affairs ("the Secretary").  All Plaintiffs allege that their supervisors and coworkers retaliated against them and subjected them to a hostile work environment because they engaged in protected Equal Employment Opportunity Commission ("EEOC") activity.  One Plaintiff also alleges that she was subjected to a hostile work environment based on her sex.  Plaintiffs appeal from the District Court's grant of summary judgment in favor of the Secretary.

Because two intervening decisions—one from the Supreme Court and one from our Court—changed the law applicable to Plaintiffs' discrete retaliation claims and retaliatory hostile work environment claims, we remand those claims to the District Court with the instruction that it analyze the claims consistent with the intervening decisions.  Because the intervening decisions did not, in our judgment, affect the resolution of the sex-based hostile work environment claim in this case, we consider that claim alone and affirm the District Court's decision to enter summary judgment for the Secretary.

I.

In 2012, Plaintiffs Erin Tonkyro, Kara Davis, and Dana Strauser filed EEOC complaints alleging that they were sexually harassed by supervisors and radiologists at the Tampa VA. An Administrative Investigation Board was formed to investigate the complaints, and Plaintiff Yenny Hernandez testified in support of the other three Plaintiffs. The complaints were eventually settled with the VA in September 2013.

In July 2014, Tonkyro, Davis, and Strauser filed formal EEOC complaints alleging retaliation for their having filed previous EEOC complaints and the 2013 settlements. Hernandez filed a formal EEOC complaint in September 2016 alleging sexual harassment and retaliation for her participation in the 2012 EEOC proceedings.

On August 23, 2016, Plaintiffs filed the present action against the Secretary. Plaintiffs' third amended complaint alleged three counts. Count One alleged that Plaintiffs' supervisors retaliated against them because of their EEOC complaints and settlements in violation of 42 U.S.C. § 2000e *et seq.*. Count Two alleged that Plaintiffs' supervisors and coworkers subjected them to a hostile work environment in retaliation for their EEOC activity. And Count Three alleged a sex-based hostile work environment claim on behalf of Hernandez.

A.

Because we decide only whether Hernandez's sex-based hostile work environment claim should have survived summary judgment, and remand the other claims to the District Court for reconsideration, we present only the facts relating to that claim.

On August 27, 2015, Hernandez's co-worker Angela Geraci pulled up her blouse to show Hernandez the outline of her breasts through her undershirt.  A few days later, Geraci—during a conversation with Hernandez about transvaginal ultrasounds—asked Hernandez "Why don't you just let me borrow your vagina?"  On September 3, 2015, Geraci approached Hernandez and asked "Is the vagina here?," and made a gesture of inserting something into her vagina.  Hernandez reported Geraci's behavior to her supervisor Scott Petrillo, who conducted a fact finding and gave both Geraci and Hernandez verbal warnings.

On September 10, 2015, Geraci stated that she enjoyed working at the Tampa VA, but could not stand the fact that she had to work with "dirty vaginas."  On September 18, 2015, Geraci gave Hernandez "an angry, hostile look."  On September 21, 2015, Geraci refused to speak with Hernandez when Hernandez approached her about a patient.

At some time in October 2015, Geraci gave Hernandez a high five and "chest bumped" her.  On multiple occasions in October and November 2015,

4

Hernandez saw Geraci scan her own abdomen with an ultrasound transducer.  In November 2015, Geraci told Hernandez, in a "condescending and hostile" tone, to use Hernandez's own assigned room.  In December 2015, Geraci referred to a radiology resident as "Dark Chocolate" and described "all the things she would do" to attract him.

In December 2015 and January 2016, Geraci gave Hernandez "dirty looks," made disparaging remarks about Hernandez's eating disorder, and told Hernandez "Oh my God, you are obsessed over the stupidest shit ever."  On multiple occasions, Geraci gave Hernandez disgusted looks while Hernandez was eating, and, on one occasion, said "I can't believe you're going to eat all that."

In January 2016, Geraci embraced Hernandez and kissed her on the cheek after she told Geraci that her patient had cancelled an appointment.  On another occasion, Geraci caused Hernandez to be late for an appointment with a patient because Geraci took 50 minutes to perform an ultrasound that should have taken 30 minutes.

