## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ERIN TONKYRO, DANA STRAUSER
KARA MITCHELL-DAVIS, YENNY
HERNANDEZ

      Plaintiffs,

v.                                                    Case No: 8:16-cv-2419-CEH-AEP

SECRETARY, DEPARTMENT OF
VETERANS AFFAIRS

      Defendant.

_____

## <u>ORDER</u>

This matter comes before the Court upon Defendant's Supplemental Brief in Support of Summary Judgment (Doc. 116), Plaintiffs' response in opposition (Doc. 119), Defendant's reply (Doc. 122), Plaintiffs' surreply (Doc. 125), and the Joint Statement of Agreed Material Facts (Doc. 63).[1] The Court, being fully advised in the premises and having considered the written submissions, including the declarations, depositions and attachments thereto, will again grant Defendant's Motion for Summary Judgment.

---

[1] The Court previously granted summary judgment for Defendant. Doc. 99. The Eleventh Circuit later affirmed in part, vacated in part, and remanded the case with instructions based on intervening decisions. *See* Doc. 109. Thus, the Court considers the Parties' prior briefing in addition to the supplemental briefing. *See* Docs. 54, 60, 64, 67, 85, 89.

## I.   Background and Statement of Facts[2]

Plaintiffs Erin Tonkyro, Dana Strauser, Kara Mitchell-Davis, and Yenny Hernandez allege that they were retaliated against and subjected to a retaliatory hostile work environment while employed in Radiology Services at the James A. Haley VA Healthcare System (the "Tampa VA"). Plaintiffs claim that Defendant retaliated against them for Equal Employment Opportunity ("EEO") complaints that were settled in 2013. Doc. 83 ¶¶ 16–32.

### a.  Defendant's Organizational Structure

The Tampa VA is a Veterans Administration hospital and medical center. The chain of command there was as follows. Kathleen Fogarty was Director from 2011 to July 2015. Doc. 54-6 at 75–76. Joe D. Battle became Director in July 2015. Doc. 54-6 at 62–64. Edward Cutolo became Chief of Staff in 2006 and oversaw all medical services at the hospital, including Radiology. *Id.* at 52–54. Dr. Stephen Stenzler became Chief of Radiology Services in October 2012. Doc. 63 ¶ 9. Stenzler is Plaintiffs' third line supervisor. *Id.* Dr. Joseph Parise was Assistant Chief of Radiology from 2008 until June 2017. *Id.* ¶ 11. John Bennett became Administrative Officer ("AO") of Radiology in January 2013 and was Plaintiffs' second line supervisor as Chief Radiology Technologist from 2008 to 2012. *Id.* ¶ 10. Jeri Graham was Plaintiffs' direct supervisor until April 2012 and is currently their second line supervisor and Chief

---

[2] This Order sets forth only the facts material to the remaining claims, as the Eleventh Circuit affirmed the grant of summary judgment for Defendant on Count Three, Hernandez's sex-based hostile work environment claim. Doc. 109 at 2–3; *Tonkyro v. Sec'y, Dep't of Veterans Affs.,* 995 F.3d 828, 831 (11th Cir. 2021).

Technologist in Radiology. *Id.* ¶ 8. The Chief Technologist supervises all radiologic examinations, including MRI, ultrasound, X-ray, CT scan and mammography. *Id.* Carolyn Eubanks was Plaintiffs' first line supervisor from January 2013 until November 2013. *Id.* ¶ 5. Mario De Leon then became Acting Supervisor over the Medical Instrument Technician ("MIT") and MRI technologists. *Id.* ¶¶ 5–6. De Leon's position change made him Plaintiffs' first line supervisor until October 2014, when Scott Petrillo became the MIT and MRI supervisor. *Id.* ¶¶ 6–7. Petrillo was Plaintiffs' first line supervisor at the time this lawsuit was filed. *Id.*

### b. Plaintiffs' Backgrounds

Erin Tonkyro has been an MIT in the Radiology Service since 2002. Doc. 54-1 at 3. An MIT performs diagnostic ultrasounds. *Id.* at 32. Kara Mitchell-Davis ("Davis") was hired in 2008 and promoted to Lead MIT in February 2014. Dana Strauser began working as an MIT in November 2008. Doc. 54-3 at 3. Yenny Hernandez began working as an MIT in October 2011. Doc. 54-4 at 5.

In May 2012, Tonkyro, Davis, and Strauser filed separate EEO complaints against the Tampa VA alleging sexual harassment by Parise, Bennett, and Graham. Doc. 63 ¶ 15. Hernandez did not file an EEO complaint at that time. Doc. 54-4 at 6. She did, however, testify in support of the other Plaintiffs' claims. Doc. 60-4 at 2 ¶ 1. In September 2013, the VA settled Tonkyro, Strauser and Davis's EEO cases. Doc. 63 ¶ 17.

Plaintiffs allege that their supervisors subsequently retaliated against them in several ways, including through initiation of an Administrative Investigative Board

("AIB"), statements that Plaintiffs would never become supervisors, disputes about understaffing in Radiology, rampant rumor-spreading within the hospital, and disclosure of confidential employment records on the "S drive" accessible to all employees. Doc. 60-1 ¶¶ 1–6, 16.

### c. Plaintiffs' Claims and Individual EEO Complaints

#### i. Erin Tonkyro

As relevant to the remaining claims in this lawsuit, Tonkyro contacted an EEO counselor alleging retaliation and a retaliatory hostile work environment based on her previous EEO complaints in January 2018. Doc. 60-1 at 2–9. She had filed an informal EEO complaint on May 1, 2012, and a formal one on June 12, 2012. *Id.* ¶ 1. She filed another informal complaint on March 28, 2014, and a formal one on July 9, 2014. Doc. 54-1 at 3; Doc. 60-1 ¶ 1.

In her complaints, Tonkyro alleged that: Bennett slowly walked past her and glared; Stenzler recommended her application for a supervisory position but Fogarty disagreed; management required a Diagnostic Radiologic Technician ("DRT") license for a supervisory MRI/Ultrasound position which made her ineligible to apply; management disclosed confidential employment records; Parise entered her work area and glared at her; an employee, Warren Rose, made disparaging remarks after accessing  confidential employment records; and Bennett failed to provide her with essential equipment. Doc. 60-1 at 123. The Tampa VA investigated the claims as evidenced by the Department of Veterans Affairs Office of Resolution Management's Written Affidavit. *Id.* at 122–133.