In February 2016, Geraci entered a room in which Hernandez was performing an ultrasound and demanded that Hernandez leave the room.  On February 17, 2016, while Geraci was chaperoning Hernandez for a transvaginal ultrasound, Geraci interrupted Hernandez and told her to "hurry up."  On February 19, 2016, Geraci told Hernandez, in an angry tone, that it was her responsibility to

close the examination rooms when she was done.  That same day, Geraci asked Hernandez, "in a condescending and angry tone," whether she completed her outpatient requests.  Hernandez reported these incidents to Petrillo, but Petrillo took no action.

In March 2016, Hernandez observed Geraci embrace Brent Burton, a male ultrasound technologist, in an inappropriate manner.  Hernandez also observed Geraci sit on Burton's lap and wrap her arms around his neck.  On multiple occasions in 2016, Geraci pulled up her shirt to reveal her abs to Hernandez despite knowing that Hernandez did not want to see them.  When Hernandez reported Geraci's behavior to Petrillo, he responded that he had more pressing issues to deal with.

Finally, Hernandez alleged that Petrillo held her to a different standard than males in the department.  According to Hernandez, female ultrasound technologists were given a greater volume of work and less time off than male ultrasound technologists.  On June 12, 2015, for example, Petrillo denied Hernandez's request for leave while granting the request of a more junior male employee.

### B.

On November 7, 2018, the District Court entered summary judgment in favor of the Secretary on all counts.  On Count One—Plaintiffs' retaliation claims—the Court found that Plaintiffs failed to show that the conduct they

complained of would not have occurred but for Plaintiffs' EEOC activity.  The

Court also found that the Secretary offered nonretaliatory explanations for the

conduct which Plaintiffs failed to show were pretextual.[1]  On Counts Two and

Three—Plaintiffs' retaliatory hostile work environment claims and Hernandez's

sex-based hostile work environment claim, respectively—the Court found that the

conduct complained of did not satisfy the "severe or pervasive" standard we

articulated in *Gowski v. Peake*, 682 F.3d 1299 (11th Cir. 2012).  This appeal

followed.

## II.

We review a district court's grant of summary judgment *de novo*.

*Crawford v. Carroll*, 529 F.3d 961, 964 (11th Cir. 2008).  In doing so, we view the

evidence in the light most favorable to, and draw all reasonable inferences in favor

of, the non-moving party.  *Id.*  Summary judgment is proper when the moving

party is entitled to judgment as a matter of law because of a lack of any genuine

issue of material fact.  Fed. R. Civ. P. 56(c).

---

[1] We acknowledge that the District Court may have found that the conduct underlying some of Plaintiffs' retaliation claims failed to rise to the requisite level of material adversity under *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006).  To the extent some of the claims were dispatched on that basis, remand would not be necessary since the Supreme Court's decision in *Babb v. Wilkie*, 140 S. Ct. 1168, 206 L. Ed. 2d 432 (2020), did not affect that particular requirement.  Nonetheless, we find it difficult to discern whether the District Court dismissed any claims under *Burlington Northern* and we therefore remand the retaliation claims wholesale.

III.

After the District Court entered summary judgment in this case, two intervening decisions—one from this Court and one from the Supreme Court—changed the law applicable to Plaintiffs' discrete retaliation claims and their retaliatory hostile work environment claims in two respects.  First, the Supreme Court in *Babb v. Wilkie*, 140 S. Ct. 1168, 206 L. Ed. 2d 432 (2020)—as we just recognized in *Babb v. Secretary, Department of Veterans Affairs*, No. 16–16492, 2021 WL 1219654 (11th Cir. Apr. 1, 2021)—undermined to the point of abrogation our prior panel precedent and thereby established that retaliation claims like Plaintiffs' that are brought under Title VII's federal-sector provision are not subject to the but-for causation standard that the District Court applied below. Second, our decision in *Monaghan v. Worldpay U.S. Inc.*, 955 F.3d 855 (11th Cir. 2020), clarified that retaliatory hostile work environment claims are properly analyzed under the standard articulated by the Supreme Court in *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006), rather than the more stringent "severe or pervasive" standard that the District Court applied.  We remand these claims to the District Court for reconsideration in light of these intervening decisions, but we affirm the entry of summary judgment as to Hernandez's sex-based hostile work environment claim, the resolution of which was not affected by the intervening decisions.

Part III.A explains the way the Supreme Court in *Babb* changed the

causation standard applicable to Title VII claims against federal employers.