On September 15, 2014, Tonkyro transferred from the main hospital to the newly opened Primary Care Annex. Doc. 63 ¶ 18. From that point on, she visited the main hospital monthly for staff meetings. Doc. 54-1 at 4, 40. On September 24, 2015, Tonkyro again contacted an EEO counselor, alleging retaliation and a retaliatory hostile work environment based upon prior EEO activity. *Id.* at 4–5. On November 2, 2015, she filed a formal EEO complaint alleging further retaliation. Doc. 54-1 at 84–86. From 2012 to 2016, Tonkyro received "exceptional" and "outstanding" performance ratings. *Id.* at 69–70; Doc. 60-9, 60-10. She has no record of discipline since the 2013 settlement agreement. Doc. 54-1 at 70; Doc. 54-5 at 94 ¶ 3.

### ii. *Dana Strauser*

Strauser filed an informal EEO complaint on May 1, 2012, and a formal complaint on June 8, 2012. She contacted an EEO counselor to allege retaliation and a hostile work environment based upon the settlement of her previous complaint in 2013. Doc. 54-3 at 4–5. She filed another informal complaint on March 28, 2014 (Doc. 60-3 ¶ 1) and a formal complaint on July 11, 2014. Doc. 54 ¶ 24. She filed a subsequent complaint on June 14, 2015. Doc. 60-3 ¶ 1.

Strauser alleged that bullying claims made by Angela Geraci-DiSimone ("Geraci") and an ensuing investigation were done in bad faith, and that management denigrated her and the other plaintiffs during the investigation. Doc. 54-3 at 5. Strauser claimed that she received threatening and harassing telephone calls. *Id.* at 12. She also alleged that management created an Ultrasound Supervisor position and then changed the qualifications to bar her from applying. *Id.* at 30. Lastly, she complained that

confidential employment records were placed on the hospital "S Drive" and Bennett failed to properly investigate the incident. *Id.*; Doc. 54-3 at 75.  Strauser took maternity leave from January 12, 2015, to May 5, 2015. *Id.* at 37. On February 10, 2016, she again contacted an EEO counselor and filed an informal complaint alleging retaliation and a retaliatory hostile work environment. She filed a formal EEO complaint on April 4, 2016. *Id.* at 10. From 2013 to 2016, Strauser received "outstanding" performance ratings. *Id.* at 57. She has no record of discipline since the 2013 settlement. Doc. 54-5 at 93–95.

### iii.   Yenny Hernandez

Hernandez contacted an EEO counselor on July 28, 2016, and filed a formal complaint alleging sexual harassment and a retaliatory hostile workplace on September 8, 2016. Doc. 54-4 at 33. Previously, Hernandez testified before an AIB that was convened in 2012 to investigate Plaintiffs' sexual harassment allegations. *Id.* at 6. She was also a witness in the 2014 EEO cases filed by her co-Plaintiffs. *Id.* at 6–7. Among other incidents and comments, Hernandez claimed that Dr. Thornton Eastham told her that Parise said she and others working in radiology would be fired. *Id.* at 16–17.

Hernandez also complained that Geraci harassed and retaliated against her in several ways. Geraci began working as an MIT in August 2015. Doc. 54-6 at 96. First, Hernandez alleged that Geraci pulled up her shirt just a few hours after the two met. Doc. 54-4 at 15. Separately, Geraci said she was a "double D" and pulled up her blouse to show Hernandez her breasts. *Id.* at 65–66. Although Hernandez told Geraci she did

not want to see her breasts repeatedly, Geraci pulled up her shirt, and later made similar comments and gestures. *Id.* At other times, Geraci referenced her mother's "close friendship" with Jeri Graham, Chief Technologist. Doc. 54-4 at 15. Hernandez alleged that Petrillo did not intervene to stop this behavior. *Id.* at 60–67. Further, Hernandez alleged that Geraci would embrace other coworkers and sit on their laps, make lewd comments and gestures about Hernandez, doctors, and patients, and make repeated inappropriate references to genitalia. *Id.*

### iv.  Kara "Nikki" Mitchell-Davis

Davis filed an informal EEO complaint on April 30, 2012, and a formal complaint on June 8, 2012. Doc. 60-2 ¶ 1. She added claims and made amendments on November 14, 2012. She filed another informal complaint on April 1, 2014, and a formal complaint on July 7, 2014. *Id.* On September 23, 2015, Davis again contacted an EEO counselor and filed a formal complaint on October 28, 2015. *Id.*

Davis's complaints alleged that two employees told her confidential records had been purposely shared on a public computer drive, including information about her previous lawsuit and EEO complaints. *See* Doc. 54-2 at 98–103. She also alleged that supervisors intentionally hired Geraci, who was unfit for the job, "in order to see her [Davis] fail," Bennett continued to glare at her, and Parise took threatening actions. *Id.* at 101. Davis also alleged that management restricted a supervisor job opening to DRT-licensed personnel, which disqualified her from applying, and that although she received a promotion to Lead Technician, management delayed it and reduced her ability to succeed. *Id.* The Office of Resolution Management investigated her EEO

claims as documented in its February 24, 2016, Written Affidavit. Doc. 60-2 at 90–109.

From 2012 to 2016, Davis received "exceptional" and "outstanding" performance ratings. Doc. 54-2 at 63–64. She has no record of discipline since the 2013 settlement agreement. Doc. 54-5 at 93–95. Her salary and pay grade increased with the 2014 promotion to lead MIT. Doc. 54-2 at 20. She took extended leave from April 25, 2014, to February 17, 2015, for a work-related injury. *Id.* at 66–67. She took maternity leave from October 12, 2015, to the first week of February 2016, and again from October 24, 2016, to March 2017. *Id.* at 9, 67. In total, Davis was absent for around 18 months of the relevant period. *Id.*

In March 2016, Geraci first complained to Petrillo about her conflicts with Davis. Doc. 54-5 at 58–59. In April, the Tampa VA posted a vacancy announcement for an Ultrasound Supervisor, to which only Davis applied. Doc. 63 at 3 ¶ 21.  The job posting closed on April 22, 2016, and remained unfilled. Doc. 54-6 at 9, 65. Stenzler stated that this was because he "felt that it was better for the service to have a lead mammography tech than for a lead in PCA." *Id.* at 9. That same month, Geraci prepared a written complaint alleging Davis bullied her and met with Stenzler regarding her complaint. Doc. 54-6 at 97; Doc. 54-5 at 103. Stenzler referred the matter to Cutolo, the Chief of Staff. Doc. 54-5 at 3. Director Battle received a briefing and decided to empanel an AIB to investigate. Doc. 54-6 at 62. None of the three AIB members worked in Radiology. Doc. 54-7 at 2, 10–11; Doc. 54-3 at 51. Various employees in Radiology testified before the AIB, which ultimately concluded that

Davis bullied and harassed Geraci. Doc. 54-7 at 5–7, 23–24. The AIB recommended remedial training and team building in lieu of disciplinary action. *Id.* In May 2016, the hospital moved Geraci to the New Port Richey Clinic. Doc. 63 ¶ 22; Doc. 54-5 at 94.