Part III.B explains *Monaghan*'s effect on the standard applicable to retaliatory

hostile work environment claims.  And part III.C analyzes Hernandez's sex-based

hostile work environment claim.

A.

Title VII contains separate provisions for private and federal employers, and

although it is generally assumed that Title VII's federal-sector provision was

intended "to make Title VII applicable in the federal workplace to the same extent

that it was already applicable in the non-federal workplace," *Llampallas v. Mini–*

*Circuits, Lab, Inc.,* 163 F.3d 1236, 1243 (11th Cir. 1998), there are significant

textual differences between the provisions that we have until very recently ignored.

The difference that concerns us today has to do with the way the provisions speak

about the necessary causal relationship between an employee's protected

characteristics and the adverse employment actions taken against her.  For present

purposes, we are concerned only with Title VII's cause of action for discrimination

based on an employee's EEOC activity—i.e., retaliation—and not with substantive

discrimination based on "race, color, religion, sex, or national origin."

In the private-sector context, Title VII makes it unlawful for an employer to

discriminate against an employee "*because* he has opposed any practice made an

unlawful employment practice by this subchapter, or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  § 2000e–3(a) (emphasis added). The Supreme Court in *University of Texas Southwestern Medical Center v. Nassar* interpreted § 2000e–3(a)'s use of the word "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action." 570 U.S. 338, 352, 133 S. Ct. 2517, 2528 (2013).  In doing so, it leaned on a previous decision interpreting the Age Discrimination in Employment Act of 1967 (the "ADEA"), which held that "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350 (2009).

> Now for Title VII's federal-sector provision, which states:
>
> All personnel actions affecting employees or applicants for employment . . . [in enumerated positions within the federal government] . . . shall be made *free from any discrimination* based on race, color, religion, sex, or national origin.[2]

§ 2000e–16(a) (emphasis added).

---

[2] It may be noted that § 2000e–16(a) does not expressly provide a cause of action for retaliation.  Because the Secretary does not raise the issue, we do not pass judgment on whether § 2000e–16(a) nonetheless provides such a cause of action implicitly.  *See Gomez-Perez v. Potter*, 553 U.S. 474, 488 (2008) (holding that "discrimination based on age" as used in the ADEA includes "retaliation for complaining about age discrimination").

The Supreme Court has not directly decided whether the federal-sector provision requires the same level of causation as the private-sector provision, and although the textual differences between the provisions are significant, we implicitly assumed in *Trask v. Secretary, Department of Veterans Affairs*, 822 F.3d 1179 (11th Cir. 2016), that the differences were immaterial as far as causation was concerned.  Citing *Nassar*, we said that "Title VII retaliation claims require proof that '[the] protected activity was a but-for cause of the alleged adverse action by the employer.'"  *Trask*, 822 F.3d at 1194 (quoting *Nassar*, 570 U.S. at 362, 133 S. Ct. at 2534) (alteration in original).  We ignored the fact that Trask's status as a federal employee meant her retaliation claim was governed by § 2000e–16(a) rather than § 2000e–3(a).  We implicitly held the same with respect to Trask's claim under the ADEA, which like Title VII, has both federal-sector and private-sector provisions, the language of which substantially tracks Title VII's provisions.[3]  *Id.* at 1191.

---

[3] The ADEA's private-sector provision provides:

It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age.

29 U.S.C. § 623(a)(1) (emphasis added).

The federal-sector provision, by contrast, states:

All personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made *free from any discrimination based on age*.

§ 633a(a) (emphasis added).

A few years later in *Babb v. Secretary, Department of Veterans Affairs*, 743 Fed. App'x 280 (11th Cir. 2018), we finally noted that the textual differences between Title VII's private- and federal-sector provisions—"because of" versus "free from any"—might be meaningful. "[I]f we were starting from scratch," we said, "we might agree" that a more lenient causation standard applied to federal-sector retaliation claims. *Babb*, 743 Fed. App'x at 290. Because *Trask* stood in our way as binding precedent, however, we were "constrained to hold that the district court did not err" in applying a but-for standard to Babb's retaliation claim against the VA Secretary. *Id.* We said the same about Babb's federal-sector ADEA claim. *Id.* at 287–88.

The Supreme Court then granted cert on the ADEA issue only. *Babb v. Wilkie*, 139 S. Ct. 2775, 204 L. Ed. 2d 1156 (2019). The question before the Court was:

> Whether the federal-sector provision of the Age Discrimination in Employment Act of 1967, which provides that personnel actions affecting agency employees aged 40 years or older shall be made free from any "discrimination based on age," 29 U.S.C. § 633a(a), requires a plaintiff to prove that age was a but-for cause of the challenged personnel action.