### d. Anonymous Memorandum

On June 23, 2016, two employees (later identified as Dr. Thornton Eastham and Dr. Katie Bailey) sent an anonymous memorandum to Director Battle. Doc. 60-9 at 25–26. The letter stated that "the leadership of the Radiology service" had engaged in numerous "prohibited, illegal, and/or deficient activities." *Id.* at 25. It stated that management engaged in "retaliatory behavior" and intentionally created a "hostile work environment," which included derogatory statements about employees in front of other staff, exclusion of employees from advancement or promotion within the department, and threats by managers that notice of any complaints would result in negative consequences. *Id.* at 26. The memo also noted that complaints were funneled through the leadership hierarchy even if the person receiving the report committed the wrongdoing, and that the employees who were initial victims of the sexual harassment EEO settlements "remain in constant vigilance for continued retaliation." *Id.*

### e. Procedural Posture

Plaintiffs sue the Secretary of the Department of Veterans Affairs under Title VII, 42 U.S.C. § 2000e-16, alleging retaliation and a retaliatory hostile work environment. Doc. 83 ¶¶ 15–32. Defendant moved for summary judgment, and Plaintiffs responded. Docs. 54, 60. Thereafter, a Third Amended Complaint was filed, which did not alter the substantive allegations. Doc. 83. Defendant and Plaintiffs

renewed their motions and responses. Docs. 85 & 89. The Court granted summary judgment for Defendant on all claims. Doc. 99.

Plaintiffs appealed. The Eleventh Circuit affirmed the order as to Hernandez's sex-based hostile work environment claim, but vacated it as to the retaliation and retaliatory hostile work environment claims. Doc. 109. The Circuit Court remanded these claims for reconsideration under two intervening decisions: (1) *Babb v. Wilkie,* 992 F.3d 1193 (11th Cir. 2021), which held that federal-sector Title VII claims are to be evaluated under the causation standard announced by the Supreme Court in *Babb v. Wilkie,* 140 S. Ct. 1168 (2020); and (2) *Monaghan v. Worldplay U.S., Inc.,* 955 F.3d 855 (11th Cir. 2020), which adopted the material adversity standard in *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53 (2006) for federal sector retaliatory hostile work environment claims. After a status conference, Defendant filed a supplemental brief in support of summary judgment. Doc. 116. Plaintiffs responded (Doc. 119), Defendant replied (Doc. 122), and Plaintiffs filed a surreply (Doc. 125). The Court heard oral argument on Defendant's renewed motion for summary judgment on December 4, 2023 (Doc. 131).

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and

identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

## A.       Retaliation

Defendant argues it is again entitled to summary judgment on Plaintiffs' retaliation claims. Doc. 116 at 3–16. Upon review of the evidence, original briefing, supplemental briefing, and with the benefit of oral argument, the Court agrees. Although the Court now reviews Plaintiff's claims under a broader and more lenient causal standard (which asks whether protected activity played any part in the way the employment decisions in question were made), the intervening caselaw has not

changed the fact that Plaintiffs must still show that there is a genuine dispute of material fact as to each of their claims. As detailed below, Plaintiffs fail to do so, and summary judgment will again be granted in favor of Defendant.

Count One alleges that Plaintiffs were retaliated against based on prior EEO activity. Doc. 83 ¶¶ 33–41. Over more than thirty-five pages, the operative complaint rattles off a lengthy list of adverse employment actions that Plaintiffs claim were retaliatory. *Id.* ¶¶ 15–32, 38. Some of these employment actions affected the plaintiffs collectively, while others affected a specific plaintiff. *Id.*

The Circuit Court remanded Plaintiffs' retaliation claims for consideration in light of *Babb v. Wilkie*, 140 S. Ct. 1168 (2020). Doc. 109 at 9. *Babb* addressed the causation requirement for federal-sector ADEA claims—holding that the requirement that decisions be "made free from any discrimination based on age" means that a plaintiff suing under the ADEA need not show that her age was a but-for cause of an ultimate personnel action. 140 S. Ct. at 1171–1178. Instead, a showing that age discrimination played "any part in the way a decision [wa]s made" is enough to establish a violation. *Id.* at 1173–74. On remand from the Supreme Court, the Eleventh Circuit concluded that *Babb*'s more lenient causation standard controls federal-sector Title VII claims as well, based on its nearly identical causation provision. *Babb v. Sec'y, Dep't of Veterans Affs.,* 992 F.3d 1193, 1196 (11th Cir. 2021).

Previously, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ("*McDonnell Douglas*") applied to federal-sector Title VII

claims based on circumstantial evidence. After the *Babb* decisions, however, it became clear that the framework's second and third steps no longer applied. A Plaintiff is thus no longer required to prove that retaliation was a but-for cause of the ultimate adverse employment action taken against her. Instead, evidence that retaliation played any part in the way a decision was made (assuming the employment action was material) is now enough to push a claim past the summary judgment stage.

Moreover, the Eleventh Circuit recently clarified that post-*Babb*, it no longer "make[s] sense" to apply any portion of the *McDonnell Douglas* burden-shifting framework to federal-sector Title VII claims. *Buckley v. Sec'y of Army,* 97 F.4th 784, 794 (11th Cir. 2024) (addressing race-based disparate treatment claims). *Buckley* also extended this holding to retaliation claims, such as the ones in this matter, stating that "after *Babb I* and *Babb II*, in analyzing Buckley's retaliation claim, we instead consider whether Buckley has submitted evidence that would allow a reasonable jury to find that retaliation 'play[ed] any part' in the Secretary's decision-making process when he proposed to remove her from federal service." *Id.* (citing *Babb I,* 140 S. Ct. at 1174).

As set forth in another recent Circuit decision, to make out a case of retaliation, Plaintiffs must show that: (1) they engaged in protected EEO activity; (2) they suffered an adverse employment action; and (3) they must establish a causal link between the protected activity and the adverse action. *Terrell v. Sec'y, Dep't of Veterans Affs.,* No. 21-14185, 2024 WL 1671962, at *7 (11th Cir. Apr. 18, 2024) (citing *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008)). Plaintiffs can establish a violation either by

proving that their EEO activity was a but-for cause of the adverse actions[3] or by proving that retaliation tainted the decision-making process. *See Buckley,* 97 F.4th at 798.

However, the remedy for each showing differs. *See id.* Specifically, if Plaintiffs ultimately proved that retaliation was a but-for cause (or one of the causes of) the adverse actions, they would be entitled to retrospective relief, like compensatory damages and back pay. *See id.* On the other hand, if they could prove only that discrimination "tainted" the hiring process but not that it was a but-for cause, they would not be entitled to damages stemming from the actions. Instead, they would potentially be entitled to "injunctive or other forward-looking relief." *Id.* (internal quotation marks omitted) (quoting *Babb II,* 992 F.3d at 1205 n.8). Here, Plaintiffs fail to establish a genuine dispute of material fact as to either type of causation.