*Id.* According to the Court, the plain meaning of "made free from any discrimination based on age" goes further than just imposing liability when age is a but-for cause of the personnel action. *Babb v. Wilkie*, 140 S. Ct. 1168, 1171 (2020). Instead, it prohibits all but those personnel actions that are "untainted by

any consideration of age." *Id.*  As long as age discrimination "plays any part in the way a decision is made," then the decision violates the ADEA. *Id.* at 1174.

On remand from the Supreme Court, we considered what bearing the Supreme Court's ADEA analysis had on the substantially identical language of Title VII's federal-sector provision, and specifically whether the Supreme Court's decision undermined to the point of abrogation our decision in *Trask*.  We concluded that "the Supreme Court's decision in Babb's case undermined *Trask* to the point of abrogation and that the standard that the Court articulated there now controls cases arising under Title VII's nearly identical text." *Babb*, 2021 WL 1219654, at *1.  We therefore remanded to the district court with instructions to analyze Babb's retaliation claim under the more lenient causation standard articulated by the Supreme Court. *Id.*

We do the same here.  Because the District Court required Plaintiffs to prove that their protected activity was a but-for cause of the adverse actions against them, we vacate the entry of summary judgment and remand to the District Court to analyze the claims consistent with the standard articulated in *Babb*.

## B.

Title VII prohibits the creation of a hostile work environment in retaliation for an employee's engagement in protected activity.  *Gowski*, 682 F.3d at 1312. When we first recognized a cause of action for retaliatory hostile work

environment in *Gowski*, we said such claims are analyzed under the same standard as substantive hostile work environment claims under § 2000e–2(a)—that is, a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Id.* at 1311 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)).

It is understandable, then, that the District Court below applied the "severe or pervasive" standard to Plaintiffs' retaliatory hostile work environment claims. After the District Court entered its order, however, we issued our opinion in *Monaghan* rejecting *Gowski*'s "severe or pervasive" standard as inconsistent with the Supreme Court's decision in *Burlington Northern* and our earlier decision in *Crawford* (applying *Burlington Northern*'s retaliation standard).  955 F.3d at 862. Instead, we said retaliatory hostile work environment claims, like retaliation claims based on discrete acts, prevail if the conduct complained of "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 862–63 (quoting *Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415).

Because the District Court analyzed Plaintiffs' retaliatory hostile work environment claims under *Gowski*, we vacate that part of the judgment and direct the Court to instead apply *Burlington Northern* on remand.

C.

The intervening decisions that affected the disposition of Plaintiffs' discrete retaliation claims and retaliatory hostile work environment claims have no bearing on Hernandez's sex-based hostile work environment claim.

While we have often said that substantive hostile work environment claims require proof that the hostile work environment was "based on" the employee's protected characteristic, *see, e.g.*, *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010), it is evident that we have not meant that such claims require but-for causation.  Congress expressly precluded a but-for requirement in the substantive discrimination context when it amended § 2000e–2 by adding a subsection providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  § 2000e–2(m); Civil Rights Act of 1991, Pub. L. No. 102–166, § 107(a), 105 Stat. 1071, 1075 (1991).  When we have said that an employer's actions must have been "based on" the employee's protected characteristic, therefore, we have really meant that the actions must have

15

been "motivated by" that characteristic.  We have applied the same standard regardless of whether the claim arises under Title VII's private- or federal-sector provisions.  *See Trask*, 822 F.3d at 1196 (holding that plaintiffs failed to show a hostile work environment was "based on their protected status" because "there is no evidence that the[ VA management's] . . . alleged hostility was *in any way motivated by* a discriminatory animus regarding the plaintiffs' age or gender").

We perceive no material difference between the motivating-factor standard we have applied to substantive hostile work environment claims and the standard articulated by the Supreme Court in *Babb*.  Although the *Babb* dissent asserts that the Court's standard "imposes an even lower bar" than motivating factor, we are unconvinced.  *Babb*, 140 S. Ct. at 1182 n.2 (Thomas, J. dissenting).  Notably, under the Court's standard, it is not enough to trigger liability that the employer simply *considered* the employee's protected characteristic; that characteristic must still "play[] [a] role in the final decision." *Id.* at 1174 n.3, 1174.  It is difficult to imagine how an employee's protected characteristic could play a part in the final decision without being a motivating factor in that decision.  *Babb*, therefore, did not alter the causation standard we apply to substantive hostile work environment claims against federal employers.