The Court begins by analyzing the incidents that affected all employees, before moving on to Plaintiffs' individual claims. Defendant claims that none of these acts are materially adverse (Doc. 116 at 12) and the Court agrees. At the outset, the Court notes that Plaintiffs rely on several comments made by managers and colleagues in the Tampa VA as direct evidence of retaliatory animus. This includes an anonymous memo sent by Doctors Eastham and Bailey discussed in the background section of this

---

[3] An adverse employment action in the retaliation context is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (quotation marks omitted).

Order, statements made during lunch meetings regarding Plaintiffs' EEO activity, and comments made by managers and colleagues in the Tampa VA.[4]

As the Court previously found, because Plaintiffs cannot attribute any of the statements that reflect retaliatory animus to any of the decisionmakers in their adverse employment actions, it is not direct evidence. *See Bass v. Board of County Commissioners,* 256 F.3d 1095, 1105 (11th Cir. 2001) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision."). More importantly, the fact that these statements came from individuals who were not decisionmakers on any of the employment actions in question means that they do not create a triable issue of fact as to causation on any of Plaintiffs' claims. As explained for each adverse action below, no reasonable jury could find that Plaintiffs' protected activity played a role in differential treatment as to any of the alleged adverse employment actions.[5]

   *1. Mold in the Ultrasound Suite*

Plaintiffs claim management's failure to address a mold issue in the ultrasound suite was a materially adverse employment action. Although they claim management ignored the issues in retaliation for their EEO claims, they concede that other co-

---

[4] These statements are outlined in the Court's prior order on summary judgment (Doc. 99 at 22–23).

[5] As described below, several claims also fail because there is no genuine issue of material fact as to whether the employment decisions in question were materially adverse.

workers also complained of the mold issue based on health concerns. Doc. 54-3 at 42; Doc. 54-2 at 11; Doc. 54-8 at 45–51.[6]

First, the Court agrees with Defendant that management's failure to fix the mold was neutral on its face, affected all employees, and did not deter Plaintiffs from pursuing EEO claims. *See Burgos v. Napolitano,* 330 Fed. Appx. 187, 191 (11th Cir. 2009) (holding that the defendant's "failure to consult [the plaintiff's] physician was not a materially adverse action because the evidence shows that Burgos was not deterred in reinstating her EEOC claim."). Nor do Plaintiffs cite evidence or law supporting their argument that this event well might have dissuaded a reasonable worker from making or supporting a charge of discrimination or retaliation. No reasonable jury could find that the mold in the ultrasound suite was materially adverse to the Plaintiffs. The mold affected all employees.

Even assuming that it was materially adverse, Plaintiffs fail to present evidence of any connection between their EEO complaints and management's inaction. This dooms Plaintiffs' claim, even under the more lenient causal standard, because there is no evidence upon which a jury could find that Plaintiffs' protected activity had anything to do with the employment action. As such, summary judgment must be granted for Defendant on this retaliation claim.

---

[6] Although Plaintiffs' renewed response to the motion for summary judgment appears to concede that the mold issue was not an adverse action (Doc. 119 at 34 n.23), the Court addresses the claim out of an abundance of caution.

2. *Publication of Personnel Files*

Defendant argues that publication of the confidential employee records was not an adverse employment action because personnel documents of all employees were published, not just Plaintiffs' documents. Doc. 116 at 13. It also argues that Plaintiffs fail to present any evidence tying this event to their EEO complaints, and that the incident was not materially adverse because there is no evidence the documents were accessed and Plaintiffs suffered no harm. *Id.* at 13–14. Plaintiffs respond that "the postings are a material adverse action" and that Bennett ordering an employee to upload the files is "traditional direct evidence" for their claim. Doc. 119 at 32. However, they concede that because the system only records the date the records were last modified, there is no way to know how many people saw them. *Id.* at 33.

Plaintiffs' arguments are speculative and unsupported by law or evidence. Again, they provide no proof of a connection between the publication of the files and their EEO complaints. Further, no reasonable jury could find that these events constituted a "materially adverse action," because there is no evidence the documents were accessed or that any harm was caused to Plaintiffs. *See Harrison v. Belk, Inc.,* 2017 WL 11475408, at *11–12 (N.D. Ga. July 6, 2017) (holding that management divulging an employee's private medical information to associates was "trivial and ordinary," not materially adverse); *cf. Wells v. General Dynamics Information Technology Inc.,* 571 Fed. Appx. 732, 736 (11th Cir. 2014) (holding that an employer cancelling medical insurance, insisting that plaintiff relocate, and several other cumulative actions were

not sufficiently harmful to be materially adverse.) Lastly, other employees' documents were also uploaded to the S drive. Doc. 54-7 at 127; Doc. 54-3 at 94–98. Plaintiffs thus fail to provide sufficient evidence of causation, or that the publication of the documents was materially adverse, and have not established a triable issue of fact as to this claim.

  3.  *The Geraci Hiring*

Plaintiffs claim that Defendant hired Geraci, an unqualified person, to make them appear incompetent and increase their workload. Doc. 83 at 31–32. Defendant argues that this claim must fail because Plaintiffs have not established a connection between their protected activity and Geraci's hiring, and because Geraci's hiring affected all employees equally. Doc. 116 at 14. Plaintiffs fail to substantively respond.

Again, Plaintiffs fail to establish that this incident was a materially adverse employment action since it affected all employees. Although their interactions with Geraci were contentious, and they felt she was unqualified, there is no evidence from which a reasonable jury could find that her hiring was a materially adverse action in any way related to Plaintiffs' protected activity.

First, there is no evidence that Petrillo hired Geraci to make the Plaintiffs' jobs more difficult or otherwise retaliate. All ultrasound technologists had to assist Geraci to improve her scanning. Doc. 54-3 at 50; Doc. 54-8 at 5–6, 10. Neither does the inconvenience caused by her alleged lack of experience nor her reminder of her mother's connection to people of influence at the Tampa VA create an inference of retaliation. *See Burlington,* 548 U.S. at 68 (holding that personality conflicts at work

18

that generate antipathy and snubbing by supervisors and coworkers are not actionable).