Our decision in *Monaghan* likewise left untouched the standard we apply to substantive hostile work environment claims as opposed to those based on

retaliation.  *See Monaghan*, 955 F.3d at 861.  Substantive hostile work

environment claims still require plaintiffs to show that "the workplace is permeated

with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive

working environment."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275

(11th. Cir. 2002) (quoting *Harris*, 510 U.S. at 21, 114 S. Ct. at 370).  That

intimidation, ridicule, and insult must also bear "the necessary sexual or other

gender-related connotations to be actionable sex discrimination."  *Mendoza v.

Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999) (en banc).  It is on these two

requirements that Hernandez's claim founders.

　　　To be sufficiently "severe or pervasive," the employer's actions "must result

in both an environment that a reasonable person would find hostile or abusive and

an environment that the victim subjectively perceive[s] . . . to be abusive."  *Miller*,

277 F.3d at 1276 (quotation marks omitted).  "In evaluating the objective severity

of the harassment," we look to the totality of the circumstances, including: "(1) the

frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct

is physically threatening or humiliating, or a mere offensive utterance; and (4)

whether the conduct unreasonably interferes with the employee's job

performance."  *Id.*

The standards for judging hostility are intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. Cty. of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283 (1998). "Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (internal quotation marks omitted). "[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21, 114 S. Ct. at 370 (quotation marks omitted) (citation omitted).

In addition to establishing that the employer's actions were sufficiently "severe or pervasive," a plaintiff must show that the actions were based on her sex rather than some other unprotected characteristic. *Mendoza*, 195 F.3d at 1245; *see also Harris*, 510 U.S. at 21, 114 S. Ct. at 370. We have noted that "Title VII does not prohibit profanity alone, however profane . . . [nor] harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1301–02 (11th Cir. 2007).

Hernandez's sexual harassment claim is based primarily on Geraci's conduct. Hernandez complains of several incidents: Geraci pulled up her blouse to

show Hernandez the outline of her breasts through her undershirt; Geraci made inappropriate jokes to Hernandez, using the word "vagina"; Geraci made a gesture of inserting something into her vagina to Hernandez; Geraci gave Hernandez an angry look; Geraci ignored Hernandez on multiple occasions; Geraci gave Hernandez a "chest bump"; Geraci scanned her own abdomen with an ultrasound transducer in Hernandez's presence, and revealed her abs to Hernandez multiple times; Geraci spoke to Hernandez in a "condescending and hostile tone"; Geraci insulted Hernandez about her eating disorder; Geraci embraced Hernandez and kissed her on the cheek; and Hernandez observed Geraci interacting with a male coworker in an inappropriately flirtatious manner.  Hernandez also bases her claim on Petrillo's failure to remedy the sexually hostile work environment created by Geraci.

As an initial matter, most of Geraci's conduct lacks "the necessary sexual or other gender-related connotations to be actionable sex discrimination." *Mendoza*, 195 F.3d at 1247.  In making this inquiry, we are guided by the "common-sense rule that the context of offending words or conduct is essential to the Title VII analysis." *Id.* at 810.

Consider the context in which Geraci revealed the outline of her breasts to Hernandez.  The incident occurred during a conversation about a male doctor to whom Geraci was attracted.  Hernandez told Geraci that the doctor preferred "big

breasts," and Geraci proceeded to lift up her shirt to prove that she was the doctor's type.  Nothing in the record allows the conclusion that Geraci's conduct had anything to do with Hernandez's sex.

Similarly, the context surrounding Geraci's inappropriate touching of Hernandez shows that the touching was not sex based.  Geraci "chest bumped" Hernandez after learning of her employment benefits and giving Hernandez a high-five.  Nothing in the record suggests that the bump was anything more than a mere celebratory gesture, as the context and the definition of the phrase suggest.  *See* Macmillan Dictionary, *Chest Bump*, https://www.macmillandictionary.com/us/dictionary/american/chest-bump (last accessed Dec. 29, 2020) (defining "chest bump" as "an action in which two people bump their chests together, usually as a celebration").  Geraci's decision to embrace Hernandez and kiss her on the cheek was similar—Geraci did so after Hernandez told her that Geraci's patient cancelled an appointment.