Nor have Plaintiffs established the materiality of this adverse employment action—specifically, that Geraci's hiring well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Tellingly, Plaintiffs were not deterred from pursuing additional EEO complaints. *See Burgos*, 330 Fed. Appx. at 191; *See also Jarvis v. Griffin,* 6:08-CV-138-PCF-KRS, 2009 WL 3781587, at *3 (M.D. Fla. Nov. 9, 2009), *aff'd sub nom*. *Jarvis v. Bolden,* 417 Fed. Appx. 925 (11th Cir. 2011) ("In fact, Plaintiff was not so deterred [by her employer's decision to ignore EEOC recommendation] and subsequently filed two more formal EEOC discrimination complaints."). As such, summary judgment will be granted for Defendant.

### 4. *Tonkyro*

Tonkyro claims she was denied the PCA Lead Ultrasound Technologist position in retaliation for her EEO activity. Doc. 83 ¶ 28(k). She specifically cites Stenzler's decision not to post and fill that position—choosing instead to fill a Lead Mammography position. Doc. 54-6 at 7–8. Defendant argues that Tonkyro again fails to establish a *prima facie* case of retaliation. Doc. 116 at 7–8; Doc. 54 at 16. Plaintiffs respond that this claim should survive summary judgment based on evidence of retaliatory intent in the record. Doc. 119 at 22–27.

For this claim to survive summary judgment, Tonkyro must provide evidence that her previous EEO activity played a part in differential treatment with regard to

19

this decision, and that the employment action in question was materially adverse. The relevant incident is Stenzler's decision that the PCA needed a Lead Mammography technician instead of a Lead Ultrasound technician. Tonkyro challenged this decision with the testimony of a mammography technologist who stated that three mammography technologists would be too many for the patient load, space, and equipment at the Tampa VA. Doc. 60 at 10. Stenzler, on the other hand, felt that such a technician was a better use of Radiology resources. Doc. 54-6 at 8–9.

Although *Babb* changed the applicable causal standard here, it did not change the fact that "courts do not sit as 'super-personnel departments,' reexamining the wisdom of business decisions." *See Johnson v. Airbus Def. & Space Inc.,* 858 Fed. Appx. 304, 310 (11th Cir. 2021). Stenzler's decision as to which new position would be a better use of resources was a business decision of the kind that the Eleventh Circuit has said should not be second-guessed in the absence of evidence of retaliation. *Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1244 (11th Cir. 2001) ("Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions.").

Additionally, Stenzler's alleged statements that Cutolo (Chief of Staff) and Fogarty (the former Tampa VA Director) would not allow Tonkyro to become a supervisor, that Davis would never become a supervisor, and that the plaintiffs were causing problems by filing frivolous EEOC complaints are not enough to allow a jury to find that Tonkyro's protected EEO activity played any role in the decision to fill a different position or resulted in any differential treatment. These statements might be

20

enough to attribute retaliatory motive to individuals other than Stenzler, but Plaintiffs provide no evidence of a causal connection between Tonkyro's EEOC complaints and Stenzler's personnel decision to create a mammography lead position. Thus, Plaintiffs have not established that a reasonable jury could find for Tonkyro on the issues of whether she suffered an adverse action or that there was a connection between her EEO activity and Stenzler's personnel decision. Defendant is entitled to summary judgment.

### 5. Strauser

Strauser's retaliation claim relies on events that affected all Plaintiffs, and she does not identify an adverse action unique to her claim. Doc. 83 ¶¶ 1–41. Thus, the Court again finds that she does not establish a triable issue of fact as to this claim. *See* Doc. 99 at 33. She also relies on the totality of the circumstances, i.e., the overall hostile environment created by the EEO settlement, as a basis for establishing causation. However, as discussed *supra* with regards to the mold incident, the publication of personnel documents, and Geraci's hiring, there is insufficient evidence to establish that retaliation played a role in any of these actions or resulted in differential treatment as to these actions, which affected all Plaintiffs. Thus, Defendant is entitled to summary judgment on this claim.

### 6. Davis

Davis claims she was not selected for an ultrasound supervisor position in retaliation for her EEO activities. Doc. 83 ¶ 29. She argues that Defendant's decision to empanel an AIB, which led to the position being placed on hold and her not being

selected, was a sham decision meant to allow Geraci to transfer locations. *Id.* at 21–22.

Under *Babb*, the Court must determine whether a genuine issue of material fact exists as to Davis's claim. As for causation, Davis must provide some evidence that her EEO activity played a role in the handling of Geraci's bullying complaint against her or the initiation of an AIB to investigate those claims. *Babb*, 992 F.3d at 1205.

Davis argues that these events were part of a plot to keep her from becoming an Ultrasound Supervisor and help Geraci transfer to the New Port Richey clinic despite her lack of seniority. Doc. 119 at 25–27, 29. She argues that this claim is supported by an April 20, 2016, meeting held by Geraci, Stenzler, and Petrillo to discuss Geraci's complaint against her, which occurred after she applied for the Ultrasound Supervisor role. Doc. 60 at 4. She argues that Geraci participated in the scheme against her by preparing a bullying complaint, presumably at the bidding of management. *Id.;* Doc. 119 at 24–26.

Defendant responds that this claim is wholly speculative. Specifically, it argues that Geraci—who started her job long after Davis settled her previous EEO complaint, decided to write the bullying complaint on her own. Defendant argues that Geraci detailed numerous instances of bullying and harassment and had no connection to prior EEO complaints. Doc. 54-6 at 97, 115–16. In her deposition, Geraci stated that she eventually learned about the Plaintiffs' previous EEO activity, but that she did not "know their circumstance around the other case" or "really care, to be honest, what happened in their past." *Id.* at 110. Second, Defendant argues that Geraci complained

about the bullying before the Ultrasound Supervisor vacancy announcement was issued, which undermines Plaintiff's argument that the bullying complaint was a ploy to hurt her promotion prospects. Doc. 116 at 9. Third, Defendant argues that Petrillo and Battle, both of whom were allegedly involved in the scheme to empanel an AIB, started at the Tampa VA after the settlement of Davis' prior EEO complaint and weren't involved in that case. *Id.* at 9–10.

Davis offers a few counterarguments as to why summary judgment should not be granted. First, she claims the AIB process was tainted because many statements about EEO activity "came from the highest officials," and no "corrective action" was ever taken. Doc. 119 at 11. Next, she emphasizes that she testified regarding her EEO claims on February 24, 2016, just weeks before Bennett, Stenzler, Petrillo, and Graham gave sworn affidavits. *Id.* at 12. Davis also argues that she was on maternity leave from October 2015 to February 2016 and thus could not have bullied Geraci. *Id.* at 24. To the contrary, Davis claims she brought Hernandez's sexual harassment complaints against Geraci to Petrillo's attention upon her return from leave and was only then accused of bullying. *Id.* Davis claims that the allegations against her were treated abnormally and that Cutolo and Stenzler decided to create an AIB and brought the issue to Battle's attention. *Id.* at 25. Then, she speculates, "Stenzler, Cutolo or Battle, and likely all three decided to put a hold on the supervisory position until the AIB was decided." *Id.* Davis next points out that at the AIB, Stenzler criticized Plaintiffs for "frivolous EEO's" and claimed that Davis "orchestrates these things." *Id.* at 25.  She argues that a jury could find that Battle, Stenzler, and Cutolo agreed the

position could not be filled until the AIB was decided, and—based on this—could find that Battle refused to decide whether to accept or reject the findings of the report to prevent Davis from obtaining the position. *Id.* at 26.