Likewise, the record shows that Geraci's use of the word "vagina" occurred first in the context of a discussion about transvaginal ultrasounds.  Then, apparently realizing that her talk of vaginas bothered Hernandez, Geraci began teasing Hernandez with the word.  "Even gender-specific terms cannot give rise to a cognizable Title VII claim if used in a context that plainly has no reference to gender." *Reeves*, 594 F.3d at 810.  Although the word "vagina" is plainly gender-

20

specific, Geraci's use of it was not gender-derogatory. *Compare id.* at 811–12 (a jury could find that the use of the words "whore," "bitch," and "cunt," together with "vulgar discussions of women's breasts, nipples, and buttocks" "contributed to conditions that were humiliating and degrading to women on account of their gender"); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 1002 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.").

Finally, there is no evidence suggesting that the angry looks, harsh words, and silent treatment that Geraci gave Hernandez were influenced by Hernandez's sex. On the contrary, the record suggests that Geraci was angry at Hernandez because Hernandez reported Geraci for sexual harassment.

Even if Geraci's conduct was based on Hernandez's sex, Hernandez's claim would still fail because the conduct is insufficiently severe or pervasive to alter the terms and conditions of Hernandez's employment. "We proceed with common sense, and an appropriate sensitivity to social context, to distinguish between general office vulgarity and the conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Reeves*, 594 F.3d at 811 (quotation marks omitted) (alterations adopted).

In *Mendoza*, we said that a male supervisor's conduct was not threatening or humiliating to a female employee when that conduct included telling the employee he was "getting fired up," making sniffing sounds while staring at the employee's crotch, brushing his hip against the employee's hip, and following the employee around the workplace. 195 F.3d at 1248–49.

In *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, by contrast, we held that an employee was sexually harassed when her male coworker repeatedly told her she had a sexy voice, winked at her, exposed the imprint of his private parts to her through his pants, gazed at her body in a sexual manner, repeatedly attempted to massage her shoulders, rubbed his body parts against her, and asked her questions about her sex life, among other things. 234 F.3d 501, 506 (11th Cir. 2000).

Geraci's conduct toward Hernandez is significantly less severe than the conduct at issue in *Johnson*, and likely less severe than the insufficiently severe conduct in *Mendoza*, as well. Unlike those cases, some of Geraci's conduct was merely witnessed by Hernandez rather than directed at her—namely, Geraci scanning her own abdomen, embracing a male coworker, and sitting on his lap. And the physical conduct that Geraci did direct toward Hernandez—pulling up her shirt, chest bumping, hugging, and kissing Hernandez—is, as explained above, qualitatively different from the sexually charged conduct in *Johnson* and *Mendoza*.

In sum, Geraci's conduct is of an entirely different nature from the sexually predatory conduct at issue in *Johnson* and *Mendoza*.  Such conduct is insufficiently severe or pervasive to alter the terms and conditions of Hernandez's employment.

Finally, Hernandez alleges that Petrillo held her to a different standard than similarly situated males in the ultrasound department.  In particular, Hernandez complains that Petrillo denied her request for leave, while granting the request of a male employee with less seniority.  This, however, is a quintessential "isolated incident[]" of the sort that is insufficient to alter the terms and conditions of employment.  *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283.

For the foregoing reasons, the District Court properly granted summary judgment for the Secretary on Hernandez's sex-based hostile work environment claim.

## IV.

We vacate the District Court's entry of summary judgment with respect to Plaintiffs' discrete retaliation claims and retaliatory hostile work environment claims and remand with instructions that the Court reconsider those claims in light of *Babb* and *Monaghan*.  We affirm the District Court's decision to enter summary judgment on Hernandez's sex-based hostile work environment claim.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 20, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  19-10014-DD
Case Style:  Erin Tonkyro, et al v. Secretary, Dept. of Veterans
District Court Docket No:  8:16-cv-02419-CEH-AEP

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF")
system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF
system by registering for an account at www.pacer.gov. Information and training materials related to
electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today
in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later
date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for
rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate
filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the
time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content
of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list
of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-
1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition
for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time
spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of
a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404)
335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the
signature block below. For all other questions, please call Bradly Wallace Holland, DD at 404-335-6181.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1 Ntc of Issuance of Opinion