Defendant replies that Battle's decision to accept, reject, or modify the AIB report was not related to any EEO activity, that there is no evidence to support Plaintiffs' theory, and that Plaintiffs ignore all of the contrary evidence showing there was no differential treatment based on EEO activity, including the genesis of the AIB (a complaint of bullying against Davis by a female co-worker who joined the VA after the plaintiffs' previous EEOs), the composition of the AIB panel (individuals outside the Radiology Service who knew nothing of the plaintiffs' EEOs), the recommendation of the panel (team building and training), and Battle's reason for not acting on the AIB report (to avoid retaliation and the appearance of retaliation). *See* Doc. 54 at 15–16.

Although Davis provides evidence of management discussing Plaintiffs' EEO activity, including in Stenzler's AIB testimony, she cites no evidence supporting her argument that these statements played any role in these actions. Therefore, she fails to establish a triable issue of fact regarding whether there was a causal connection between any adverse action and her protected activity. *See Cincinnati Ins. Co. v. Metro. Props., Inc.*, 806 F.2d 1541, 1544 (11th Cir. 1986) (holding that "contentions which are based on mere speculation and conjecture are . . . impermissible" to defeat a summary judgment motion).

First, she fails to provide evidence showing that a cause of Battle's decision to empanel the AIB was her EEO activity, or that her EEO activity played any role in the process, or in Battle's decision to start the process. In the absence of any such evidence, the AIB occurred six months after Davis's last EEO claim, which is "too distant to infer causation." *See Williams v. Waste Mgmt., Inc.,* 411 Fed. Appx. 226, 229-30 (11th Cir. 2011) ("However, a two-month gap between the two events has been found to be enough of a delay to preclude an inference of causation."). Additionally, the record shows none of the AIB members worked in Radiology, and after hearing testimony from various employees in the Radiology Service, they found that Davis had indeed bullied and harassed Geraci. Doc. 54-7 at 14–24.

Overall, there is insufficient evidence to support Davis' contention that her EEO activity played a role in any differential treatment with regards to the AIB or Board's final decision. Moreover, the AIB concluded that the facts supported Geraci's Hostile Work Environment claims against Davis and co-workers in the Ultrasound Department, as well as the allegation that Davis bullied Geraci. Doc. 54-7 at 23–24. Thus, based on the record, the Court finds that no reasonable jury could find a causal link between the AIB and Davis' EEO activity, and summary judgment will be granted for Defendant.

Davis also challenges the delay in her boarding package after being selected for a new position in February 2014, which she alleges delayed her promotion to May. Doc. 83 at ¶ 29(e). The Court previously found that a non-retaliatory reason existed for the delay—the schedule of the Board—and granted summary judgment for

Defendant. Doc. 99 at 29. Nothing in *Babb* or the record compels a different result. Again, Davis' claim—that Bennett delayed her boarding package because of her EEO settlement—is speculative and unsupported by any evidence. *Cincinnati Ins. Co.*, 806 F.2d at 1544.

*Cat's Paw Theory*

In the alternative, Davis again argues that the "cat's paw" doctrine articulated in *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011) applies to her claims. Doc. 119 at 31; Doc. 60 at 27. In *Staub*, the Supreme Court explained that the cat's paw theory applies when an employee seeks to hold her employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision. 562 U.S. at 415. *Staub* concluded that an independent investigation did not relieve an employer of fault where the supervisor's biased act was intended to cause and proximately caused an adverse employment action. *Id.* at 422. Davis argues that the VA empaneled the AIB based on assertions by an individual with retaliatory animus (Stenzler) who said that Davis made frivolous EEO claims, and Petrillo and Graham gave false and misleading testimony. *Id.* She also argues that Battle's decision to reject the AIB recommendation is evidence that he inappropriately considered her EEO activity in his decision.

In any event, there is no proximate cause, and therefore no liability, if the adverse action is entirely justified apart from the biased supervisor's recommendation. *Staub,* 562 U.S. at 421–422. Here, for the same reasons Davis fails to state a *prima facie* claim, her cat's paw claim fails to survive summary judgment as well. The AIB was

empaneled based on Geraci's bullying complaints, which were ultimately found to have merit. And "while the cat's paw theory may be appropriate in cases in which the plaintiff is required to prove only that the protected characteristic was a motivating factor," Davis puts forward nothing more than speculation to explain why the AIB was retaliatory or unjustified. *Duncan v. Alabama,* 734 Fed. Appx. 637, 640 (11th Cir. May 9, 2018) (citing *Staub*, 562 U.S. 421-22). Thus, no reasonable jury could find in favor of Davis on this claim and Defendant is entitled to summary judgment.[7]

## B.       Hostile Work Environment

In Count Two, Plaintiffs bring a retaliatory hostile work environment claim, and in Count Three Hernandez brings hostile work environment claims based on retaliation and sex. Doc. 83 ¶¶ 42–51. Previously, the Court found that Defendant was entitled to summary judgment on both counts. Doc. 99 at 38–43. The Eleventh Circuit affirmed this Court's decision to enter summary judgment for Defendant on Hernandez's sex-based hostile work environment claim. Doc. 109 at 2. However, it

---

[7] Count One of the Third Amended Complaint mentions that, in addition to the Plaintiffs' EEO retaliation claim, Hernandez sues Defendant "for retaliation based upon sex." Doc. 83 ¶ 33. Defendant moves for renewed summary judgment on the retaliation claims of all the Plaintiffs. *See* Doc. 116 at 12–16.

The Complaint alleges several ways in which Hernandez has been subjected to retaliation by way of incidents that affected all employees (*Id.* ¶¶ 24–27), which the Court has considered and rejected above. It also includes allegations regarding Hernandez's sex-based hostile work environment claim, (*Id.* at ¶ 31) on which the Court previously granted summary judgment for Defendants (and which the Eleventh Circuit affirmed). The Complaint includes no other incidents that would support Hernandez's retaliation claim, and Plaintiffs fail to respond to Defendant's summary judgment motion as to this claim or cite supporting evidence. Thus, the claim is deemed abandoned, and Defendant is awarded summary judgment on this claim. *Jones v. Bank of Am., N.A.,* 564 F. App'x 432, 434 (11th Cir. 2014) (citations omitted).

remanded Plaintiffs' retaliatory hostile work environment claims for consideration under *Monaghan v. Worldplay U.S., Inc.,* 955 F.3d 855 (11th Cir. 2020). *Id.* at 13–15.

As detailed below, even under the standard in *Monaghan*, Plaintiffs fail to establish that a reasonable jury could rule in their favor on the elements of causation and/or material adversity. Therefore, the Court will again grant summary judgment in favor of Defendant.

*Monaghan* reaffirmed that the materiality standard applicable to all Title VII retaliation claims (including retaliatory hostile work environment claims) is one and the same. This is the *Burlington Northern* standard, which determines whether retaliation is material by asking whether it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan,* 955 F.3d at 862–63 (quoting *Burlington Northern*, 548 U.S. at 68). Defendant argues that Plaintiffs' claims fail under this standard, because the acts they identify were not materially adverse and the acts Hernandez identifies were neither materially adverse nor related to her EEO activity. Doc. 116 at 16–25. Plaintiffs respond that the actions taken against them were materially adverse under *Burlington Northern* and *Monaghan* and retaliatory. Doc. 119 at 34–39.

"A retaliatory-hostile-work-environment claim complains that the employer created or tolerated a hostile work environment in retaliation for an employee's participation in protected activity under Title VII . . . [and] is somewhat of a hybrid of a traditional protected-characteristic-based hostile-work-environment claim and a traditional retaliation claim." *Buckley*, 97 F.4th at 799.

To establish such a claim, a plaintiff must show that she: (1) engaged in protected EEO activity; (2) suffered unwelcome harassment; (3) the harassment was based on protected activity; and (4) the harassment was materially adverse, meaning that it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 862–63. In assessing material adversity, however, the Court must "separate significant from trivial harms" because Title VII is not "a general civility code for the American workplace," and an employee's decision to report discriminatory behavior "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern,* 548 U.S. at 68. "[E]ven when a plaintiff 'accumulate[s] a long list of slights' a court might not be able to 'discern a collective retaliation claim greater than the sum of its parts.'" *Toomer v. Mattis,* 266 F. Supp. 3d 184, 205 (D.D.C. 2017) (quoting *Lurensky v. Wellinghoff,* 167 F. Supp. 3d 1, 21 (D.D.C. 2015)).

With respect to causation, a plaintiff must show that the decision-maker knew of her protected activity, and that the protected activity and adverse action were not wholly unrelated. *Shannon v. BellSouth Telecomms., Inc.,* 292 F.3d 712, 716 (11th Cir. 2002). "At a minimum, [a plaintiff] must show that the adverse act followed the protected conduct[.]" *Griffin v. GTE Fla., Inc.,* 182 F.3d 1279, 1284 (11th Cir. 1999). "It is not enough for the plaintiff to show that someone in the organization knew of the protected expression; instead, the plaintiff must show that the person taking the adverse action was aware of the protected expression." *Bass v. Bd. of Cnty. Comm'rs,*

*Orange Cnty.*, Fla., 256 F.3d 1095, 1119 (11th Cir. 2001). "In the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir. 2007) (citation omitted).

          *i.*      *Tonkyro, Davis, and Strauser*

Tonkyro, Davis, and Strauser bring retaliatory hostile work environment claims based on events that affected all employees as well as statements made by other employees. Doc. 83 at ¶¶ 47–51. For example, they point to Stenzler's suggestion that Tonkyro apply for Eubanks' position once he retired, after which management decided to hire somebody else (Doc. 60-1 at 20, 24); Stenzler's statement that "you girls will never get past this," (Doc. 60-3 at 36–37, 60; Doc. 60-2 at 54); Chuang telling Tonkyro that he heard about the settlement; a co-worker telling Plaintiffs that Chuang told her that they received $250,000 in a settlement; and an HR employee stating that the Plaintiffs have a new case which would cost the agency money. Doc. 60-2 at 29–30; Doc. 60-1 at 61. Plaintiffs also rely on Geraci's knowledge of the EEO settlements from an unidentified Tampa VA employee to support their claim. Doc. 60-8 at 216–217. Like in a game of telephone, Geraci allegedly spoke to Axsom, who spoke to Hernandez, who in turn spoke to Tonkyro and Davis. Doc. 60-1 at 34–35; Doc. 60-2 at 28; Doc. 60-11 at 7–8. Eastham also told Plaintiffs that he heard general conversations about the EEO settlement. Doc. 60-1 at 35–36, 38.

Other incidents include the following: Parise told Eastham that Plaintiffs would be terminated; Bailey reported that Parise yelled "yes" and made a "fist pumping gesture" when he heard that Davis was going on maternity leave; Kathy Arruda reported to Davis that Jeri Graham advised her of openings in Tampa and discussed problems in the ultrasound department; and Andrews told Plaintiffs that Stenzler reported that they were filing frivolous EEO complaints which affected the ultrasound department. *See* Doc. 54 at 22. Plaintiffs also allege they were portrayed as "money hungry" and "money grubbing bitches." *See* Doc. 60-2 at 30, 41; Doc. 60-1 at 61. Although Plaintiffs contend that many staff members used the term, they could not identify any by name or the source of their knowledge. *See* Doc. 60-1 at 61; Doc. 60-2 at 41; Doc. 60-6 at 86–87. Several other acts Plaintiffs claim were retaliatory affected the entire department, as discussed in the analysis of Count One.

Defendant argues that the conduct in this case is distinguishable from *Monaghan* because Plaintiffs rely upon "a trail of office gossip" that eventually reached them, whereas in *Monaghan*, a supervisor directly told the plaintiff she would be terminated in retaliation for previous complaints. Doc. 116 at 19–20. Defendant asserts that the comments here fall into the category of petty slights that Title VII is not meant to remedy, and that certain other comments and incidents were facially neutral and lacked any connection to Plaintiffs or their EEO activity. *Id.* Finally, Defendant argues that Plaintiffs were not deterred from filing subsequent complaints, which shows that the conduct was not materially adverse. *Id.* at 21. Plaintiffs respond by discussing—at length—the intervening decisions and standards the Eleventh Circuit identified and

instructed this Court to apply. Doc. 119 at 33–39. However, they do so in lieu of applying the law to the facts. Nor do they respond to Defendant's argument distinguishing the case from *Monaghan*.

Summary judgment will be granted in favor of Defendant on all the retaliatory hostile workplace claims because the identified acts are: (1) not materially adverse under *Monaghan*—i.e., they would not have dissuaded a reasonable employee from engaging in protected activity; and (2) there is no evidence that the events are related in any way to Plaintiffs' EEO activity.

First, the Court discusses the actions that affected all employees equally: management's failure to promptly remediate the mold in the ultrasound suite; its decision to hire Geraci in August 2015; the publication of the confidential employee records; and the advertisement of the position created by Eubanks' retirement as a DRT licensed position. Again, the Court agrees with Defendant that these employment actions, common to all Plaintiffs, are neutral on their face and are not materially adverse employment actions as contemplated by Title VII. *See Mason v. Geithner,* 811 F. Supp. 2d 128, 180 (D.D.C. 2011), *aff'd*, 492 F. App'x 122 (D.C. Cir. 2012). Moreover, Plaintiffs fail to show evidence of any connection between these events and their prior EEO activity. Thus, because no reasonable jury could find that these events were materially adverse or that they were related to Plaintiffs' prior EEO activity, Defendant is entitled to summary judgment. *Shannon v. BellSouth Telecomms., Inc.,* 292 F.3d 712, 716 (11th Cir. 2002).

Next, the Court considers the comments from colleagues and supervisors that eventually made their way to Plaintiffs. The Court agrees with Defendant that the remarks are not materially adverse, and thus not actionable under Title VII. As an example, Plaintiffs complain that they were labeled as "money hungry" or "money grubbing bitches." However, they are unable to identify who said this or the source of their knowledge. *See* Doc. 54-1 at 52; Doc. 54-2 at 22; Doc. 54-7 at 57.  In addition to the fact that the speaker is unknown, these comments, while negative, do not present evidence of retaliation akin to the facts in *Monaghan*. 955 F.3d at 858 (reversing a grant of summary judgment for an employer where an employee was "berated for 45 minutes regarding her complaints," advised that she had "cut her own throat," that she would be "blackballed," that her days at the company were numbered, and that she "better watch it" because the supervisor knew her address.") Here, it is not clear from whom the comments originated, none of them were physically threatening, as in *Monaghan*, and the comments fall under the category of "petty slights" that Title VII does not cover. *Burlington Northern,* 548 U.S. at 68. Other comments, like Graham speaking to Kathy Arruda about job openings at Bay Pines or Stenzler saying that Cutolo and Fogarty wanted to fill Eubanks' position with someone outside the facility, are facially neutral and have no connection to the plaintiffs or their EEO activity.

Additionally, Plaintiffs were not deterred from filing additional complaints. Although not dispositive, this is relevant to the analysis under *Monaghan*, as subsequent EEO complaints tend to show Defendant's conduct was not materially adverse. *See Burgos*, 330 Fed. Appx. at 191; *Shannon v. Postmaster Gen. of U.S. Postal*

*Serv.*, 335 Fed. Appx. 21, 27 (11th Cir. 2009) (plaintiff's filing of his last two EEOC complaints after the alleged adverse action raised doubt as to whether the actions might have dissuaded a reasonable worker from making a charge of discrimination).

Plaintiffs also claim that Parise and Bennett were responsible for many of the actions taken against them, which they support by pointing to an encounter with Parise in 2014 where he allegedly told Plaintiffs that they "will never get past this." Doc. 83 at 12 ¶ 28(h). However, Plaintiffs had minimal contact with Parise thereafter, and this isolated incident is insufficient to allow a reasonable jury to find for Plaintiffs on their retaliatory hostile workplace environment claim, based on a lack of causation evidence and (as relevant to materiality), the fact that Plaintiffs were not dissuaded from complaining about the incident immediately after it happened. In conclusion, even under *Monaghan*, Defendant is entitled to summary judgment on all of Plaintiffs' hostile work environment claims.

### ii.   *Hernandez*

Hernandez's claim is based on bullying by Geraci and an ultrasound tech named Victor Martinez, as well as Petrillo's failure to act on her complaints about the bullying. Doc. 83 ¶¶ 24–27, 31, 47–51. Also, Hernandez asserts that she was forced to perform additional ultrasounds because Geraci was not performing her duties. *Id.* ¶ 31(jj). Even after *Monaghan,* Hernandez must demonstrate that her protected activity was causally connected to the "accumulation of actions." *Gowski*, 682 F.3d at 1313. Hernandez offers no evidence to satisfy that causal standard, other than asserting she signed an EEO affidavit in support of Plaintiffs' 2014 EEO complaints. That alone

does not establish that the actions of Geraci, Martinez, and Petrillo were based in any way on Hernandez's EEO activity. Therefore, Hernandez's claim fails because there is no evidence it was tied to her protected activity.

Moreover, under *Monaghan*, no reasonable jury could find that the conduct would dissuade a reasonable employee from engaging in EEO activity. Instead, the acts in question are the kinds of petty slights and typical tribulations of the workplace that Title VII typically does not cover. *Burlington Northern,* 548 U.S. at 68. The Circuit Court's analysis in affirming summary judgment on Hernandez's sex-based hostile work environment claim is helpful here, as the two claims were based largely on the same allegations. It first found that Geraci's angry looks, harsh words, and silent treatment toward Hernandez "suggest[ed] that Geraci was angry at Hernandez because Hernandez reported Geraci for sexual harassment." *Tonkyro,* 995 F.3d at 838. Without more, however, the Circuit Court found that this conduct was "insufficiently severe or pervasive to alter the terms and conditions of Hernandez's employment." *Id.*

Although the Court applies a broader materiality standard here, the claims based on Geraci's conduct nonetheless fail because the actions amount to nothing more than ordinary tribulations of the workplace and "normally petty slights, minor annoyances, and simple lack of good manners" which are not actionable under Title VII. *Burlington Northern*, 548 U.S. at 68. The same is true of the teasing by Martinez and disputes over who is to conduct which ultrasounds or how work is split up. These are not the kinds of acts that would deter victims of discrimination from complaining under *Burlington Northern* and in fact did not deter Hernandez from complaining.

Furthermore, the context of the conduct matters, and Hernandez points to no conduct or comments that were physically threatening or suggested a retaliatory hostile work environment based on prior EEO activity.

Therefore, for the reasons described above, the Court finds that Hernandez has not established a genuine issue of material fact as to whether the conduct in question was materially adverse or related in any way to her EEO activity. She therefore fails to establish a triable issue of fact as to her hostile work environment claim, and summary judgment is again due to be granted in favor of Defendant.

Accordingly, it is **ORDERED AND ADJUDGED:**

1.     Defendant's Renewed Motion for Summary Judgment (Doc. 116) is **GRANTED**.

2.     The Clerk is directed to enter Judgment in favor of Defendant Secretary, Department of Veterans Affairs, and against Plaintiffs Erin Tonkyro, Dana Strauser, Kara Mitchell-Davis, and Yenny Hernandez.

3.     The Clerk is further directed to terminate any pending motions and deadlines and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida on June 5, 2024.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record